# 22-2106-cv(L),
## 22-3063-cv(CON), 22-3120-cv(CON)

# United States Court of Appeals

*for the*

# Second Circuit

DIAGEO NORTH AMERICA, INC.,

*Plaintiff-Counter Defendant-Appellee,*

– v. –

W.J. DEUTSCH & SONS LTD., DBA Deutsch Family Wine & Spirits,
BARDSTOWN BARREL SELECTIONS LLC,

*Defendants-Counter Claimants-*
*Counter Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANTS-COUNTER CLAIMANTS-COUNTER DEFENDANTS-APPELLANTS

MICHAEL S. CRYAN
ARENTFOX SHIFF LLP
Prudential Tower
800 Boylston Street, 32nd Floor
Boston Massachusetts 02199
(212) 973-6100

ZACHARY D. SMITH
ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, DC 20006
(202) 857-6000

NEIL LLOYD
ARENTFOX SCHIFF LLP
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606
(312) 258-5500

*Attorneys for Defendants-Counter Claimants-*
*Counter Defendants-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Defendants/Counterclaim Plaintiffs – Appellants W.J. Deutsch & Sons Ltd. d/b/a Deutsch Family Wine & Spirits, and Bardstown Barrel Selections LLC certifies the following: neither party has a parent corporation and no publicly held corporation owns 10% or more of either party's stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ............................................................................ v

I.     PRELIMINARY STATEMENT ....................................................1

II.    JURISDICTIONAL STATEMENT .............................................4

III.   QUESTIONS PRESENTED ........................................................5

IV.    STATEMENT OF THE CASE .....................................................6

     A.     Nature of the Action ..............................................................6

     B.     Relevant Procedural History ...............................................7

     C.     Relevant Factual Background ...........................................11

         1.     The Asserted Bulleit Design Mark and Trade Dress ................11

         2.     The Accused Redemption Bottle and Packaging.......................15

         3.     Evidence Diageo Offered to Support the Fame of the Bulleit Trade Dress and the Redemption Packaging's Claimed Dilution Thereof ........................................18

             a.     Advertising Expenditures and Brand Investment...........19

             b.     Sales...................................................................19

             c.     Advertising and Marketing Efforts.................................19

             d.     Lack of Survey Evidence Supporting Fame or Dilution ...........................................................23

             e.     Lack of Evidence of Widespread Association Among the U.S. Public ...................................27

         4.     The Injunction ........................................................29

         5.     The Sur Lee Motion ................................................30

         6.     The Non-Embossed Redesign Motion ......................32

V.     SUMMARY OF ARGUMENT...................................................36

VI.   ARGUMENT ...................................................................................... 38

    A.   Deutsch Is Entitled to Judgment on the Trade Dress Dilution
        Claims ........................................................................................ 38

        1.   Standard of Review ................................................................ 38

        2.   Lanham Act Dilution ............................................................. 39

                a.   Dilution By Blurring Requires a "Famous" Mark .......... 39

                b.   Evidence of Bulleit Advertising and Sales Prior
                     to November 2016 Insufficient to Support a
                     Finding of Fame as a Matter of Law ............................. 43

                        (1)   Evidence of Moderate Spending On
                              Advertising and Publicity Insufficient To
                            Show Fame ......................................................... 43

                        (2)   Evidence of Relatively Modest Volume of
                              Sales Insufficient to Support a Finding of
                            Fame ................................................................... 45

                c.   Record Does Not Support Actual Association of
                       the Bulleit Trade Dress with Bulleit Whiskey
                     Prior to November 2016 ................................................. 46

        3.   Deutsch Is Entitled to Judgment on the New York
             Dilution Claim ....................................................................... 50

                 a.   New York Dilution Requires Substantial
                     Similarity ....................................................................... 50

                b.   Insufficient Evidence of the Required Similarity ........... 51

                c.   The No-Likelihood-of-Confusion Finding Is
                     Also Dispositive ............................................................ 53

    B.   In the Alternative, An Instructional Error Warrants a New
        Trial ........................................................................................... 55

        1.   Legal Standard ....................................................................... 56

        2.   "Fame" Was Insufficiently Contextualized, Prejudicing
            Deutsch .................................................................................. 56

C.    The District Court Abused Its Discretion When it Held the Sur Lee and Non-Embossed Redemption Packaging Would Be Inconsistent with the Injunction.......................................................58

    1.    Legal Standards..........................................................................59

    2.    The Sur Lee and the Non-Embossed Redesign are Compliant...............................................................................60

VII.    CONCLUSION ...............................................................................64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Akiro LLC v. House of Cheatham, Inc.*,
  946 F. Supp. 2d 324 (S.D.N.Y. 2013) ..........................................................51

*Car Freshner Corp. v. Am. Covers, LLC,*
  419 F. Supp. 3d 407 (N.D.N.Y. 2019), *aff'd in part,*
  *rev'd in part on other grounds*, 980 F.3d 314 (2d Cir. 2020) ........... 44-45, 50

*Caruolo v. John Crane, Inc.*,
  226 F.3d 46 (2d Cir. 2000) ........................................................................39

*Chevron Corp. v. Donziger,*
  990 F.3d 191 (2d Cir. 2021) ......................................................................59

*Coach Servs., Inc. v. Triumph Learning LLC,*
  668 F.3d 1356 (Fed. Cir. 2012) ........................................................... 40, 41

*Dancy v. McGinley*,
  843 F.3d 93 (2d Cir. 2016) ........................................................................56

*Diageo N. Am., Inc. v. W.J. Deutsch & Sons Ltd.*,
  No. 17 CIV. 4259 (LLS), 2022 WL 16748778
  (S.D.N.Y. Nov. 7, 2022) ............................................................................10

*Diageo N. Am., Inc. v. W.J. Deutsch & Sons Ltd.*,
  No. 17 CIV. 4259 (LLS), 2022 WL 4093752
  (S.D.N.Y. Sept. 7, 2022) ..............................................................................9

*DigitAlb, Sh.a v. Setplex, LLC*,
  284 F. Supp. 3d 547 (S.D.N.Y. 2018) ............................................. 40, 41, 42

*E-21 Glob., Inc. v. Second Renaissance, LLC*,
  360 F. App'x 172 (2d Cir. 2009) ................................................................38

*Easy Spirit, LLC v. Skechers U.S.A., Inc.*,
  515 F. Supp. 3d 47 (S.D.N.Y. 2021) ..................................................... 50-51

*ExxonMobil Oil Corp. v. TIG Ins. Co*.,
  44 F.4th 163 (2d Cir. 2022), *cert. dismissed*,
  No. (R46-7 / OT 2022), 2022 WL 17971294 (U.S. Dec. 27, 2022) .............60

v

*Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*,
    136 F.3d 276 (2d Cir. 1998) .........................................................39

*Glob. Brand Holdings, LLC v. Church & Dwight Co.*,
    No. 17-CV-6571 (KBF), 2017 WL 6515419
    (S.D.N.Y. Dec. 19, 2017) ...........................................................41

*Heller Inc. v. Design Within Reach, Inc.*,
    No. 09 Civ. 1909 (JGK), 2009 WL 2486054
    (S.D.N.Y. Aug. 14, 2009)...................................................... 40-41

*Jada Toys, Inc. v. Mattel, Inc.*,
    518 F.3d 628 (9th Cir. 2008) ......................................................45

*LeBlanc-Sternberg v. Fletcher*,
    143 F.3d 748 (2d Cir. 1998) .......................................................60

*Luv N' Care, Ltd. v. Regent Baby Prods. Corp.*,
    841 F. Supp. 2d 753 (S.D.N.Y. 2012) ................................... 42, 45

*Miliea v. Metro-N R.R. Co.*,
    658 F.3d 154 (2d Cir. 2011) .......................................................56

*Miss Universe, L.P., v. Villegas*,
    672 F. Supp. 2d 575 (S.D.N.Y. 2009) .........................................54

*Murray v. UBS Sec., LLC*,
    43 F.4th 254 (2d Cir. 2022) ........................................................56

*Nabisco, Inc. v. PF Brands, Inc.*,
    191 F.3d 208 (2d Cir. 1999) .......................................................51

*Nabisco, Inc. v. PF Brands, Inc.*,
    50 F. Supp. 2d 188 (S.D.N.Y.), *aff'd*, 191 F.3d 208 (2d Cir. 1999) .............45

*Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*,
    198 F. Supp. 2d 474 (S.D.N.Y. 2002) .........................................42

*Nike, Inc. v. Nikepal Int'l, Inc.,*
    No. 2:05–CV–1468–GEB–JFM, 2007 WL 2782030
    (E.D. Cal. Sept. 18, 2007)...........................................................45

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005) .......................................................56

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 (2000)............................................................. 38-39

*Savin Corp. v. Savin Grp.*,
    391 F.3d 439 (2d Cir. 2004) ..........................................................52

*Starbucks v. Wolfe's Borough Coffee, Inc.*,
    588 F.3d 97 (2d Cir. 2009) ................................................. 50, 52

*Strange Music, Inc. v. Strange Music, Inc.*,
    326 F. Supp. 2d 481 (S.D.N.Y. 2004) ..........................................50

*Truskoski v. ESPN, Inc.*,
    60 F.3d 74 (2d Cir. 1995) ................................................... 59-60

*Warren v. Pataki*,
    823 F.3d 125 (2d Cir. 2016) ..........................................................56

*Zervos v. Verizon New York, Inc.*,
    252 F.3d 163 (2d Cir. 2001) ..........................................................60

**Statutes & Other Authorities:**

15 U.S.C. § 1121 ...............................................................................4

15 U.S.C. § 1125(c)(1) .....................................................................18

15 U.S.C. § 1125(c)(2)(A) ..................................................... 18, 40, 41

15 U.S.C. § 1125(c)(2)(B) ...............................................................39

28 U.S.C. § 1291 ...........................................................................4, 5

28 U.S.C. § 1331 ...............................................................................4

28 U.S.C. § 1332 ...............................................................................4

28 U.S.C. § 1338 ...............................................................................4

28 U.S.C. § 1367 ...............................................................................4

4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition
    § 24:117 (2004)...........................................................................50

4 McCarthy on Trademarks and Unfair Competition § 24:107-10 ........42

New York General Business Law § 360-l .........................................7, 50

# I.    PRELIMINARY STATEMENT

This appeal raises important issues with respect to dilution under federal and New York law, including concerning the sufficiency of the evidence to find fame under federal law and substantial similarity under New York law.  Plaintiff Diageo North America, LLC ("Diageo") sued defendants W.J. Deutsch & Sons Ltd. d/b/a Deutsch Family Wine & Spirts and Bardstown Barrel Selections LLC (collectively, "Deutsch") for trade dress infringement and dilution under federal law and for dilution under New York law, contending that the packaging of certain of Deutsch's Redemption Bourbon and Rye infringed and diluted the trade dress of Diageo's Bulleit Bourbon and Rye.  The jury returned verdicts in Deutsch's favor on the infringement claims (likelihood of confusion and willfulness) and on the claim of willful dilution, thereby eliminating every claim that Diageo had for monetary damages.  The jury returned a verdict in Diageo's favor on dilution under both federal and New York law.  As a result, the district court entered a permanent injunction barring Deutsch from marketing certain Redemption Bourbon and Rye on the ground that a redesign was necessary to prevent Redemption from diluting by blurring the supposed fame of Bulleit.

While the jury concluded that Bulleit is famous, it is not, as a matter of law. It is not the Beatles.  It is not Disney.  It is not Nike.  It is not Jack Daniels.  And

while Bulleit is widely available across America, ubiquity is not the same thing as fame.

Congress understood that it is possible to persuade a jury without evidence. That is why we have Rule 50. Bulleit is not famous under the Lanham Act and Redemption is not substantially similar to Bulleit for purposes of the New York dilution statute. The evidence introduced at trial – construed in the light most favorable to Diageo, the prevailing party on the dilution claims – failed to show the requisite level of fame or substantial similarity. The evidence was sparse, anecdotal, and limited to consumers of whiskey. The limited survey evidence that Diageo introduced failed to show that Bulleit was famous among the general public; it in fact showed the opposite. Nor did Diageo offer substantial evidence in respect to Bulleit's supposed fame in the period preceding Deutsch's launch of its Redemption Bourbon and Rye in the later-challenged packaging, as required by the federal dilution statute. The judgment accordingly lacks substantial evidence. It should be reversed, and along with it the permanent injunction.[1]

In the alternative, if the Court concludes that there is insufficient evidence to support the New York dilution claim (resulting in the entry of judgment as a matter of law in favor of Deutsch on the New York dilution claim), but that there is

_____

[1] If the judgment is reversed in its entirety, then the post-injunction orders that Deutsch has separately appealed will no longer be valid and Deutsch's appeal of those orders will be moot.

sufficient evidence to support the federal dilution claim (resulting in the denial of Deutsch's request for judgment as matter of law on the federal dilution claim), then an error in the jury instructions requires a new trial on the federal dilution claim. Here's why: "fame" for purposes of the federal dilution statute requires fame among the general public, not fame within a niche market, here whiskey drinkers. To properly guide the jury in determining whether Bulleit was famous for purposes of the federal dilution claim, Deutsch requested — consistent with its theory of the case and the evidence presented at trial — that the jury be instructed that fame within a niche market was insufficient. The district court reversibly erred in refusing to give this instruction.

Additionally, in the alternative, should the Court affirm the judgment in whole or in part concerning the federal and New York dilution findings, then Deutsch requests that the Court reverse each of the trial court's post-judgment orders concerning the Sur Lee and Non-Embossed Redesign Motions. Deutsch twice sought the district court's approval for two designs that are undoubtedly distinct from Bulleit.[2]  The district court turned both requests down, but even on

---

[2] Deutsch filed a third motion, which is not the subject of this appeal, seeking a determination that a different packaging, which Deutsch sought to use as an interim measure during a redesign process, was consistent with the injunction.  Diageo did not oppose this third request and the district court entered an order permitting Deutsch to use the requested packaging.

the highly deferential review afforded a district court in interpreting its own injunction, the orders, respectfully, do not stand up.

Diageo sued Deutsch for substantial damages on the ground that the Redemption Packaging infringed Bulleit (willfully so) and that Deutsch was a willful diluter by blurring of Bulleit. The jury disagreed and Diageo accordingly recovered no monetary damages. Diageo did not appeal. The claims that are left – claims of fame by a mark that is not famous, claims of substantial similarity when even modest scrutiny shows that the designs are not substantially similar at all — lack sufficient evidence. The jury rejected nearly all of Diageo's claims because Deutsch acted properly and Redemption does not infringe Bulleit. Because there is no evidence to support the dilution claims that remained, Deutsch requests that the Court grant judgment in its favor.

## II.   JURISDICTIONAL STATEMENT

The U.S. District Court for the Southern District of New York had jurisdiction over the claims and counterclaims in this matter pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1332, 1338, and 1367. Appellate jurisdiction in the main appeal (No. 22-2106) is proper under 28 U.S.C. §1291 because the notice of appeal was filed on September 26, 2022 from a final judgment entered on

September 12, 2022. SPA-39.[3] Appellate jurisdiction is proper under Section 1291 in the two post-judgment appeals because both orders appealed were entered after final judgment and the notices of appeal were filed within 30 days. The first of these orders (appeal No. 22-3063) was entered on November 7, 2022 and the notice of appeal was filed on November 29, 2022. JA7342. The second of these orders (appeal No. 22-3120) was entered on December 8, 2022 and the notice of appeal was filed on December 9, 2022. JA7344.

### III.   QUESTIONS PRESENTED

1. Whether Deutsch is entitled to judgment as a matter of law on Diageo's federal dilution claim because the evidence was insufficient to support the level of fame required.

2. Whether Deutsch is entitled to judgment as a matter of law on Diageo's New York dilution claim because the evidence was insufficient to support a finding of substantial similarity between Diageo's design mark and trade dress and Deutsch's Redemption bottle and packaging, as required under New York dilution law.

3. Whether, in the alternative, Deutsch is entitled to a new trial on the federal dilution claim because its proposed jury instruction concerning "niche fame" (that

_____

[3] "SPA" and "JA" refers to the parties' Special Appendix and Joint Appendix for this appeal, filed contemporaneously herewith.

is, that fame among whiskey consumers is insufficient to establish fame for purposes of dilution under the Lanham Act) properly stated the law and the refusal to give the instruction was substantially prejudicial.

4. Whether, should the Court reach the issue, the trial court abused its discretion in holding that either or both of the redesigns for which Deutsch unsuccessfully sought a compliance determination were not acceptable under the permanent injunction.

## IV.    STATEMENT OF THE CASE

### A.    Nature of the Action

These consolidated appeals arise from (1) a final judgment after a jury trial and (2) two post-judgment orders seeking a judicial determination that different proposed packing would be consistent with the permanent injunction.[4] Diageo sued Deutsch, contending that the bottle design and packaging of certain of Deutsch's Redemption whiskeys at issue (the "Redemption Packaging") infringed and diluted

---

[4] As explained below, the first of these requests concerned the what is referred to as the "Sur Lee" packaging, a request that Deutsch made during the period that the injunction was temporarily stayed; accordingly, Deutsch was under no prohibition from selling Redemption in the Sur Lee packaging and indeed was not prohibited from selling Redemption in the packaging covered by the injunction.  The second request, concerning non-embossed packaging, was made after the injunction went into effect following this Court's denial of Deutsch's request for a stay pending appeal;  this second request accordingly sought a pre-release compliance determination from the district court.  Because the district court denied this second request, Deutsch has not marketed Redemption in this packaging.

Diageo's asserted trade dress rights in the bottle design and packaging for Bulleit whiskey (the "Bulleit Trade Dress"). The jury rejected Diageo's claims for infringement, for willful infringement, and for willful dilution, and Diageo did not appeal the judgment seeking reversal of those claims or a new trial. The jury found in favor of Diageo and against Deutsch on Diageo's claims for dilution under federal and New York law.  As a result, the trial court to entered a permanent injunction with respect to the Redemption Packaging and retained jurisdiction with respect to the scope of that injunction.

## B.    Relevant Procedural History

On June 6, 2017, Diageo filed its complaint against Deutsch in the United States District Court for the Southern District of New York. JA67. The complaint sought, in relevant part, monetary damages and injunctive relief for (i) trade dress infringement and dilution under Sections 32(1), 43(a), and 43(c) of the Lanham Act; (ii) trade dress dilution under Section 360-l of the New York General Business Law; and (iii) common law trademark infringement and unfair competition. *Id.* Deutsch answered the complaint on July 25, 2017 and amended its answer on September 28, 2017. JA88. Deutsch denied Diageo's allegations and asserted several counterclaims, none of which is at issue in this appeal. *Id.*

On October 11, 2019, following the completion of discovery, the parties filed dispositive motions: Deutsch for partial summary judgment in its favor on its

affirmative defenses and counterclaims, Diageo for summary judgment dismissing Deutsch's amended counterclaims and affirmative defenses.  JA24–26. On March 11, 2020, the District Court denied both motions, finding that there were genuine issues of material facts to be resolved at trial. JA31.

A jury trial was held from May 12, 2022, until June 1, 2022. On May 23, 2022, after the close of evidence in Diageo's affirmative case, Deutsch moved both orally and in writing for judgment as a matter of law under Rule 50(a), contending that there was insufficient evidence for a jury to find in Diageo's favor on its federal and state dilution claims. JA1327:2-12; JA1327:13– JA1329:10. The district court denied the motion with leave to renew after the close of all the evidence. *See* JA1352:23– JA1353:1.

On June 1, 2022, the jury returned a verdict in favor of Deutsch on Diageo's trade dress infringement counts (and explicitly found no likelihood of confusion), and in favor of Diageo on its federal and New York state dilution counts (explicitly finding that the Bulleit Trade Dress was "famous" for purposes of federal dilution). *See* JA2212:13– JA2213:25. The jury also held that any likelihood of dilution was not willful, eliminating all monetary damages claims from the case. *See* JA2214:6– 8. The district court did not immediately enter judgment following the verdict.

On July 1, 2022, before entry of judgment, Deutsch renewed its motion for judgment as a matter of law under Rule 50(b) and separately moved for a new trial

under Rule 59. *See* JA58. That same day, Diageo filed a motion for a permanent injunction based on the dilution verdict. *See* JA58. On September 7, 2022, the district court denied Deutsch's Rule 50 motion and granted Diageo's motion for a permanent injunction. SPA-1; *see also Diageo N. Am., Inc. v. W.J. Deutsch & Sons Ltd.*, No. 17 CIV. 4259 (LLS), 2022 WL 4093752 (S.D.N.Y. Sept. 7, 2022). The next day, Deutsch moved the district court for a stay of any permanent injunction pending Deutsch's appeal. JA60.

On September 12, 2022, the district court entered final judgment against Deutsch on Diageo's dilution claims, pursuant to which it issued a permanent injunction (SPA-39, the "Injunction"), enjoining Deutsch from continuing to sell whiskey in the Redemption Packaging that was "at issue in this litigation and any other colorable imitation thereof." *Id*. The Injunction, while allowing Deutsch to retain certain "unchallenged aspects" of the Redemption Packaging, also directed Deutsch to "undertake a change to the Redemption glass bottle and packaging that will convey a substantially different commercial impression." *Id.* The district court retained "jurisdiction over the parties and the subject matter of this litigation for the purpose of interpretation, enforcement, or modification of [the Injunction." *Id*.

On September 13, 2022, the district court denied Deutsch's motion to stay the Injunction pending appeal, but granted a temporary stay pending disposition of Deutsch's request for a stay from this Court. *See* JA61.

On September 14, 2022, with the temporary stay in effect, Deutsch filed a motion for clarification of the Injunction, seeking a ruling that a packaging design for a specialty whiskey product sold by Deutsch called Redemption Sur Lee ("the Redemption Sur Lee design"), which was already in the marketplace, was consistent with the Injunction. *See* JA61 (the "Sur Lee Motion"). The Redemption Sur Lee design utilized dark, opaque glass for two thirds of the bottle instead of clear and colorless glass like the Bulleit bottle. *See Id*. On November 7, 2022, after a hearing and additional briefing, the district court denied the Sur Lee Motion. *See* SPA-41; *see also Diageo N. Am., Inc. v. W.J. Deutsch & Sons Ltd*., No. 17 CIV. 4259 (LLS), 2022 WL 16748778, at *1 (S.D.N.Y. Nov. 7, 2022).

On November 8, 2022, this Court denied Deutsch's request for a stay pending appeal.

On November 16, 2022, Deutsch filed a motion with the district court for a pre-release compliance determination based on a proposed redesign of the Redemption Packaging ("the "Non-Embossed Redesign" Motion). This proposed redesign changed six of the seven elements to the Redemption Packaging that Diageo had claimed comprised the Bulleit trade dress, including removing raised embossed lettering from the glass bottle. JA64. Following a hearing on December 7, 2022, the district court entered an order on December 8, 2022 denying the Non-Embossed Redesign Motion. SPA-83.

On November 29, 2022, and December 9, 2022, Deutsch timely filed notices of appeal of the district court's denials of the Sur Lee Motion and the Non-Embossed Redesign Motion, respectively. JA7342–JA7344. The Court consolidated these appeals with the appeal of the final judgment.

## C.     Relevant Factual Background[5]

### 1.     The Asserted Bulleit Design Mark and Trade Dress

Diageo owns a registered design mark and an unregistered trade dress covering the Bulleit bottle and packaging. The registered mark, Trademark Registration No. 3,075,812 (the "Bulleit Design Mark") was issued in 2006. The drawing submitted with the registration is depicted below:

---

[5] Because Diageo prevailed on its federal and state dilution claims, the facts have been set out below in the light most favorable to the jury's verdict on those claims.



JA2495. The registration for the Bulleit Design Mark states that the mark consists

of:

> the three-dimensional configuration of a bottle that is used
> to contain the goods, as well as a label design and
> protruding words and designs. The label design with
> ridged edges is claimed as a feature of the mark, the
> protruding words, bullet bourbon frontier whiskey, the
> protruding line below bullet bourbon, and the four
> protruding dots below frontier whiskey are all also
> claimed as features of the mark.

JA2495.

In its complaint, Diageo alleged that the Bulleit Design Mark and its asserted

unregistered trade dress (the "Bulleit Trade Dress") together comprise the

combination of the following elements:

a. Clear canteen-shaped glass bottle with rounded shoulders;

b. Embossed brand name above the label;

c. Arched text in the top line of the embossed brand name;

d. Convex text divider between components of the embossed brand name

(*e.g.* "BULLEIT BOURBON" separated from "FRONTIER WHISKEY");

e. Arrow-shaped text divider on the label;

f. Border of parallel lines on the label; and

g. Cork bottle cap with black top.

JA71. At trial, however, Edward Bello – Diageo's then senior director in charge of the Bulleit brand – testified that the Bulleit Trade Dress comprised the combination of (i) the canteen shape of the glass bottle, (ii) the raised "embossed" lettering on the glass bottle, (iii) the size and placement of the embossed lettering, (iv) the border on the label, and (v) the black cap, thereby eliminating items (d) and (e) from the Complaint from the elements assertedly comprising the Bulleit Trade Dress. JA335:10-18 .

One of the Bulleit bottles at issue is depicted below, with the five trade dress elements claimed at trial identified:



Throughout the trial, Diageo made clear that it was the combination of these elements, not any one or subset of them, that comprised the Bulleit Trade Dress, and that Diageo was not claiming exclusive rights in any one or subset of the individual elements in isolation. JA335:14-18. For example, Mr. Bello testified that all the trade dress elements "together, is really what creates our very distinctive and unique trade dress." *Id.* Mr. Bello testified that Diageo is not claiming exclusive rights in "embossing on spirits bottles," or in the use of "a label with a border," or even in "a clear canteen-shaped bottle with rounded shoulders." JA334:21-JA335:18; JA578:18-24; JA576:15-JA577:8; JA577:13-JA578:6.

### 2. The Accused Redemption Bottle and Packaging

In June 2015, Deutsch acquired the Redemption Whiskey brand. *See* JA596:14-17. At that time, the whiskey was sold in a bottle packaging that comprised, among other things, a tall, clear cylindrical bottle design, with a black top, and a label covering roughly half the bottle.

After conducting marketing research, Deutsch discovered that whiskey consumers did not have a positive response to the design of the original Redemption bottle packaging. JA1219:7-22. Many found the original Redemption bottle to be too tall and sleek and reported that its design was more reminiscent of an olive oil or shampoo bottle than of a whiskey bottle. JA925:8-19; JA1219:7-22; . The research showed that whiskey consumers preferred a more "masculine" bottle design and packaging, such as the ones utilized, for example, by Templeton, Old Overholt, High West, or Bulleit. *Id. See also* JA975:1-7.

As a result, Deutsch decided to redesign the Redemption bottle and packaging to have more "masculine" cues, including a wider, squatter glass bottle with a whiskey-appropriate flask-like shape, which is one of the "classic shapes that [consumers] really felt like that says whiskey" and the "quintessentially whiskey" bottle shape. JA1227:4-22. As Deutsch went through the initial research stages of the redesign process, Deutsch's consumer research found that whiskey consumers had a strong positive association with the Bulleit bottle and packaging.

JA2437. One of Deutsch's marketing employees, Jennifer Thomason, remarked that she hoped that one of the Redemption redesigns could approach that positive affinity consumers had for Bulleit.   JA2267;  *see also* JA2226; JA1224:16-JA1225:22; JA622:1-17 ; ; JA931:2-7; JA1153:23- JA1154:5; JA1162:20-JA1163:1.

At the time that Deutsch was engaged in redesigning the Redemption bottle and packaging, there were an array of third-party flask-shaped whiskey and spirits bottles in the market. *Id. See also for example* JA6761 {Maker's 46}; JA3767 {Black Bottle}; JA3506 {Dr. McGillicuddy's Butterscotch}; JA6760 {Fireball}; JA6763 {Highland Park}; JA6762 {Plymouth Gin}; and JA6755 {Singleton}; and JA6754 (Bib & Tucker).  *See* images below:



After months of research and multiple proposed designs, Deutsch officially launched the new Redemption design in November 2016 (the "Redemption Packaging"), as shown below. *See* JA6749- JA6750 (depicted below).



The individual elements of the Redemption Packaging are each different from the individual elements of the Bulleit Trade Dress. *See* JA6742-JA6746; JA2885; PX 418}; *see also* JA2996; JA3002.

Viewed side by side, the caps are different, as are the labels, which are not only different in shape but are positioned differently on the front face of the respective bottles. JA3081. Both bottles have embossed lettering which is common among premium brands, but the fonts and logo styles are different and are positioned and sized differently (Redemption's embossed lettering occupies the top front of the bottle while Bulleit's is more prominent, covering more than half of the space on the front of the bottle). JA3081. The shapes of the bottles are also different. JA3081-JA3086. While they share a general flask-like shape (like a large portion of the whiskey segment), the shoulders and side taper of the two shapes are

different, and the Redemption bottle has a concave rounded back, which is different from Bulleit's bottle. JA3082-JA3085.

While Diageo admitted that each of the individual elements of the two trade dresses is different, it argued that, taken together, the Redemption Packaging had the same overall look and feel as the Bulleit Trade Dress. .

### 3. Evidence Diageo Offered to Support the Fame of the Bulleit Trade Dress and the Redemption Packaging's Claimed Dilution Thereof

To establish likelihood of dilution under the Lanham Act, a plaintiff must establish, among other things, that its asserted trade dress (i) is famous, *i.e.,* is widely recognized by the general U.S. public as a designation of source of the goods of the trade dress' owner, and (ii) had already achieved the requisite level of fame by the time the defendant began using the accused trade dress in commerce. 15 U.S.C. § 1125(c)(1) and (c)(2)(A).

At trial, Diageo offered four types of evidence to support its contention that the Bulleit Trade Dress met these fame requirements: (a) advertising expenditures on Bulleit; (b) sales of Bulleit; (c) advertising efforts in respect to Bulleit; and (d) evidence of consumer association between Bulleit and Redemption. However, Deutsch's accused Redemption Packaging first entered the U.S. market in November 2016. JA448:24-JA449:1; JA957:9-11; JA1613:6-11. Therefore, only

evidence that clearly pre-dates Deutsch's launch of the accused Redemption Packaging is relevant to establish fame under the Lanham Act.

### a. Advertising Expenditures and Brand Investment

Diageo presented evidence that between 2011 and 2016 – a period of five years – Diageo spent a total of only $56 million in advertising the Bulleit product. JA2572. Mr. Bello testified that, although Diageo had invested more than $200 million in the Bulleit brand during the past 10 ten years, the bulk of it -- $150 million – was spent between 2018 and 2022, well after the accused Redemption Packaging entered the market in November 2016. JA347:10-16;JA370:3-8 .

### b. Sales

In the year preceding the rebrand launch of the Redemption brand, *i.e.,* from about July 2015 to June 2016, Diageo's total annual sales for Bulleit were just over $150 million, equating to approximately 12 million bottles sold. *See* JA2491. Mr. Bello testified Diageo currently sells 1.9 million cases of Bulleit annually and had sold a little more than 20 million cases over the life of the brand. JA367:18-23. By comparison, the total United States alcohol beverage market is about 200 million consumers. *See* JA505:22-24.

### c. Advertising and Marketing Efforts

To support its contention that the Bulleit Trade Dress was famous prior to the launch of the accused Redemption Packaging in November 2016, Diageo

presented evidence that both before and after the launch, Diageo used various forms of advertisement to market its Bulleit brand, a portion of which included the entire Bulleit Trade Dress. *See* JA368:14-JA385:7; JA388:2-JA392:9 (testimony from Mr. Bello on Diageo's various advertising efforts before and after 2016). It is undisputed, though, that only evidence of pre-November 2016 fame was relevant to the federal dilution inquiry, and much of Diageo's evidence predates the launch of the accused redesigned Redemption Packaging.

For example, Diageo presented evidence of several print advertisements. *See, e.g.*, JA2705-JA2720. These advertisements appeared in various publications likely to be viewed by whiskey consumers, including Drinks International, Garden and Gun Magazine, GQ, Esquire, Wine Enthusiast, Whiskey Aficionado, and Cigar Aficionado. JA371:15–JA372:7. However, Diageo published only five print advertisements to the jury that were run before November 2016 and that showed the entire Bulleit Bottle and Design Mark. *See* JA0927___ 2708 (Impact Trade publication), JA2709 (Garden and Gun), JA2714-JA2715 (San Francisco Giants), JA2716.

Diageo presented evidence of two sports sponsorships, one with the San Francisco Giants and one with the Brooklyn Nets. JA378::23–JA379:17. While there was evidence that at least one of those sponsorships was placed with the Giants sometime in 2016 (*See* JA2714, it is not clear precisely when and for how

long that sponsorship took place.  No evidence was presented of when the sponsorship with the Nets took place or that it occurred before 2016.

Additionally, Diageo presented evidence that it used a point-of-purchase drink cart called the "Woody" with the Bulleit Bottles displayed on it to advertise the brand. *See* JA379:18–JA381:19; JA2710; JA2942. According to Diageo's witness, Mr. Bello, the Woody has been in existence since 2012, and was taken to various events coinciding with sports events at separate venues, including the Super Bowl, the World Series, some film and music festivals, and other cultural events. *See* JA379:18–JA381:19.  However, other than a promotional video that was created in 2012, which depicted the Woody being built and other generic scenes incorporating the Woody, there was no evidence presented of precisely when the Woody was taken to any of these Bulleit events.

Diageo also presented evidence that the Bulleit bottle and trade dress at issue appeared in four movies in 2013 and 2014 (Promised Land, Bullet to the Head, This Is the End, and That Awkward Moment) and in single episodes of approximately a dozen television shows between 2005–2016. *See* JA2800–2838 (compilation of Bulleit product placements in movies and television); *see also* JA2839 (video clips from these movies and shows); JA385:20–387:6 (Bello testimony on these placements)}. Viewership numbers for the first run of these shows and movies ranged from an estimated 600,000 to 18 million. *See* JA2800.

After November 1, 2016 (a period irrelevant for establishing fame for purposes of the federal dilution claim, Diageo had both additional paid and unsolicited placements in 17 additional movies and shows. *See* 2800.

Diageo also presented other evidence of advertising and marketing efforts, but no evidence that those efforts took place during the relevant period (that is, before November 2016). For example, Diageo introduced evidence that it advertised all of or part of the Bulleit Bottle and Design Mark on billboard advertisements. *See* JA2721{PX 341}. Diageo's representatives testified that these billboards appeared "in cities all over the country." *See* JA374:8-JA375:9 . However, there is no evidence from the trial testimony that these billboards existed before November 2016.

Diageo also presented evidence that it used social media to advertise its brand. *See* JA2734; JA375:15– JA376:17. Three of the social media posts that were entered into evidence are dated December 2016. JA2737; JA2738; JA2739. However, no evidence was presented regarding whether any of this social media activity took place prior to November 2016.

The evidence also showed that Diageo employed digital advertisements on websites including "NewYorkTimes.com, … WashingtonPost.com, … GQ.com, Esquire.com, etc." *See* JA375:15–JA376:22  (testimony of Edward Bello concerning targeted social media and banner advertising). However, again no

evidence was presented as to whether any of these digital advertisements pre-date the launch of the accused Redemption Packaging in November 2016.

In addition, Diageo presented evidence that it has maintained a website since 2000 that is now visited by "over 2 million consumers" and "at least a million a year" "if you go back a few years" for a cumulative total over twenty-two years of "20 million." *See* JA377:12–JA:377:18; JA2751–JA2761.  However, no evidence was presented of what that website looked like prior to November 2016, or precisely how many visits there were to the website prior to that date.

### d. Lack of Survey Evidence Supporting Fame or Dilution

Diageo did not present any survey evidence that the Bulleit Trade Dress was famous among the general U.S. public prior to November 2016, or any other survey evidence that would directly support its dilution claims.  Diageo's survey evidence, presented through its witness Mr. Poret, focused almost exclusively on likelihood of confusion or actual confusion, claims that the jury rejected.

However, Diageo did present evidence of an external marketing survey, which it commissioned in June 2016, entitled "Data Report, Benchmarking distinctivity: Bulleit."  This survey was directed at determining how distinctive the different elements of the Bulleit brand were among consumers at that point in time. *See* JA3446–JA3460; JA495:2–JA496:2. The survey results showed that while the Bulleit name itself was viewed by whiskey consumers as being distinctive, the

Bulleit bottle shape — which the survey identified as a key aspect of the Bulleit Trade Dress — was not. The survey included both quantitative data (*i.e.*, data derived from an online survey of 150 *whiskey consumers*) and qualitative data (*i.e.*, responses from online focus groups of 18 *drinking consumers*). *See* JA3447; JA497:3–JA497:11.

The overall results of the survey proved that elements of the Bulleit Trade Dress at issue in this case were not distinctive among whiskey drinkers in June 2016 – much less famous among the U.S. public at large as required for likelihood of dilution under the Lanham Act. For example, the quantitative survey of 150 whiskey consumer respondents found that "the bottle on its own did not have the memorability or uniqueness required for it to be an asset or potential asset" and that "[b]eyond the wordmark" Bulleit – which is not an element of the Bulleit Trade Dress at issue – "no assets [were] emerging," *i.e.*, no distinctiveness among consumers was evidenced. JA3450; JA3453–JA3455.

## Beyond the wordmark – no assets emerging



The survey also found that the elements of the Bulleit Bottle – including the Bottle shape, label design, and embossed brand name – were "not as effective at triggering the brand vs. key competitors," and did not approach consumer awareness of other brands such as Jack Daniels and Jim Beam. *See* JA3457.[6] A

---

[6] The designer of the Bulleit Bottle, Mr. Sandstrom, identified Jack Daniels as "the most famous iconic brand" and "a really famous brand." JA522:20-21; JA524:16-20.

chart comparing various brands in the survey is included below, which shows that the elements of the Bulleit Trade Dress, while on par with Woodford Reserve, were not as effective as Jim Beam, Jack Daniels, and Maker's Mark in triggering brand recognition.



The qualitative portion found that "the bottle, the embossing and the pumpkin coloured label" all "demonstrated potential as assets." *See* JA3450 (emphasis added). Although a number of the 18 respondents identified the Bulleit bottle design as distinctive, all of the respondents were whiskey drinkers. JA2840 (Topline Learning, Qualitative Summary). Several of these respondents also mentioned the brand name and colored labels as memorable and distinctive. *See* JA2843–JA2844; JA2847–JA2848.

**Lack of Evidence of Widespread Association Among the U.S. Public**

Mr. Bello testified that "over 40 million people are aware of this [Bulleit] package" based on "the brand ha[ving] over 20 percent awareness, which 20 percent awareness out of 200 million [alcohol] drinkers…." JA502:14–20; JA505:11–JA506:4. Mr. Bello presented this evidence in the present tense, not as of November 2016. He also testified that "tens of millions" of consumers "are exposed to just the [Bulleit] brands…." JA373:14–JA374:1. Mr. Bello, however, did not point to any documentary or other empirical evidence that would support those numbers. Additionally, Diageo did not present evidence as to how these figures, which relate to consumers of alcohol, apply to the general public beyond this specific market.

In any event, although Diageo has sold more than 80 million bottles of Bulleit in the six years preceding the trial in this case, (JA373:14–JA374:1; JA502:1–JA503:13) and Deutsch sold nearly 4 million bottles of Redemption during this same time period (JA2944–JA2948), Diageo was able to present evidence of only three individual instances where actual customers associated the accused Redemption Packaging with the Bulleit Trade Dress. The first was an anonymous Facebook posting in November 2016, reacting to Redemption's launch of the accused packaging. The poster wrote "I liked the original. Looks a bit like Bulleit, but I'll still partake." JA2291. Notably, a later posting on the same

Facebook page, comparing the original Redemption Packaging to the redesigned accused packaging, stated "the original spoke on behalf of the whiskey. Now [referring to the accused redesign] it looks like every other brand…especially the cheap ones…But I still love your whiskey…" *Id.*

Second, in April 2018, Diageo's customer service center received a call from a consumer, Morris Parker (a prior Redemption customer), inquiring why "Diageo" was now using the Bulleit bottle for Redemption. JA2940 (audio recording).

Third, a few months later in September to October 2018, a whiskey consumer, Andy Schuler, purchased Redemption whiskey, drank about a 1/2 oz of it along with a couple of beers, and while under the influence of that alcohol mixture he posted about it on his Untappd social media account, which is a discussion site for alcohol enthusiasts. JA7088:14–18; JA7088:21–22; JA5876. When asked about this post, he testified that he believed that Redemption was an "offshoot" of the Bulleit brand, although he did not believe that the two were the "same exact brand." JA7038:5–:11; JA7097:19–JA7098:2..

These three instances were the only instances to which Diageo could point among the more than 80 million bottles of Bulleit and 4 million bottles of Redemption sold from November 2016 to the trial in 2022. *See* JA2944–JA2948. And none of these consumers was actually confused.

Diageo pointed to nothing more in its opening statement and closing argument. In fact, in its opening, Diageo did not even mention the Facebook post, identifying the testimony of Parker and Schuler as Diageo's evidence of instances of actual association or confusion. JA277:15–JA278:2. And in closing Diageo admitted that it was just these three instances out of 84 million bottles of Bulleit and Redemption sold that were its evidence of actual association or confusion.

### 4. The Injunction

After the verdict, Diageo sought a permanent injunction. JA58. Diageo asked the district court to prohibit Deutsch from selling Redemption in the accused Redemption Packaging. JA58. In addition, and despite its admissions at trial that the Bulleit Trade Dress was a combination of elements, Diageo asked the district court to require certain, individual, changes to any redesigned Redemption Packaging. *Id.*

On September 7, 2022, the district court granted Diageo's motion in part and issued an injunction. SPA1 . While the Injunction enjoined future use of the accused Redemption Packaging, the district court declined to require any specific changes as part of a compliant redesign. *Id.* at SPA37.[7]

---

[7] In its injunction request, Diageo also asked the district court to require that Deutsch recall all product in the challenged Redemption Packaging that was already on the market. JA58. The district court denied this relief, permitting product that was already in the hands of distributors and retailers to continue to be sold. SPA36–SPA37.

Instead, the Injunction required, in relevant part, that Deutsch "undertake a change to the Redemption glass bottle and packaging that will convey a substantially different commercial impression" from the Bulleit Trade Dress such that future Redemption Packaging would have "no superficial, at a glance, resemblance to the Bulleit bottle." *Id.* at SPA37, n.2. The Injunction also *permitted* Deutsch to retain certain unchallenged elements of the accused Redemption Packaging, including the Redemption name and the embossed rye frond. *Id.* at SPA37. The district court retained jurisdiction over "the parties and the subject matter of this litigation for the purpose of interpretation" of the Injunction. *Id.*

### 5. The Sur Lee Motion

On September 14, 2022, Deutsch filed a Motion for Clarification (the "Sur Lee" Motion), asking the district court to confirm that the packaging design for Redemption Sur Lee complied with the Injunction. JA62. When compared to the Bulleit bottle, the Sur Lee packaging was different in a number of ways. *Id.* The most conspicuous difference was the color and opacity of the Sur Lee bottle glass:

**Bulleit Trade Dress**   **Redemption Sur Lee Bottle**

 

Instead of utilizing clear, colorless glass like the Bulleit bottle, the Sur Lee bottle was more than two-thirds opaque, made of brown glass that gradually lightened from the bottom of the bottle up toward the shoulders. JA62. The Sur Lee packaging had a large, dark silkscreen label printed directly onto the bottle, which covered the majority of the front of the bottle. *Id.* In contrast, Bulleit's label is much smaller, covers only a small portion of the bottle, is located in the bottom half of the bottle, is made of paper and not printed directly onto the glass, and is much lighter in color. *Id.* The Sur Lee packaging also removed the border lines from the label,[8] and added a number of other design elements to the label, including the image of a whiskey barrel and additional text, which the Bulleit label does not have. *Id.*

---

[8] The Injunction specifically permits Deutsch to keep the label from the accused Redemption Packaging, provided the border is removed.

The district court found that the change in color of the glass in the Sur Lee packaging was "not minor" (JA7334:20–JA7334:23), that the new label was "striking," and that "these new aspects will tend to guide a purchaser away from the initial impression that the bottle is part of the Bulleit brand." SPA-44. Nonetheless, the district court held that the Sur Lee packaging was not compliant, reasoning that "[n]o customer can be in doubt; nor can there be a question about the bottle's difference from that of [Bulleit]." SPA-44.

**6.    The Non-Embossed Redesign Motion**

On November 16, 2022, with the permanent injunction in effect, Deutsch filed a Motion for a Pre-Release Compliance Determination (the "Non-Embossed Redesign Motion"), seeking the district court's determination that a new and different proposed Redemption Packaging redesign complied with the Injunction. JA64. The redesigned Redemption Packaging retained the enjoined Redemption bottle shape but differed from the Bulleit Trade Dress in several material respects. *Id*.



Specifically, the proposed Redemption redesign (1) eliminated the embossed glass text from the bottle's top frontal area;



(2) changed the Redemption label to make it larger;



(3) changed the design of the Redemption label to add a new logo, a different border design (either embossed black or four-corner framing), and a new communication structure;[9]

---

[9] According to the Injunction's guidance, Deutsch did not need to change anything other than the border on the label.



(4) changed the cork enclosure from dark to lighter-colored cork enclosure;



and (5) included a "tax band" at the top of the bottle to further distinguish

the Redemption and Bulleit packaging.



New "tax band"

**Enjoined Bottle Package**

JA. at 3, 5; JA7336–JA7341{Doc. 505-1, Ex. A}.

Despite the many differences between the Non-Embossed packaging and the Bulleit Trade Dress, the district court held that the proposed Non-Embossed Redemption redesign did not "go far enough" to comply with the Injunction. (Dec. 8, 2022 Order).[10]

## V.   SUMMARY OF ARGUMENT

The judgment of likelihood of dilution under the Lanham Act and New York's dilution statute and the Injunction entered against Deutsch's use of the Redemption trade dress should be reversed.

---

[10] Subsequently, Deutsch proposed an interim redesign using a stock bottle and redesigned label. Diageo did not object and the district court entered an order permitting Deutsch to sell Redemption in that packaging. (Dec. 19, 2022 Order).

In respect to dilution under the Lanham Act, even taking all inferences in favor of the verdict, there was insufficient evidence at trial to show that Diageo met its burden of proving that (i) the Bulleit Trade Dress was famous among the general U.S. public, as opposed to having more limited recognition in the niche whiskey consumer market and (ii) that the Bulleit Trade Dress had achieved the requisite level of fame before the introduction of the Redemption Packaging into the market.

Concerning dilution under New York law, the evidence at trial was insufficient to show that the Redemption Packaging was so similar to the Bulleit Trade Dress that a substantial segment of the target group of customers saw the two trade dresses as being essentially the same, *i.e.*, very or substantially similar.

In the alternative, if the Court concludes that there is insufficient evidence to support the New York dilution finding but sufficient evidence to support the federal dilution finding, then Deutsch is entitled to a new trial on the federal dilution claim because of a crucial instructional error. Specifically, the district court abused its discretion in failing to give Deutsch's proposed instruction that fame in a niche market, such as among whiskey consumers, was insufficient to support a finding of dilution under the Lanham Act. This instructional error was prejudicial because it allowed the jury to apply a lower standard for fame than the

one required by the Lanham Act (fame among the general public, not simply fame within a niche market).

Should the Court affirm the judgment in whole or in part concerning the federal and New York dilution findings, then Deutsch requests that the Court reverse each of the trial court's post-judgment orders concerning the Sur Lee and Non-Embossed Redesign Motions. The appeals of these two orders have been consolidated with the appeal from the final judgment. In each case, the proposed designs met the terms of the Injunction. Both designs convey a substantially distinct commercial impression from Bulleit, as the Injunction required.

## VI. ARGUMENT

### A. Deutsch Is Entitled to Judgment on the Trade Dress Dilution Claims

#### 1. Standard of Review

This Court reviews *de novo* the denial of a renewed motion under Rule 50(b) for judgment as a matter of law, applying the same standard as the district court. *See E-21 Glob., Inc. v. Second Renaissance, LLC*, 360 F. App'x 172, 174 (2d Cir. 2009) (citations omitted).

That standard is well established. Under Rule 50, "a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133,

149 (2000) (quoting Rule 50(a)). In considering a question of evidentiary sufficiency, the Court views the evidence, "in the light most favorable to the opposing party." *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 51 (2d Cir. 2000) (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d. Cir. 1998)). A court "must give deference to all credibility determinations and reasonable inferences of the jury," and may not weigh the credibility of witnesses or otherwise consider the weight of the evidence. *Id.* Thus, judgment as a matter of law should be granted when: "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Id.* (citations omitted).

### 2. Lanham Act Dilution

#### a. Dilution By Blurring Requires a "Famous" Mark.

The Lanham Act defines dilution by blurring as an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark."[11] 15 U.S.C. § 1125(c)(2)(B). Accordingly, to

---

[11] Under the Lanham Act, dilution has two potential forms: dilution by blurring and dilution by tarnishment. Diageo's dilution claim against Deutsch was based solely on a *blurring* theory. *See* JA1349:25-JA1350:1 ("And then lastly on dilution, we are claiming dilution by blurring in this case.").

establish a likelihood of dilution by blurring, Diageo was required to prove that the Bulleit Design Mark and Trade Dress were famous. Without the requisite showing of fame, Diageo's dilution claim fails. *See Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1376 (Fed. Cir. 2012) (holding that "[a]bsent a showing of fame, [plaintiff's] dilution claim fails, and we need not address the remaining statutory factors for dilution by blurring.").

Under the Trademark Dilution Revision Act of 2006 (which amended Section 43(c) of the Lanham Act), a famous mark or trade dress is one that is widely recognized *by consumers generally* as a designation of source of the trade dress owner's goods or services. *See* 15 U.S.C. § 1125(c)(2)(A). "[F]ame is the key ingredient in a trademark dilution claim." *DigitAlb, Sh.a v. Setplex*, *LLC*, 284 F. Supp. 3d 547, 557 (S.D.N.Y. 2018) (internal quotations omitted). To be considered famous for purposes of dilution, a mark must be widely recognized by *the general public* in the United States. *See id.* Section 43(c) of the Lanham Act lists certain factors to apply to determine if a mark or trade dress has the required degree of general public recognition to be famous. These include (1) the "duration, extent, and geographic reach of advertising and publicity of the mark," (2) the "amount, volume, and geographic extent of sales of goods or services offered under the mark," (3) the "extent of actual recognition of the mark," and (4) whether "the mark was registered." *Heller Inc. v. Design Within Reach, Inc*., No. 09 Civ. 1909

(JGK), 2009 WL 2486054, at *4 (S.D.N.Y. Aug. 14, 2009) (quoting 15 U.S.C. § 1125(c)(2)(A)) (internal citations omitted).

Fame for dilution is difficult to prove and requires a stringent evidentiary showing. *Coach Servs., Inc*., 668 F.3d at 1373 ("Fame for likelihood of confusion and fame for dilution are distinct concepts, and dilution fame requires a more stringent showing.") (internal citations omitted). For example, fame for dilution does not exist along a continuum. It either exists or it doesn't. *Id.* ("While fame for dilution 'is an either/or proposition'—it either exists or does not—fame for likelihood of confusion is a matter of degree along a continuum."). Also, the mark — or, here, trade dress — has to be proven to have become truly famous, *i.e.,* a "household name." *See, e.g., DigitAlb*, 284 F. Supp. 3d at 557. This means that the Lanham Act's fame standard is rigorous, with protection (that is, the ability to obtain a monopoly) extending only to highly distinctive marks that are well-known throughout the country. *See Glob. Brand Holdings, LLC v. Church & Dwight Co*., No. 17-CV-6571 (KBF), 2017 WL 6515419, at *2 (S.D.N.Y. Dec. 19, 2017) (internal citations omitted) (noting that "this broad form of relief must be reserved for only the most well-known marks.").

Courts have "generally limited famous marks to those that receive multi-million dollar advertising budgets, generate hundreds of millions of dollars in sales annually, and are almost universally recognized by the general public." *DigitAlb*,

284 F. Supp. 3d at 557 (" "[D]ilution claims are restricted to marks that are 'truly famous' or so well-known that they are essentially household names."). *See also Luv N' Care, Ltd. v. Regent Baby Prods. Corp*., 841 F. Supp. 2d 753, 757 (S.D.N.Y. 2012) (finding that marks such as Nike and Hot Wheels are sufficiently famous to support a federal trademark dilution claim); *Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc*., 198 F. Supp. 2d 474, 486 (S.D.N.Y. 2002) (noting that the Lanham Act's prohibition against trademark dilution is "only intended to protect truly famous marks, such as DUPONT, BUICK and KODAK").

For example, DuPont, Buick, Kodak, Nike, Delta Airlines, and Citibank have all been held to be famous marks while the App Store, University of Texas's "Longhorn" logo, and Maker's Mark's trade dress of red dripping wax on its whiskey bottle top have not. *See* 4 McCarthy on Trademarks and Unfair Competition § 24:107-109. McCarthy suggests that a mark or trade dress should attain 75% recognition among the general public of the United States before it is considered "famous" for dilution purposes. *Id*. § 24:106.

In short, to establish federal dilution, the evidence must show that the Bulleit Trade Dress achieved widespread, household-level fame among the U.S. purchasing public, not merely among the niche market of whiskey consumers. The evidence must also show that the Bulleit Trade Dress reached this requisite level of

fame prior to November 2016, when the accused Redemption Packaging was first introduced into the market.

Even when viewed in the light most favorable to Diageo, the evidence of record fails to meet any of these requirements.

> **b.** **Evidence of Bulleit Advertising and Sales Prior to November 2016 Insufficient to Support a Finding of Fame as a Matter of Law.**

There is no direct evidence in the record that the Bulleit Trade Dress has ever been famous, much less that it was famous before the accused Redemption Packaging entered the market, as the statute requires. Diageo introduced no dilution or fame survey showing whether, or to what extent, the general public associated the Bulleit Trade Dress with Bulleit whiskeys prior to November 2016. Instead, the evidence of fame in the trial below consisted primarily of testimony and documents showing that prior to November 2016, Diageo spent relatively modest sums of money on conventional advertising, marketing, and publicity that is typical of brand promotion efforts for most alcoholic beverage brands, that generated commensurately moderate sales, and that targeted whiskey drinkers rather than the general public.

> **(1)** **Evidence of Moderate Spending On Advertising and Publicity Insufficient To Show Fame**

For example, according to the record in the five-year span between 2011 and 2016, Diageo spent approximately $56 million in advertising Bulleit, which

roughly averages to about $10 million a year. This was spent on conventional efforts such as print advertisements, only five of which were introduced into evidence that both pre-dated the later-accused Redemption Packaging's entry into the market. These appeared in relatively obscure publications such as Garden and Gun. But there was no evidence establishing how many people may have been exposed to those advertisements prior to the launch of the accused Redemption Packaging.

Diageo's pre-November 2016 advertising efforts also included use of a Bulleit-themed drink cart called the "Woody," which was used at festivals (e.g., for film and music) and sports events. The Woody thus targeted purchasers of alcohol but there is no clear evidence of any larger reach or impact. The record shows that the Bulleit Trade Dress appeared in about four relatively unknown movies and about a dozen television shows during the relevant time period. But those were primarily paid product placements and not probative of household-level fame among the U.S. purchasing public. And in any event, "[e]vidence that some television shows have depicted the products is insufficient to show fame even in a niche market." *Car Freshner Corp. . v. Am. Covers, LLC,* 419 F. Supp. 3d 407, 447-48 (N.D.N.Y. 2019) (finding that registered marks for car freshener products were not famous, despite appearing in movies and shows, where annual sales were

under $1 billion and no fame survey was conducted), *aff'd in part, rev'd in part on other grounds*, 980 F.3d 314 (2d Cir. 2020).

Diageo's advertising and promotional expenditures which averaged roughly $10 million during the relevant time period are hardly the sort of top-ranking numbers required for a finding of national, household-level fame. *See Luv N' Care, Ltd.,* 841 F. Supp. 2d at 757 (collecting cases showing famous marks having from $350 million to $1 billion dollars in annual promotional expenditures) (citing *Nike, Inc. v. Nikepal Int'l, Inc.,* No. 2:05–CV–1468–GEB–JFM, 2007 WL 2782030, at *5–6 (E.D. Cal. Sept. 18, 2007) (Nike mark deemed famous in view of expenditure of more than $1 billion to promote its mark in the US in athlete endorsements and television, radio, print media, and billboard placements); *Jada Toys, Inc. v. Mattel, Inc.,* 518 F.3d 628, 635 (9th Cir. 2008) ($350 million dollars expended in advertising the mark)).

### (2) Evidence of Relatively Modest Volume of Sales Insufficient to Support a Finding of Fame

In determining fame, courts also look to the volume and extent of sales of products that use the purportedly famous trade dress. *See, e.g., Nabisco, Inc. v. PF Brands, Inc.*, 50 F. Supp. 2d 188, 202 (S.D.N.Y.), *aff'd,* 191 F.3d 208 (2d Cir. 1999) (finding that "Goldfish" cheese cracker snack food was famous mark in national market because of, among other things, long use, high-volume sales, aggressive advertising, and federal registration). Here, however, the limited extent

of Diageo's advertising and publicity expenditures and efforts prior to November 2016, is matched by a commensurately moderate volume of Bulleit sales during that time period.

From June 2012 to July 2016, Diageo sold 7.7 million cases of Bulleit, and annual sales of Bulleit in the Bulleit Trade Dress did not exceed one million cases until about July 2017, in a U.S. alcohol beverage market comprising about 200 million consumers.  JA2941; JA505:22-24.  These numbers do not come anywhere near the high volume of sales that evidences widespread, non-niche-level fame among the general U.S. public.

> ### c.    Record Does Not Support Actual Association of the Bulleit Trade Dress with Bulleit Whiskey Prior to November 2016

The record contains no evidence of any survey – no secondary meaning survey, no fame survey, and no dilution-by-association survey – that supports a finding that the general purchasing public in the United States associated the Bulleit Trade Dress with Bulleit whiskeys as of November 2016.

In fact, one of Diageo's own surveys (the only survey evidence offered by Diageo at trial) – a 2016 market research survey of the distinctiveness of various elements of the Bulleit Trade Dress – showed that in 2016 Bulleit *lacked* the requisite degree of fame and that consumer recognition of the Bulleit Trade Dress at that point in time was comparatively low. Shortly before the launch of the

Redemption Packaging in November 2016, Diageo conducted market research that showed that none of the claimed elements of the Bulleit trade dress was memorable or unique, apart from the orange-colored label and the Bulleit brand name, neither of which was at issue in this case. JA3457 (depicted below).

Bulleit elements not as effective at triggering the brand vs. key competitors – although on a par with Woodford Reserve

| | Recognition %: TOTAL SAMPLE | | | | |
|---|---|---|---|---|---|
| Bulleit | Jim Beam | Jack Daniels | Maker's Mark | Woodford Reserve |
| 21% | 65% | 59% | 45% | 21% |
| 16% | 26% | 51% | 41% | 10% |
| 15% | | 43% | 5% | 5% |
| 14% | | | 5% | |

Indeed, the only whiskey brand that any of Diageo's witnesses claimed to be truly famous is Jack Daniels, which Mr. Sandstrom, the designer of the Bulleit trade dress, identified as "the most famous iconic brand" and "a really famous brand." JA522:20–21; JA524:16–18.

The record is also bereft of any evidence of actual association between the Bulleit Trade Dress and Bulleit whiskey among U.S. customers as a whole. Diageo presented evidence of only three anecdotal instances – one in November 2016 and two in 2018 – where customers indicated that they associated either the Bulleit Trade Dress with Bullet whiskey, or were confused about the origins of the accused Redemption Packaging. However, this evidence also cannot support the

jury's finding of fame in this case. First, the two instances that occurred in 2018 – namely, the testimony of Mr. Schuler and the evidence of the call to customer service by Morris Parker – are irrelevant to a finding of fame as of November 2016, as required under the Lanham Act. Second, even if all three instances were relevant, *three instances out of the more than 84 million bottles of Bulleit and Redemption sold from November 2016 to the time of the trial* does not establish the sort of widespread, household-level association required for fame under the Lanham Act.

Finally, these three instances, even if taken together, are insufficient to overcome the 2016 market survey, described above, indicating that the Bulleit Trade Dress was not famous prior to the time that the accused Redemption Packaging entered the market. Moreover, there is extensive evidence in the record that elements of the Bulleit Trade Dress – for example, the canteen shape of the glass bottle, the raised "embossed" lettering on the glass bottle, and the size and placement of the embossed lettering – were in widespread use by third parties prior to November 2016. Just a few examples are below:



DX 029   DX 065   TX 056   DX 096   DX 225   DX 243   TX 061   DX 307

DX 340   DX 364   DX 427   DX 496

At day's end, Diageo presented no substantial evidence to prove that the Bulleit trade dress was famous among the general public — that is, famous like Nike or Disney — but instead offered nothing more than anecdotal evidence from three random people from among claimed millions of Bulleit consumers. As a matter of law, that evidence is insufficient to hold Deutsch liable for a likelihood of dilution by blurring of a famous mark. The Court should accordingly grant judgment as a matter of law in favor of Deutsch on Diageo's federal dilution claim. In tandem with the granting of judgment on the New York dilution claim (discussed below), there will be no predicate for the permanent injunction, which should also be reversed.

**3.** **Deutsch Is Entitled to Judgment on the New York Dilution Claim.**

**a.** **New York Dilution Requires Substantial Similarity.**

While both federal and New York law protect against dilution (under N.Y. Gen. Bus. Law § 360–l, protection against likelihood of dilution "of the distinctive quality of a mark or trade name"), there are two key differences between the statutes. First, unlike federal dilution law, the New York law does not require that the mark be famous. *Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 496 (S.D.N.Y. 2004); *see Starbucks v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 113-14 (2d Cir. 2009).

Second, "New York law does not permit a dilution claim unless the marks are 'substantially' similar." *Starbucks*, 588 F.3d at 113-14 (internal citation omitted). In turn, the "substantiality" required is high. *See, e.g., Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 335 (2d Cir. 2020) (triable issue of dilution under New York law when marks possessed "high degree of similarity").

To prove dilution under New York law, a plaintiff must show more than the "familiar test of similarity" used in the traditional infringement context. *See* 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 24:117 (2004). The trademarks or trade dresses at issue "must at least be similar enough that a substantial segment of the target group of customers sees the two marks as *essentially the same.*" *Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 515 F. Supp. 3d

47, 77 (S.D.N.Y. 2021) (trade dress case; internal citations omitted; emphasis added); *see also Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 342 (S.D.N.Y. 2013) (rejecting New York dilution claim because "while the two marks may be similar enough for one to infringe the other, they are not so similar that consumers would view the marks as essentially the same."); *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 215 (2d Cir. 1999) (affirming grant of preliminary injunction; Pepperidge Farm was likely to succeed in establishing that "Nabisco's use of its goldfish shape in an orange, cheddar-cheese-flavored, bite-sized cracker dilutes the distinctive quality of Pepperidge Farm's previously famous mark, consisting of a goldfish-shaped orange, cheddar-cheese-flavored, bite-sized cracker;" "Both fish are presented arbitrarily in the form of a cracker. Notwithstanding slight differences in shape, size and marking, Nabisco's crackers are essentially the same color, shape, size, and taste.").

### b. Insufficient Evidence of the Required Similarity.

The trial record does not support a finding that the Redemption Packaging and the Bulleit Design Mark and Trade Dress are substantially similar for purposes of New York dilution law. By Diageo's own admission, the product packages are not identical. *See, e.g.*, JA2092:4– JA2092:8 (Diageo's attorneys in closing, stating, "Are [the Bulleit Trade Dress and the Redemption Packaging] identical? No. And that's not what we are arguing."). At best, according to Diageo's own

argument at trial, the Redemption Packaging bore a "family resemblance," or looked "strikingly similar" to the Bulleit Design Mark and Trade Dress, but with the important caveat "[w]hen you're looking at them for the first time at a glance ..." *See* JA2091:16–JA2091:18; JA2092:8–JA2093:9.

As noted above, Diageo submitted no survey evidence in support of its dilution claim, under federal or New York law. Because the marks here are neither identical nor very similar, the lack of survey evidence showing the kind of association required for a finding of dilution is alone fatally deficient. *See, e.g., Starbucks*, 588 F.3d at 110 ("We will not assume that a purportedly negative-sounding junior mark will likely harm the reputation of the famous mark by mere association when the survey conducted by the party claiming dilution could have easily enlightened us on the matter."); *see also Savin Corp. v. Savin Grp.*, 391 F.3d 439, 451 (2d Cir. 2004) (when junior and senior marks not identical, direct evidence of dilution as proven through surveys or financial evidence required).

In addition, Diageo's own witnesses testified about many differences between key elements of the Bulleit Design Mark and Trade Dress and the Redemption Packaging. For example, Andrew Schuler — a non-party witness upon whose testimony Diageo relied heavily during closing — testified that he posted on an alcoholic beverage enthusiast's site (while under the influence of two to three beers and one half of an ounce of Redemption bourbon) that he believed

there was an association between Redemption and Bulleit. Yet on cross-examination, Schuler noted many significant differences between the Bulleit Design Mark and Trade Dress and the Redemption Packaging that weigh against a finding of substantial similarity. JA7105:2-7109:9 (admitting that the backs, necks, footprints, closures, labels, and label text of the Bulleit bottle packaging are all clearly different from that of the Redemption bottle packaging).

Moreover, taking into consideration the sheer number of bottles of Redemption and Bulleit sold in the last six years to consumers — more than 84 million — neither Schuler's testimony nor the testimony of any other individual witness could sufficiently prove an association in the minds of consumers between the Redemption Packaging and the Bulleit Trade Dress. Only a survey could do so sufficiently.

Accordingly, in tandem, the extensive evidence of record concerning how different the bottle packages at issue are and the lack of a dilution survey, there was insufficient evidence for the jury to conclude that there was an association between those bottle packages in the mind of the general U.S. public, entitling Deutsch to judgment on the New York dilution claim.

### c. The No-Likelihood-of-Confusion Finding Is Also Dispositive

If the Redemption Packaging was not similar enough to the Bullet Trade Dress to support a finding of infringement, it follows that the Bulleit and

Redemption Packaging could not be similar enough to support a finding of substantial similarity under New York's dilution statute. *See Miss Universe, L.P., v. Villegas*, 672 F. Supp. 2d 575, 595-96 (S.D.N.Y. 2009) (holding that because the marks at issue were not similar enough for a finding of infringement, "it follows that the former is not similar enough to dilute the latter" under New York dilution law).

In this action, the jury found that there was no infringement, a finding that Diageo did not appeal. Viewing *this* verdict in the light most favorable to the prevailing party — here, Deutsch — the jury plainly determined that the two trade dresses were too dissimilar to support a finding of likelihood of confusion. This is clear from a review of the *Polaroid* factors that the jury was instructed to consider in connection with deciding likelihood of confusion, specifically (i) the strength of Diageo's trade dress, (ii) the similarity between the Redemption bottle packaging and the Bulleit Design Mark and Trade Dress, (iii) the relatedness of the products at issue, (iv) instances of actual customer confusion, (v) Deutsch's good or bad faith when adopting the Redemption bottle packaging at issue, (vi) the quality of Deutsch's Redemption whiskey, and (vii) the sophistication of the buyers. JA2181:22-JA2184:9.

Under *Polaroid*, product quality matters only when the claim is dilution by tarnishment. Product relatedness favored a finding of confusion as both products

(whiskeys) are identical. The "strength of the mark" factor did not influence the jury's finding of non-infringement, since it explicitly found that the Bulleit Trade Dress was non-functional and distinctive. The jury undoubtedly decided that the "bad faith" factor weighed against infringement as evidenced by its finding that there was no willful dilution. And the jury's verdict of no likelihood of confusion indicates that it found insufficient evidence of actual confusion.

Of the remaining two *Polaroid* factors, similarity is the most critical and was the one on which the jury certainly based its decision. The jury found no trademark infringement because the bottle packages at issue were insufficiently similar to support that finding. The bottle packages accordingly are not similar enough to each other to support a finding of likelihood of dilution under New York law and Deutsch is entitled to judgment on the New York claim for this separate reason.

**B.** **In the Alternative, An Instructional Error Warrants a New Trial.**

Should the Court hold that there is insufficient evidence to support the New York dilution claim (thereby granting judgment as a matter of law to Deutsch on the New York dilution claim), but sufficient evidence to support the federal dilution claim (thereby denying Deutsch's request for judgment as a matter of law on the federal dilution claim), then Deutsch is entitled to a new trial on the federal dilution claim because of a prejudicially erroneous jury instruction.

### 1.    Legal Standard

This Court "review[s] for abuse of discretion a district court's disposition of a motion for a new trial" under Rule 59. *Nimely v. City of New York*, 414 F.3d 381, 392 (2d. Cir. 2005). The Court "review[s] a claim of error in jury instructions *de novo*, reversing only where appellant can show that, viewing the charge as a whole, there was a prejudicial error." *Murray v. UBS Sec.*, LLC, 43 F.4th 254, 262 (2d Cir. 2022) (quoting *Warren v. Pataki*, 823 F.3d 125, 137 (2d Cir. 2016)). "An erroneous instruction requires a new trial unless the error is harmless and an error is harmless only if the court is convinced that the error did not influence the jury's verdict." *Id.*

### 2.    "Fame" Was Insufficiently Contextualized, Prejudicing Deutsch.

While the jury was instructed concerning "fame" for purposes of the federal dilution claim, the instructions in the context of the evidence presented were insufficient, requiring in the alternative a new trial on the federal dilution claim before a properly instructed jury. *See Miliea v. Metro-N R.R. Co.*, 658 F. 3d 154, 163 (2d Cir. 2011); *Dancy v. McGinley*, 843 F. 3d 93, 116 (2d Cir. 2016) ("A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law") (internal quotations and citation omitted).

Consistent with the statutory text, the jury was instructed that fame meant "widely recognized by the general consuming public." JA7240.21:470-488. This instruction in light of the type of case did not go far enough. Because this case involved a whiskey product, the phrase "general consuming public" used in the instruction could have been interpreted to mean the general *alcohol* consuming public or the general *whiskey* consuming public, not U.S. consumers as a whole – the relevant market when evaluating fame.

As set forth above, Diageo's *evidence* of fame was limited to a few anecdotes from whiskey drinkers and did not include a fame survey (indeed, Diageo's own survey showed that Bulleit was *not* famous). This evidentiary presentation in turn raised the strong possibility that the jury would be confused as to whether "general consuming public" in the instruction meant the general whiskey consuming public (i.e., those who "consume" or drink whiskey) or the public at large. Since it is well established that "wide recognition" among the general whiskey consuming public would be insufficient to support a finding a fame (and since that was what the evidence showed), Deutsch sought a clarifying, limiting instruction that niche market fame was not enough.

Specifically, Deutsch requested an instruction that "[a] mark with fame in a limited niche or market segment cannot qualify for dilution protection."[12] The district court declined to give the instruction. The instruction correctly stated the law and giving it would have appropriately ensured that the jury answered the right question (famous with the public at large, like Nike) and not the wrong one (famous among whiskey drinkers) in deciding fame. Absent the assurance provided by the instruction, there is strong possibility rising to the level of prejudicial error that the jury returned a verdict on federal dilution based on a misunderstanding of the law. A new trial is accordingly appropriate should the Court grant judgment in favor of Deutsch on the New York dilution claim, but affirm the judgment in favor of Diageo on the federal dilution claim.

## C. The District Court Abused Its Discretion When it Held the Sur Lee and Non-Embossed Redemption Packaging Would Be Inconsistent with the Injunction

Following the September 7, 2022 entry of the permanent injunction and the district court's retention of jurisdiction to interpret the Injunction's scope, Deutsch, in good faith, filed two motions seeking determinations in respect to two packaging redesigns — the Sur Lee design (which used the same bottle mold and embossing as the enjoined packaging, but with colored glass and a distinct, darker silk-screen

---

[12] JA195.

label) and the Non-Embossed redesign (which changed six of the seven elements that Diageo claimed comprised its trade dress) — that were denied. On November 7, 2022, the district court held that the Sur Lee design (which Deutsch had sold and marketed prior to and pending the disposition of a stay motion in this Court) did not comply with the Injunction. On December 8, 2022, the district court held that the Non-Embossed redesign did not comply with the Injunction. Deutsch timely appealed both post-judgment orders and the Court consolidated those appeals with the appeal from the final judgment.

For the reasons discussed in Section VI.A., above, the Court should reverse the judgment and accordingly dissolve the Injunction. But if the Court decides to affirm the judgment, then, for the reasons discussed below, it should reverse the two post-judgment orders and hold that both the Sur Lee and the Non-Embossed redesigns comply with the Injunction. While Deutsch is fully cognizant of the broad discretion afforded a district court in interpreting its own injunction, by holding that these two designs, which were different from Bulleit in nearly every way, did not comply, the district court abused its discretion, requiring reversal.

### 1. Legal Standards

A district court's interpretation of its own injunction is generally afforded heavy weight, *Chevron Corp. v. Donziger,* 990 F.3d 191, 210 (2d Cir. 2021), and will be disturbed only for an abuse of discretion. *Truskoski v. ESPN, Inc.*, 60 F.3d

74, 77 (2d Cir. 1995). Although an exacting standard, "[r]eviewable for abuse of discretion, however, 'is not the equivalent of unreviewable.'" *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 757 (2d Cir. 1998). "A district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision … cannot be located within the range of permissible decisions." *Zervos v. Verizon New York*, Inc., 252 F.3d 163, 169 (2d Cir. 2001); *ExxonMobil Oil Corp. v. TIG Ins. Co*., 44 F.4th 163, 172 (2d Cir. 2022), *cert. dismissed*, No. (R46-7 / OT 2022), 2022 WL 17971294 (U.S. Dec. 27, 2022).

### 2. The Sur Lee and the Non-Embossed Redesign are Compliant

The district court abused its discretion when it found that the Sur Lee and Non-Embossed redesigned packaging were not consistent with the Injunction. Both the Sur Lee and Non-Embossed redesigned packaging objectively met the "substantially different commercial impression" standard, which the Injunction set for permissible packaging designs, and neither had a "superficial, at a glance, resemblance to the Bulleit bottle."

The Sur Lee packaging created a "substantially different commercial impression" from the Bulleit Trade Dress.

**Bulleit Trade Dress**   **Redemption Sur Lee Bottle**

 

Compared with the Bulleit Trade Dress, the Sur Lee packaging design used colored (not colorless) glass, was more than two-thirds opaque (not clear), and had a dark silkscreen label printed directly on the bottle (not a light-colored paper label affixed to the bottle) that took up a substantial portion of the entire front of the bottle (not a small, rectangular area at the bottom of the bottle) and did not have any border. JA61. With these changes, the Sur Lee packaging looked more like the packaging of a different Deutsch whiskey, Bib & Tucker, than Bulleit:



Diageo admitted that Deutsch's Bib & Tucker packaging does not violate Diageo's rights. JA2113:20-25).

The different colored glass and silk-screen label gave the Sur Lee packaging a radically different look that is obviously and readily distinguishable from the Bulleit Trade Dress. Indeed, the district court agreed that the differences between the Sur Lee design and Bulleit were "non-trivial" (JA7334:20-23), that the new label was "striking," and that "these new aspects will tend to guide a purchaser away from the initial impression that the bottle is part of the Bulleit brand." SPA-41 at SPA44; SPA-74:11-15. The district court's keen observations made its decision that the Sur Lee design non-compliant with the Injunction all the more incorrect.

The Non-Embossed Redemption Packaging also differed drastically from the Bulleit Trade Dress.

 

To make the Non-Embossed Redemption Packaging, Deutsch altered six of the

seven design elements that Diageo claimed in its complaint made up the Bulleit

Trade Dress. JA7337. Without any embossing above the label,[13] the redesigned

Redemption Packaging had a sleeker, decidedly less rugged feel. *Id.* And the

changes to the label and cork further distanced the redesigned Redemption from

the Bulleit Trade Dress. *Id.* Again, the district court acknowledged that these

"successive changes made in the [Non-Embossed Redemption Packaging] are in

the right direction" (SPA-74:12-13) yet still held it was inconsistent with the

Injunction.

---

[13] The Injunction permitted Deutsch to retain the label from the accused Redemption Packaging with the exception of its border. Even still, Deutsch made additional changes to the label to further distance the proposed Non-Embossed Redesign from the Bulleit Trade Dress.

The district court refused to permit the Non-Embossed Redemption Packaging even though it looked even more different from the Bulleit Trade Dress than many of the other third-party flask-shaped bottles that Diageo admitted did not violate its rights.



The Sur Lee and Non-Embossed Redemption Packaging created a substantially different commercial impression from the Bulleit Trade Dress and had no superficial, at a glance, resemblance to the Bulleit bottle. Accordingly, while an abuse of discretion in interpreting an injunction is not a common occurrence, Deutsch respectfully urges the Court to conclude that that is what occurred in this instance.

## VII.   CONCLUSION

For the foregoing reasons, this Court should reverse the judgment concerning dilution under federal and New York law and dissolve the Injunction predicated on that judgment. In the alternative, if the Court finds that there is

sufficient evidence to support the federal dilution verdict, but insufficient evidence to support the New York dilution verdict, then the Court should grant a new trial based on the failure to give the niche market instruction. If the Court affirms the judgment and denies a new trial, then it should conclude that both of Deutsch's proposed post-judgment redesigns are compliant with the Injunction.

Dated:   February 3, 2023             Respectfully submitted.

**ARENTFOX SCHIFF LLP**

By:   /s/ Michael Cryan
                          Michael Cryan
                          1301 Avenue of the Americas, Floor 42
                          New York, NY 10019
                          michael.cryan@afslaw.com

                          Zachary D. Smith
                          1717 K Street, NW
                          Washington, DC 20006
                          zachary.smith@afslaw.com

                          Neil Lloyd
                          233 South Wacker Drive
                          Suite 7100
                          Chicago, IL 60606
                          neil.lloyd@afslaw.com

                          *Attorneys for Defendants/Counterclaim Plaintiffs - Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(g)(1) and Local Rule 32.1, because it contains 12,389 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32 (a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Michael Cryan

**SPECIAL APPENDIX**

i

## TABLE OF CONTENTS

**Page**

Opinion, Order and Injunction, dated
September 7, 2022 ................................................. SPA-1

Judgment, dated September 9, 2022 ......................... SPA-39

Order of the Honorable Louis L. Stanton, dated
November 7, 2022 ................................................. SPA-41

Transcript of December 7, 2022 Hearing .................. SPA-46

Order of the Honorable Louis L. Stanton, dated
December 8, 2022 (incorporating rulings in the
Transcript of December 7, 2022 Hearing). ............ SPA-83

ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/1/22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -X

DIAGEO NORTH AMERICA, INC.,

                            Plaintiff,                    17 Civ. 4259 (LLS)

            - against -                                   OPINION, ORDER

W.J. DEUTSCH & SONS LTD. ET AL.,                          & INJUNCTION

                            Defendants.
- - - - - - - - - - - - - - - - - - -X

This is a case about two spirits distributors, Diageo North

America and Deutsch Family Wine & Spirits, who sell whiskey in

similarly designed canteen-shaped, embossed bottles with a label

placed on the lower portion. The central issue is whether the

trademark and trade dress rights of Diageo in its Bulleit Bottle

Packaging Design are violated by Deutsch's Redemption Bottle

Packaging.  After an approximately three-week trial, on June 1,

2022, the jury rendered its verdict finding, in part, that the

Bulleit Packaging Design Mark and Trade Dress are valid,

protectable, and famous, and that Deutsch's Redemption Bottle

packaging diluted the Bulleit Packaging Design under federal and

New York law. The jury did not consider damages because it found

that Deutsch's dilution was not willful.

Diageo now seeks a permanent injunction to prevent

Deutsch's further use of the diluting Redemption bottle design

and packaging. Dkt. No. 450. Deutsch opposes that issuance and

further moves for Judgment as a Matter of Law or in the

Alternative for a New Trial. Dkt. No. 453. For the reasons

SPA-2

explained below, Diageo's motion for a permanent injunction is granted and Deutsch's motion for Judgment as a Matter of Law or a New Trial is denied.

## FACTS

The Court assumes that the parties know the full extent of the facts and will only recapitulate what is necessary.

Following the close of evidence in Diageo's affirmative case, Deutsch moved under Federal Rule of Civil Procedure 50(a) "for judgment as a matter of law based on the plaintiff's failure to meet their burden of proof on any of the causes of action that they've asserted in this case." Trial Tr. 1077:2-5; see Deutsch's Memorandum of Law in Support of its Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(a) ("Deutsch is moving for judgment as a matter of law on all of Diageo's claims for relief because it has failed to meet its burden of proof."). Conversely, at the close of Deutsch's affirmative case on its counterclaims, Diageo moved orally under Rule 50(a) for dismissal as a matter of law "with respect to Deutsch's counterclaims in this case for fraud, abandonment, and functionality." Trial Tr. at 1823:24-1824:1. Deutsch opposed the motion. See Trial Tr. 1823:11-1828:9 (addressing only Diageo's Rule 50(a) motion for denial of Deutsch's counterclaims).

2

The Court reserved decision on both motions and the case was submitted to the jury. See Trial Tr. 1823:11-1828:9. The jury found that defendants were not liable for trade dress infringement or willful trade dress dilution but held Deutsch liable for trade dress dilution under both federal and New York law. Additionally, it found in Diageo's favor against Deutsch's counterclaims and affirmative defenses of functionality, abandonment, and fraud.

Accordingly, the Court ordered the parties to make any additional submissions under Rule 50 or for an injunction by July 21, 2022. Dkt. No. 421.

## DISCUSSION

### Renewed Motion for Judgment as a Matter of Law

In its renewed motion, Deutsch argues that it is entitled to judgment as a matter of law under Rule 50(b) denying Diageo's federal dilution claim, saying that the evidence at trial did not demonstrate that the Bulleit Trade Dress was famous or that it was famous prior to Deutsch's use of the Redemption Packaging, and that the evidence was insufficient to establish dilution by blurring. See Capri Sun GmbH v. Am. Beverage Corp., No. 19 CIV 1422, 2022 WL 976270, at *61 (S.D.N.Y. Mar. 31, 2022)("Federal trademark dilution claims require showing that '(1) the mark is famous; (2) defendant's use of the mark is made in commerce; (3) the defendant used the [junior] mark after the

[senior] mark is famous; and (4) the defendant's use of the mark is likely to dilute the quality of the mark by blurring or tarnishment.").

Deutsch similarly asserts that it is entitled to judgment as a matter of law denying Diageo's state dilution claim because there is insufficient evidence to show that the marks are similar. Id. at *64. ("Courts in the Second Circuit consider six factors to determine dilution by blurring under New York law: (i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark.).

Finally, Deutsch argues that it is entitled to judgment as a matter of law finding in favor of its counterclaims that the Bulleit Trademark and Trade Dress are invalid because they are functional, have been abandoned, and the trademark registration was obtained fraudulently.

**Legal Standards**

Under Rule 50(a), "before the submission of the case to the jury," a party may move for judgment as a matter of law, provided such motion "must specify the judgment sought and the law and the facts that entitle the movant to the judgment." F. R. Civ. P. 50(a)(2). The purpose behind Rule 50's strict timing and specificity requirements is "to give the claimant a fair

4

SPA-5

opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury." Piesco v. Koch, 12 F.3d 332, 340 (2d Cir. 1993) (internal citation omitted); see also Tolbert v. Queens College, 242 F.3d 58, 76-77 (2d Cir. 2001) ("The motion must be sufficient to inform the opposing party of the precise issue as to which more evidence is needed in order to warrant its submission to the jury.").

After the jury returns its verdict, the motion may be renewed under Rule 50(b), but "only on grounds that were specifically articulated before submission of the case to the jury." Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 164 (2d Cir. 1998); Leniart v. Ellison, 761 F. App'x 47, 49 (2d Cir. 2019) (summary order) (citing Tolbert, 242 F.3d at 70) ("A party may renew the motion after an unfavorable verdict on the grounds specifically raised in the prior motion for judgment as a matter of law."). "[T]his procedural requirement may not be waived as a mere technicality." Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1155 (2d Cir. 1994). A Rule 50(b) motion that articulates new grounds for relief may be granted only to "prevent a manifest injustice in cases [w]here a jury's verdict is wholly without legal support." Pahuta v. Massey-Ferguson, Inc., 170 F.3d 125, 129 (2d Cir. 1999) (alteration in original) (internal quotations omitted); Kirsch, 148 F.3d at 164 ("As to any issue on which no proper Rule 50(b)

motion was made, JMOL may not properly be granted by the district court ... unless that action is required in order to prevent manifest injustice.").

Under Rule 50(b), "[a] district court may grant judgment as a matter of law only if it finds that 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party.'" Triolo v. Nassau Cnty., 24 F.4th 98, 105 (2d Cir. 2022) (quoting Fed. R. Civ. P. 50(a)(1)). A court must "'consider the evidence in the light most favorable to the party against whom the motion was made and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in [its] favor from the evidence.'" Knox v. John Varvatos Enters. Inc., 512 F. Supp. 3d 470, 478 (S.D.N.Y. 2021) (quoting Tolbert, 242 F.3d at 70). "In performing this function, a court cannot 'assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury, and must disregard all evidence favorable to the moving party that the jury is not required to believe.'" Id. (quoting Tolbert, 242 F.3d at 70). "The movant's burden is 'particularly heavy' where, as here, the 'jury has deliberated in the case and actually returned its verdict.'" Triolo, 24 F.4th at 105 (quoting Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005)).

**Deutsch's Counterclaims**

7

Deutsch alleges that it may move for Judgment as a Matter of Law under Rule 50(b) granting its counterclaims of functionality, abandonment, and fraud because it provided notice of such arguments and Diageo will not be prejudiced by the absence of formal notice in a 50(a) motion. Dkt. No. 467 (Reply) at 16.

But, under Rule 50(a), Deutsch only moved against Diageo's claims of dilution under federal and state law, claim of Deceptive Acts and Practices under state law, claims to any monetary relief, and claims of trademark infringement under federal and common law. See Deutsch's Memorandum of Law in Support of its Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(a). Deutsch did not move for judgment as a matter of law granting its counterclaims.

A "Rule 50(a) motion requesting judgment as a matter of law on one ground but omitting another is insufficient to preserve a JMOL argument based on the latter." Lore v. City of Syracuse, 670 F.3d 127, 152 (2d Cir. 2012). Accordingly, Deutsch's 50(b) motion granting its counterclaims can be granted only if necessary to prevent manifest injustice. Id. ("As to any issue on which proper Rule 50 motions were not made, JMOL may not properly be granted by the district court, or upheld on appeal, or ordered by the appellate court unless that action is required in order to prevent manifest injustice.") No manifest injustice

requires the granting of defendants' motion. Therefore,

Deutsch's Rule 50(b) motion for granting its counterclaims of

functionality, abandonment, and fraud is denied.

**Federal Dilution**

Fame

Viewing the evidence in the light most favorable to Diageo,

Deutsch does not show that the jury lacked an evidentiary basis

to find in favor of Diageo. Rather, Diageo presented compelling

evidence at trial that the Bulleit Packaging Design is

nationally famous and a reasonable trier of fact could and did

conclude that the Bulleit trade dress was famous before Deutsch

used the Redemption packaging: the Bulleit trade dress has been

in identical use for 21 years (Trial Tr. 78:25-79:5, 79:6-12,

118:14-121:1, 138:11-16 (Bello)); $56 million has been spent in

advertising during the five years prior to the introduction of

the competing Redemption packaging in 2016 (PX 338); advertising

campaigns featuring the Bulleit trade dress have appeared in

national print and digital magazines (PX 340), on billboards

located across the country (PX 341), in and at professional

arenas, sporting events, and festivals throughout the nation (PX

340, 448; Trial Tr. 128:23-129:17; 129:18-131:17 (Bello)), and

on social media, which reached over 100 million consumers (Trial

Tr. 126:23-127:18 (Bello); the Bulleit trade dress has appeared

in television shows and movies from 2005 through 2019 (PX 355);

8

150 million dollars' worth of sales of Bulleit were made in Fiscal Year 2016 alone (PX 438); and Deutsch witnesses admitted "consumers already know and love" Bulleit (PX 71 (April 2016 email from former Deutsch Marketing Director Jennifer Thomason)). See Nabisco, Inc. v. PF Brands, Inc., 50 F. Supp. 2d 188, 203 (S.D.N.Y. 1999) (holding that the "extended duration and high volume of use tend to make the Goldfish mark distinct and famous"), aff'd, 191 F.3d 208 (2d Cir. 1999); Savin Corp. v. Savin Grp., 391 F.3d 439, 450 (2d Cir. 2004) (finding fame from $20 million in advertising in one year, annual revenues of $675 million, and "products and services, which are regularly featured in print advertisements, trade magazines, and tradeshow promotions"); Victorinox AG v. B & F Sys., Inc., 114 F. Supp. 3d 132, 139-40 (S.D.N.Y. 2015) (holding that the Swiss Army knife trade dress was famous when it received "extensive unsolicited media coverage," including "its appearance in the opening credits of the television series 'MacGyver'"), aff'd, 709 F. App'x 44 (2d Cir. 2017).

The jury was reasonable and had a legally sufficient evidentiary basis to find the Bulleit trade dress was famous before the introduction of the diluting Redemption packaging.

Dilution By Blurring

In assessing a claim for dilution by blurring, a factfinder may consider the following factors: (i) "The degree of

similarity between the mark or trade name and the famous mark";
(ii) "The degree of inherent or acquired distinctiveness of the
famous mark"; (iii) "The extent to which the owner of the famous
mark is engaging in substantially exclusive use of the mark";
(iv)"The degree of recognition of the famous mark"; (v) "Whether
the user of the mark or trade name intended to create an
association with the famous mark"; and (vi) "Any actual
association between the mark or trade name and the famous mark."
15 U.S.C. § 1125(c)(2)(B).

To support its argument that the jury did not have a
sufficient evidentiary basis to find dilution by blurring,
Deutsch argues that there is insufficient evidence to support
the first (degree of similarity) and third (substantially
exclusive use) factors. Deutsch points to the facts that the
bottles are nonidentical with numerous differences and that
Diageo did not submit dilution survey evidence showing an
association between the bottles' packages in the minds of
consumers. It also argues that Diageo is not engaging in
substantially exclusive use of the mark because the Bulleit
trade dress has already been blurred by extensive third-party
use.

Deutsch's arguments ignore the evidence presented at trial
and ask the Court to substitute its (assumed) judgment for that
of the jury. The evidence, such as the bottles themselves,

pictures of the bottles on shelves, and testimony from consumers and parties' witness, showed the jury the similarities and dissimilarities between the bottles, and it came to a sensible judgment that the bottles are similar enough to support a finding that dilution by blurring would occur. See Miss Universe, L.P. v. Villegas, 672 F. Supp. 2d 575, 593 (S.D.N.Y. 2009) ("Substantial similarity is not necessarily required, and a lack of similarity is not necessarily dispositive.").

Diageo was not required to perform a dilution survey to prove similarity. See Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 736 F.3d 198, 212–13 (2d Cir. 2013)(holding that although a survey showing actual association is probative, proof of actual association is not required). Diageo showed the bottles were similar by presenting three incidents of actual association by participants in Deutsch's focus group, in a Facebook page comment, and by two consumers. While mere evidence of isolated instances of "actual association" is insufficient, that evidence in conjunction with the other evidence just mentioned suffices for a reasonable fact finder to determine that the bottles are similar.

Additionally, the jury was able to review a plethora of third-party bottles to determine whether those bottles were similar enough to the Bulleit Packaging Design to render use of the design non-exclusive. The jury was within its right to

credit the evidence as it did, and the Court cannot weigh conflicting evidence of third-party bottles to overcome its verdict.

Deutsch's Renewed Motion for Judgment as a Matter of Law against Diageo's claim for federal dilution is denied.

**NY State Law Dilution**

Deutsch argues that there is insufficient evidence to show that there is a substantial similarity between the Bulleit Trade Dress and the Redemption Packaging because "[t]he fact that they found no likelihood of confusion or infringement necessarily implies that the evidence failed to establish that the Bulleit Trade Dress and the Redemption Packaging are similar enough to support a finding of infringement in this case." Dkt. No. 456 (JMOL) at 22.

But New York law provides dilution may be found "notwithstanding the absence . . . of confusion as to the source of goods or services." N.Y. Gen. Bus. L. § 360-l. As discussed above, there was ample evidence of the close similarity between the Bulleit Trade Dress and the Redemption packaging, and such evidence of similarity may be taken with some evidence of instances of consumer confusion to show likelihood of dilution. See ABC Rug & Carpet Cleaning Serv., Inc. v. ABC Rug Cleaners, Inc., 2010 WL 10091076, at *23 (S.D.N.Y. Feb. 10, 2010) (holding that the marks were substantially similar under New York's

dilution statute in part because, based on four affiants of actual confusion, "enough consumers were confused by the similarity of the marks for the Court to conclude that they are 'essentially the same'" and showed a likelihood of blurring), report and recommendation adopted, 2011 WL 182114 (S.D.N.Y. Jan. 13, 2011).

The jury was also presented with extensive evidence allowing it to find that the other factors used to assess dilution under New York law also were in Diageo's favor—such as the fact that the products are identical in type and the famous nature of the Bulleit Packaging Design. Accordingly, the evidence on dilution under New York law was sufficient to support the jury's finding and Deutsch's motion for judgment as a matter of law dismissing Diageo's claim of dilution under New York law is denied.

## New Trial

Deutsch moves for a new trial arguing that: the jury's verdict granting the federal and state dilution claims and denying the functionality, abandonment, and fraud counterclaims is against the weight of the evidence; the jury instructions were erroneous; and evidence was improperly excluded.

**Legal Standards**

Under Rule 59, a court may grant a new trial on some or all issues "after a jury trial, for any reason for which a new trial

SPA-14

has heretofore been granted in an action at law in federal court," F. R. C. P. 59(a)(1)(A), including that the verdict is against the weight of the evidence, Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 418 (2d Cir. 2012). A decision is against the weight of the evidence if the verdict is seriously erroneous or a miscarriage of justice. Id.; Ali v. Kipp, 891 F.3d 59, 64 (2d Cir. 2018) ("A trial court should not grant a motion for a new trial unless it is 'convinced that the jury ... reached a seriously erroneous result or that the verdict is a miscarriage of justice.'").

In contrast to a motion for judgment as a matter of law, on a motion for a new trial, a trial judge "'is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner.'" Song v. Ives Labs, Inc., 957 F.2d 1041, 1047 (2d Cir. 1992) (quoting Bevevino v. Saydjari, 574 F.2d 676, 684 (2d Cir. 1983). "However, our precedent counsels that trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge 'should rarely disturb a jury's evaluation of a witness's credibility,' and may not 'freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury.'" Raedle, 670 F.3d at 418 (citations omitted).

**Verdict Against Weight of Evidence**

14

SPA-15

Diageo's Federal and State Dilution Claims

Even under Rule 59's different standards, Deutsch cannot show that the verdict is seriously erroneous or a miscarriage of justice. The jury's findings of fame and of likelihood of dilution under federal and state law are fact-intensive inquiries involving a variety of factors and, as discussed above, there was ample evidence to support the jury's verdict on those issues. See Can't Live Without It, LLC v. ETS Express, Inc., 373 F. Supp. 3d 434, 442–43 (S.D.N.Y. 2018) (denying motion for a new trial when the plaintiff put forward "ample evidence for the jury to find that it met its burden" of proving trade dress infringement and holding that even a "relatively close question" was not sufficient to find that the "jury's verdict was seriously erroneous or a miscarriage of justice" warranting a new trial).

Deutsch's motion for a New Trial on federal and state dilution is denied.

Deutsch's Counterclaims

*Functionality*

Deutsch argues that each of the elements of the Bulleit Trade Dress, including the bottle's rounded shoulders, shape, cork closure, embossing, black cap, clear glass, label borders, arched text, and text dividers, has its separate utilitarian or aesthetic function.

15

SPA-16

That overlooks that the functionality of the trade dress must be assessed with respect to the trade dress as a whole. See, e.g., Cartier, Inc. v. Sardell Jewelry, Inc., 294 F. App'x 615, 620–21 (2d Cir. 2008) (holding "sound" the district court's conclusion that "it was improper for defendants to break the trade dress down into specific elements and call them functional, because plaintiffs' claim is that the combination and arrangement of those design elements comprise the trade dress at issue"); GeigTech E. Bay LLC v. Lutron Elecs. Co., 352 F. Supp. 3d 265, 280–81 (S.D.N.Y. 2018) ("Where the asserted trade dress extends to the overall look of the combination of features comprising a product or product line, the Court must evaluate the distinctiveness and functionality of those features taken together, not in isolation." (quotation marks omitted)).

Looking at the Bulleit Trade Dress as a whole, the evidence at trial was sufficient for the jury to find that the bottle design is not functional because of evidence that it: increases the cost of production, is not advertised as being functional, was not intended to be functional, and has many alternatives, such that competitors' ability to compete is not impaired. See, e.g., Trial Tr. 99:1–7 (Bello) ("This is a hard to pack bottle. It costs us money to bottle, it is difficult."); id. at 573:20–579:17 (Guiliani) (testifying how the Bulleit design increases the bottle's manufacturing costs); id. at 580:17–581:3

(Guiliani) (testifying that no aspect of the bottle is intended to make it easier to ship or to minimize the chance of breakage); id. at 99:19–100:3 (Bello) (calling it ridiculous to insinuate Bulleit advertised functional benefits of the design); id. at 286:10–287:3, 288:10–289:18 (Sandstrom) (testifying that his design process did not take account of whether the bottle would be easy to pour or whether elements of the bottle would make manufacturing it easier or more difficult); id. at 101:16–102:19 (Bello) (discussing the alternative bottle designs used by Crown Royal, Johnnie Walker, George Dickel, and Singleton).

Deutsch's motion for a New Trial on the counterclaim that the design is functional is denied.

*Abandonment*

Deutsch argues that the evidence introduced at trial overwhelmingly established that Diageo has tolerated numerous third-party competitors who have continuously used bottle packaging with features that are similar to or identical to those that Diageo claims as part of the Bulleit Design Mark and Trade Dress, both before and after the Bulleit bottle design was first used.

But the evidence shows that Diageo does not tolerate third-party use and protects its rights by pursuing enforcement actions when necessary. See Trial Tr. 145:10–159:2 (Bello) (discussing Diageo's enforcement actions against McGillicuddy

and Manatawny). The jury's conclusion finding no abandonment has evidentiary support and will not be disturbed.

Deutsch's motion for a New Trial on that issue is denied.

*Fraud*

Deutsch argues that the Bulleit Design Mark was obtained fraudulently because Diageo knew or should have known that its statement to the Trademark Office that the bottle shape was unique and not functional was false.

While the argument that Diageo should have known that the statements to the Trademark Office were false has force, there is too little evidence that its representatives did actually know that their representations were untrue. See MPC Franchise, LLC v. Tarntino, 826 F.3d 653, 659 (2d Cir. 2016) ("That is, to succeed on a claim that a trademark holder procured the mark by fraud, a plaintiff cannot merely show that the trademark holder 'should have known' that the application contained false statements of material fact."). Deutsch's argument that as the largest alcohol company in the world, Diageo must have been aware of third-party bottles with similar shapes and should have known of that the bottle's rounded shoulders serve a functional purpose does not establish that they actually knew it, especially when extensive evidence was adduced at trial that showed Diageo thought that its bottle shape was distinctive. See TX 1 at 40-41 (Diageo's outside counsel Robert Henley's

statement, in response to the Trademark Office's request to disclaim protection for the bottle shape in the registration application, that the Bulleit bottle shape was an inherently distinctive component of the mark and stood out in the beverage alcohol industry); Trial Tr. 572:15-573:11 (Guiliani) (the Bulleit bottle shape uses a proprietary custom mold and was designed to look different from other products on the market); id. 274:12-16 (Sandstrom)(same); Henley Dep. Tr. 167:3-8 ("[G]iven the bottle's unique shape, it[s] tapering, the type of high, high, short neck, wide shoulders, and somewhat barreling of the chest, so to speak, of the bottle design, I do remember it being—it being unique.").

Thus, the evidence on that question was divided and posed a classic case for resolution by a jury, and its verdict will not be disturbed.

Deutsch's motion for a New Trial is denied.

### Claims of Improper Jury Instructions

"A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." Dancy v. McGinley, 843 F. 3d 93, 116 (2d Cir. 2016). The error must be sufficiently serious to undermine "the very integrity of the trial." SCS Commc'ns Inc. v. Herrick Co., 360 F.3d 329, 343 (2d Cir. 2004) (quoting Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 61 (2d Cir.

2002)). The charge is adequate so long as it, "taken as a whole, is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it." Newport Elecs., Inc. v. Newport Corp., 56 F. App'x 63, 65 (2d Cir. 2003); e.g., Schermerhorn v. Local 100, Transp. Workers Union of Am., 91 F.3d 316, 322 (2d Cir. 1996).

Under Federal Rule of Civil Procedure 51(c)(1), a party "who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Accordingly, "a party may not 'rely on her submission of proposed jury instructions that included a[ ] [requested] instruction' to preserve an objection." Emamian v. Rockefeller Univ., 971 F.3d 380, 387 (2d Cir. 2020) (quoting Caruso v. Forslund, 47 F.3d 27, 31 (2d Cir. 1995) (alteration in Emamian). A party's failure to object to an instruction on the record may be excused when "the party's position has previously been made clear to the trial court and it was apparent that further efforts to object would be unavailing." Id.

The Court addresses in turn Deutsch's claims that the jury was wrongly given the following instructions:

- The Court instructed that "A trade dress is famous if it is widely recognized by the general consuming public of the United States as a designation that the source of the

20

product is the owner of the trade dress." Jury Instructions
21:471-474.

Deutsch now objects to the term "general consuming
public" and the lack of an instruction that niche market
fame was insufficient to meet the standard. However,
Deutsch did not object on the record to the use of "general
consuming public." Moreover, "general consuming public" is
the statutory language of 15 USC § 1125(c)(2)(A) and is
sufficient to apprise the jury that it needed to consider
the fame of the Bulleit Packaging Design beyond any niche
market or limited set of consumers.

- The Court instructed that "If you determine that Diageo has
  proven by a preponderance of the evidence that the
  Redemption bottle dilutes the Bulleit Trade Dress and you
  determine that Deutsch's use of the packaging began after
  the Bulleit Trade Dress became famous, you must find that
  Deutsch diluted Diageo's trade dress in violation of
  federal law." Jury Instructions 22-23:510-515.

Deutsch now objects to the lack of an instruction that
Diageo was required to establish that the Bulleit Design
Mark or the Bulleit Trade Dress achieved the requisite
level of fame before Deutsch began using its Redemption
packaging. Deutsch did not make such an objection on the

SPA-22

record. The instruction explicitly required that Deutsch's use "began after the Bulleit Trade Dress became famous."

- The Court instructed that "to determine whether the accused Redemption packaging will cause a likelihood of dilution under New York General Business Law, you may consider the following factors: 1) Whether the Bulleit Trade Dress and Redemption Trade Dress are very similar. If they are not, then there is no dilution." Jury Instructions 23:517-22.

Deutsch objects and argues that the jury was not properly instructed that it was required to find that the Redemption packaging is so substantially similar to the Bulleit Trade Dress that consumers would view the marks as essentially the same. However, on the record, Deutsch did not object to the use of "very similar," which comports with the law of this Circuit. See Playtex Prod., Inc. v. Georgia-Pac. Corp., 390 F.3d 158, 167 (2d Cir. 2004) ("A plaintiff cannot prevail on a state or federal dilution claim unless the marks at issue are 'very' or 'substantially similar.'"); Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 114 (2d Cir. 2009) (quoting Playtex Prod., Inc., 390 F.3d 167).

- The Court instructed that the standard of proof for abandonment is clear and convincing evidence, which Deutsch objected to on the record arguing that the standard is

SPA-23

preponderance of the evidence. Nonetheless, the instruction
provided the correct legal standard. See e.g., Saratoga
Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir.
1980) ("abandonment, being the forfeiture of a property
interest, should be strictly proved'); Emmpresa Cubana Del
Tabaco v. Culbro Corp., 213 F. Supp. 2d 247, 268 (S.D.N.Y.
2002); Dual Groupe, LLC v. Gans-Mex LLC, 932 F. Supp. 2d
569, 574 (S.D.N.Y. 2013); J. Thomas McCarthy, 3 McCarthy on
Trademarks and Unfair Competition § 17:12 (5th ed. 2021)
(stating that "[t]he majority of courts" require that
"evidence of the elements of abandonment must be clear and
convincing").

- The Court instructed that "When considering whether the
  Bulleit bottle Trade Dress is functional, you must consider
  the entire trade dress as a whole." Jury Instructions
  7:168-170. Deutsch objected on the record and argued that
  the functionality of each feature of the trade dress must
  be examined. Such an instruction would have been error.
  See, e.g., Cartier, Inc. v. Sardell Jewelry, Inc., 294 F.
  App'x 615, 620-21 (2d Cir. 2008); GeigTech E. Bay LLC v.
  Lutron Elecs. Co., 352 F. Supp. 3d 265, 280-81 (S.D.N.Y.
  2018) ("Where the asserted trade dress extends to the
  overall look of the combination of features comprising a
  product or product line, the Court must evaluate the

23

SPA-24

distinctiveness and functionality of those features taken
together, not in isolation.").

- The Court instructed that "In determining whether the
Bulleit Trade Dress is functional, you may consider . . .
(3) the availability to competitors of alternative design
mark designs for the same kinds of products. If there are
alternative designs (i.e., alternative combinations of
elements that make up the design mark) available for the
same kind of product, that is evidence of non-
functionality." Jury Instructions 8:172-193.

> Deutsch argues that it did properly object to this
> instruction on the record:
>
>> MR. GROW: Well, again, I would propose where it says
>> in determining whether the non-functional features of
>> the Bulleit trade dress, in considering whether the
>> non-functional features of the Bulleit trade dress,
>> you may consider the following factors. There is no
>> amount of advertising, there is no amount of intent or
>> availability of an alternative designs that can save
>> the invalidity of the bottle.  Trial Tr. at 1665:20-
>> 1666:1.

Whatever thought that statement conveys, it is not an
objection to using the availability of alternative designs
as a factor in determining utilitarian functionality.

24

SPA-25

Accordingly, Deutsch did not properly preserve that objection. Further, the charge as given is correct.

- The Court instructed that "To find for Diageo on this claim [of unregistered trade dress infringement], you must conclude that Diageo has shown by a preponderance of the evidence that it owns a valid Bulleit Trade Dress. . . An unregistered trade dress is valid if it is (1) non-functional . . . In reaching a determination of whether the Bulleit Trade Dress is non-functional. . . you should consider the same factors . . . always aware that for this claim Diageo, not Deutsch, carries the burden of proof." Jury Instructions 15: 330-40.

    Deutsch for the first-time objects that the jury was not instructed that the burden of proving that an unregistered trade dress is not functional is on the plaintiff. In the final sentence, the Court stated that "Diageo, not Deutsch, carries the burden of proof."

- The Court instructed that to prevail on its fraud counterclaim Deutsch must prove that "Diageo knew that the representation was false." Jury Instructions 10:233.

    Deutsch objected on the record that it wanted the instruction "to read knew or had to have known." Trial Tr. 1670:16-17. The Court declined to give that instruction because "The law is clear that had to have known is not

SPA-26

knowing and is not punishable as knowing. Knowing is
something different. At least I'm following the cases that
say that. I think it makes more sense." Id. at 1670:23-
1671:3. To have given Deutsch's proposed instruction would
be error.

- The jury verdict form instructed that Deutsch had to prove
  that "Diageo obtained the Bulleit Trademark Registration
  through intentional fraud on the U.S. Patent and Trademark
  Office." Jury Verdict # 3.

  Deutsch now objects to that for the first time. Even
  had the objection been properly raised, the Court's full
  charge outlined the elements of fraud, and in context, the
  reference to "intentional fraud" plainly refers to the
  element of the claim that requires proof of intent to
  deceive the PTO. See Jury Charge at 10:227–11:239.
  Accordingly, there was not error in the instruction.

- Deutsch objects to the fact that no instruction was given
  concerning the distinction between Diageo's Registered
  Design Mark and its Unregistered Trade Dress. While Deutsch
  did not make this exact objection on the record, it made
  clear its position that the registered and unregistered
  trade dresses were separate and distinct sufficiently to
  save the point. See Trial Tr. at 1696:1-8 (counsel for
  Deutsch noting that "The way the instruction is written,

26

the way the verdict form is written, in the first
paragraph, we're only addressing the registered mark which
is not the same as the registered trade dress or the
unregistered trade dress, and it is not the bottle
package."); id. at 1632:4-1633:16; id. at 1643:18-1644:19;
id. at 1646:16-1647:23; id. at 1662:23-24. Adopting the
suggested phrase of "Bulleit design mark and trade dress,"
the Court and Deutsch's counsel went through the charge
page by page, substituting that phrase chosen by counsel to
make clear that the trademark and trade dress were separate
items. Thus, Deutsch's objection to the lack of the
instruction is unsubstantiated because "the charge, taken
as a whole, is correct and sufficiently covers the case so
that a jury can intelligently determine the questions
presented to it.'" Newport Elecs., Inc., 56 F. App'x at 65.

None of Deutsch's present objections, timely or untimely,
have merit.

Evidentiary Rulings

Deutsch argues that three key exhibits were excluded from
trial: a demonstrative display showing 100 differences between
the bottles; a third-party stock bottle, the O.Berk Philadelphia
flask bottle; and an antique Four Roses bottle.

"A district court has broad discretion over the
admissibility of evidence at trial." Ojeda v. Metro.

Transportation Auth., 477 F. Supp. 3d 65, 77 (S.D.N.Y. 2020), aff'd, 41 F.4th 56 (2d Cir. 2022) (citing Kogut v. Cnty. of Nassau, 789 F.3d 36, 47 (2d Cir. 2015)). "[A]n erroneous evidentiary ruling warrants a new trial only when 'a substantial right of a party is affected.'" Lore, 670 F.3d at 155 (quoting Arlio v. Lively, 474 F.3d 46, 51 (2d Cir. 2007)). This means it must be "likely that in some material respect the factfinder's judgment was 'swayed by the error.'" Costantino v. David M. Herzog, M.D., P.C., 203 F.3d 164, 174 (2d Cir. 2000) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 150 (2d Cir. 1997)).

Deutsch certainly has not met this demanding standard. The exclusion of the demonstrative display did not sway the jury's judgment as they could see for themselves the differences between the Bulleit and Redemption trade dresses. Neither did the exclusion of the O.Berk Philadelphia flask bottle because it was cumulative of many other bottles already admitted to prove Duetsch's counterclaims.

The Court provided Deutsch with an opportunity to lay a foundation to show the antique Four Roses bottle was relevant to its fraud counterclaim. But Deutsch was unable to lay a foundation that Diageo knew of the bottle, making it irrelevant to the registration statement Diageo made to the Patent and Trademark Office. See Trial Tr. 1535:1–1540:2. A new trial is not warranted.

SPA-29

## Conclusion

The jury was properly instructed. Its verdict was a discriminating and reasoned appraisal of the evidence and will not be disturbed. It remains only to address the proper remedy.

### Permanent Injunction

The Federal Trademark Dilution Act provides that subject to the principles of equity, the owner of a trademark found to have been diluted "shall be entitled to an injunction . . . regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C.A. § 1125(c)(1); see id. § 1125(c)(5) ("In an action brought under this subsection, the owner of the famous mark shall be entitled to injunctive relief as set forth in section 1116 of this title.").

Similarly, under New York General Business Law, "(l)ikelihood of . . . dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered . . ., notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." N.Y. Gen. Bus. Law § 360-l. The New York and federal statutes are similar in many respects and may be analyzed together. Nabisco, Inc. v. PF Brands, Inc., 50 F. Supp. 2d 188, 200 (S.D.N.Y.), aff'd, 191 F.3d 208 (2d Cir. 1999) ("Both

29

statutes permit a claim for dilution regardless of whether there is proof of consumer confusion.").

In short, the court should issue an injunction when a plaintiff has succeeded on the merits and has demonstrated that (1) it suffered irreparable harm; (2) that remedies available at law are inadequate to compensate for that injury; (3) that the balance of hardships between the parties warrants such a remedy; and (4) that the public interest would not be disserved by the issuance of an injunction. Moonbug Ent. Ltd. v. A20688, No. 21 CIV. 4313 (VM), 2022 WL 1239586, at *2 (S.D.N.Y. Apr. 26, 2022); see U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 800 F. Supp. 2d 515, 539 (S.D.N.Y. 2011), aff'd, 511 F. App'x 81 (2d Cir. 2013).

**Irreparable harm**

Upon a finding of trademark dilution, a plaintiff seeking a permanent injunction "shall be entitled to a rebuttable presumption of irreparable harm."[1] 15 U.S.C.A. § 1116(a).

---

[1] Although the rebuttable presumption of irreparable harm was not enacted until the Trademark Modernization Act of 2020 (TMA), years after this litigation commenced but prior to the trial, the Second Circuit has held that intervening legislation applies to prospective requests for injunctive relief. Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 477 F.3d 765, 766 (2d Cir. 2007). Moreover, the Second Circuit's warning that "unless Congress intended a 'major departure from the long tradition of equity practice,' a court deciding whether to issue an injunction must not adopt 'categorical' or 'general' rules or presume that a party has met an element of the injunction standard" is heeded. Salinger v. Colting, 607 F.3d 68, 78 n.7 (2d Cir. 2010). Here, Congress passed the TMA to confirm that "the historical practice of applying a rebuttable presumption of irreparable harm is the appropriate course for claims under the Lanham Act." H.R. Rep. No. 116-645, att 19 (2020).

SPA-31

Irreparable harm exists in a trademark case when the party seeking the injunction shows that it will potentially lose goodwill and control over the reputation of its trademark. See Kelly Toys Holdings, LLC v. alialialiLL Store, No. 21 CIV 8434, 2022 WL 2072567, at *11 (S.D.N.Y. June 9, 2022); U.S. Polo Ass'n, Inc., 800 F. Supp. 2d at 540. Goodwill is simply the intangible "business value of a company's brand and reputation" beyond the value of its tangible assets. 1 McCarthy on Trademarks & Unfair Competition § 2:19 (5th ed. June 2022 update).

As the jury has found that the Bulleit Trade Dress is diluted by the Redemption packaging, Deutsch seeks to rebut the presumption of irreparable harm by arguing that no evidence adduced at trial supported a showing of a loss of goodwill arising from Deutsch's use of the Redemption packaging or of erosion of the Bulleit Trade Dress by the Redemption packaging.

To the contrary, Diageo introduced evidence of both. Ample evidence showed a loss of goodwill and the whittling away of the distinctiveness of Bulleit packaging to the detriment of its reputation and its ability to signify to the public that it is a unique product, including Deutsch's design brief requesting a shape "similar to Bulleit" (PX 40 at DFWS00083062); comments made by participants in Deutsch's focus group and by consumers associating the brands because of the similarities in their

31

bottle designs (TX 5 at 1:07:15-1:07:31 (focus group participant
stating that the proposed Redemption design is "just trying to
be the Bulleit Rye bottle"); PX 103 (comment on Deutsch's
Facebook post that the Redemption bottle "Looks a bit like
Bulleit"); PX 425 (consumer phone call asking why Diageo was now
using the Bulleit bottle for Redemption); Schuler Dep. Tr. 27:4-
15, 33:5-34:10 (read into trial record) (consumer referring to
the Redemption bottle as "Bulleit Redemption Bourbon" because he
thought the brands were "linked" and Redemption was "an offshoot
from what Bulleit had to offer")); survey evidence on the
likelihood of confusion (Trial Tr. 591:24-592:10 (finding "a net
confusion rate of 15 percent, which I found to be a significant
level that I believe indicates a significant likelihood of real
marketplace confusion with the Redemption bottle."), Id. at
611:11-613:3 ("33 percent said they think the Redemption product
is made by the same company as Bulleit and an additional 7
percent said they think that the company that makes Redemption
is affiliated with or sponsored or approved by the company that
makes Bulleit. So it was a 40 percent total rate of connecting
the Redemption product to Bulleit."); and a decline in sales
(Id. at 144:25-145:7 (Bello) (testifying that when the
Redemption packaging entered the market, Bulleit "went from
growing 25, 28, high twenties, to basically 10 percent and then
single digits. So it halved our growth, more than halved our

33

growth."), Id. at 855:8-13 (expert testimony that Deutsch earned "approximately $21.4 million" in profits from the sale of Redemption).

Therefore, in addition to the statutory presumption to which Diageo is entitled, the evidence at trial demonstrated that Diageo suffers irreparable harm due to the diluting Redemption Packaging.

**Inadequate Legal Remedies**

Where, as here, there is an absence of willful dilution, the sole remedy to a finding of dilution is an injunction prohibiting the use of the diluting packaging. See 15 U.S.C.A. § 1125(c)(1); 15 U.S.C.A. § 1116(a); N.Y. Gen. Bus. Law § 360-1; cf. John E. Andrus Mem'l, Inc. v. Daines, 600 F. Supp. 2d 563, 572 n.6 (S.D.N.Y. 2009) (citing United States v. State of New York, 708 F.2d 92, 93 (2d Cir. 1983) (finding injunctive relief appropriate when it was the only available remedy).

Further, a plaintiff has no adequate remedy at law if, absent an injunction, the defendant is likely to continue diluting its trade dress rights. See Kelly Toys Holdings, 2022 WL 2072567, at *11 ("A showing that there is no adequate remedy at law is satisfied where the record contains no assurance against defendant's continued violation," of a plaintiff's rights."); Mattel, Inc. v. 1622758984, No. 18-CV-8821, 2020 WL 2832812, at *5 (S.D.N.Y. May 31, 2020). Deutsch's President has

publicly asserted in post-verdict press interviews that "nothing in this decision requires us to change anything about Redemption's packaging." Dkt. No. 451 (Memorandum of Law in Support of Motion for Permanent Injunction) at 2. Deutsch has also made no assurance that it will cease diluting the Bulleit trade dress.

The Court finds that remedies at law are inadequate to protect Diageo.

**The Balance of Hardships**

Deutsch argues that it will be irreparably crippled by the issuance of the requested injunction, which prohibits Deutsch from continuing to put into the market "additional diluting packaging or creating new advertising materials that feature the enjoined packaging," Dkt. No. 463 (Reply) at 7, because it would essentially be the "death knell of the brand" and cause Deutsch to lose approximately $33 million in annual revenues, Dkt. No. 459 (Opposition) at 15 & 17.

But a dilutor cannot complain about the loss of its ability to sell a diluting product. Cf. Mattel, Inc. v. 1622758984, No. 18-CV-8821, 2020 WL 2832812, at *5 (S.D.N.Y. May 31, 2020).

Further, Deutsch has available alternative packaging designs into which it can rebottle its existing inventory of whiskey, including the bottle used to package its upper-tier barrel-proof Redemption whiskey. TX 62; see N.Y.C. Triathlon,

SPA-35

LLC v. NYC Triathlon Club, Inc., 704 F. Supp. 2d 305, 326-27

(S.D.N.Y. 2010) (finding that harm to defendant, "who has other

names and marks available to it," would not outweigh harm to

plaintiff). Changing the diluting Redemption packaging will not

disproportionately harm Deutsch's business, since approximately

97% of Deutsch's total sales are from non-infringing products.

Thus, the hardships imposed on Deutsch are not so great as to

outweigh the harm that is being done to Diageo absent an

injunction.

**The Public Interest**

Granting injunctive relief does not disserve the public

interest. Consumers have an interest in being assured that the

mark it associates with a product is not attached or associated

with other goods. N.Y.C. Triathlon, LLC, 704 F. Supp. 2d at 344

("The public has an interest in not being deceived – in being

assured that the mark it associates with a product is not

attached to goods of unknown origin and quality.").

Indeed, that public interest in the prevention of dilution

is shown by the passage of both federal and state legislation

providing for injunctive relief for that purpose.

Diageo's motion for a permanent injunction is granted.

**Injunction Terms**

"A district court has 'broad discretion to enjoin possible

future violations of law where past violations have been

shown.'" <u>City of New York v. Tavern on the Green Int'l LLC</u>, No.

17-CV-1376, 2021 WL 1316956, at *3 (S.D.N.Y. Apr. 7, 2021)

(quoting <u>United States v. Carson</u>, 52 F.3d 1173, 1184 (2d Cir.

1995)). Still, "injunctive relief must be 'narrowly tailored to

fit specific legal violations.'" <u>Coty Inc. v. Excell Brands,</u>

<u>LLC</u>, 277 F. Supp. 3d 425, 463 (S.D.N.Y. 2017)

    Accordingly, IT IS HEREBY ORDERED THAT:

1. Deutsch Family Wine & Spirits and Bardstown Barrrel
   Selections LLC, their agents, and any third parties who are
   in active concert or participation with the manufacture,
   sale, or promotion of Redemption who receive notice of this
   injunction are permanently restrained and enjoined
   nationwide from, directly or indirectly, manufacturing,
   selling, offering for sale, distributing, licensing,
   importing, exporting, advertising, promoting, displaying,
   or using in commerce, including in stores, online, and in
   physical, digital, or recorded advertisements or
   promotional materials, the Diluting Redemption Packaging at
   issue in this litigation and any other colorable imitation
   thereof, except for the product that on the date of entry
   of this Order has already been transferred to distributors,
   retail stores, bars, or restaurants. That product in the
   Redemption packaging that has been transferred by the date

of entry of this Order may continue to be sold, but none
thereafter.

2. Defendants are directed to undertake a change to the
Redemption glass bottle and packaging that will convey a
substantially different commercial impression, but may
retain those unchallenged aspects of the package like i)
the brand name Redemption or terms such as "pre-
prohibition" or "rye revival;" ii) the label, other than
its border; iii) the embossed rye "frond;" and iv) the
concave back of the bottle. If defendants do not create a
meaningfully changed Redemption Packaging, such that it
cannot dilute the Bulleit trademark and trade dress,
Deutsch may be directed to use its present upper-tier
barrel-proof Redemption whiskey bottles, with only minor
changes sufficient to signify that the bottle does not
contain its present premium product.[2]

3. This Court shall retain jurisdiction over the parties and
the subject matter of this litigation for the purpose of
interpretation, enforcement, or modification of this
Permanent Injunction.

---

[2] The Court recognizes that this gives scant guidance about the
individual elements of the acceptable trade dress, but it is not a
judicial function to design an unobjectionable package. That has
difficulties shown by the testimony of the main designer of the
diluting bottle. Nonetheless the Redemption package must have no
superficial, at a glance, resemblance to the Bulleit bottle.

So Ordered.

Dated:   New York, New York
         September 7, 2022

_Louis L. Stanton_
LOUIS L. STANTON
U.S.D.J.

SPA-39

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
DIAGEO NORTH AMERICA , INC .,

|  |  |
|---|---|
| Plaintiff, | 17 **CIVIL** 4259 (LLS) |
| -against- | **JUDGMENT** |
| W . J . DEUTSCH & SONS LTD . ET AL ., |  |
| Defendants. |  |

-------------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:**   That for the reasons set forth in the Court's Opinion Order & Injunction dated September 07, 2022, Deutsch Family Wine & Spirits and Bardstown Barrrel Selections LLC, their agents, and any third parties who are in active concert or participation with the manufacture, sale, or promotion of Redemption who receive notice of this injunction are permanently restrained and enjoined nationwide from, directly or indirectly, manufacturing, selling, offering for sale, distributing, licensing, importing, exporting, advertising, promoting, displaying, or using in commerce, including in stores, online, and in physical, digital, or recorded advertisements or promotional materials, the Diluting Redemption Packaging at issue in this litigation and any other colorable imitation thereof, except for the product that on the date of entry of this Order has already been transferred to distributors, retail stores, bars, or restaurants. That product in the Redemption packaging that has been transferred by the date of entry of this Order may continue to be sold, but none thereafter. Defendants are directed to undertake a change to the Redemption glass bottle and packaging that will convey a substantially different commercial impression, but may retain those unchallenged aspects of the package like i) the brand name Redemption or terms such as "pre prohibition" or

"rye revival;" ii) the label, other than its border; iii) the embossed rye "frond;" and iv) the concave back of the bottle. If defendants do not create a meaningfully changed Redemption Packaging, such that it cannot dilute the Bulleit trademark and trade dress, Deutsch may be directed to use its present upper-tier barrel-proof Redemption whiskey bottles, with only minor changes sufficient to signify that the bottle does not contain its present premium product. This Court shall retain jurisdiction over the parties and the subject matter of this litigation for the purpose of interpretation, enforcement, or modification of this Permanent Injunction.

.

**Dated:** New York, New York
          September 09, 2022

**RUBY J. KRAJICK**

—————————————————————
**Clerk of Court**

**BY:**

—————————————————————
**Deputy Clerk**

SPA-41

ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/7/22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -X

DIAGEO NORTH AMERICA, INC.,

                  Plaintiff,          17 Civ. 4259 (LLS)

       - against -                ORDER

W.J. DEUTSCH & SONS LTD. ET AL.,

                  Defendants.
- - - - - - - - - - - - - - - - - - -X

    Before the Court is Deutsch's Motion for Clarification of

the September 7, 2022 Permanent Injunction (Dkt. No. 476), which

Diageo opposes, Dkt. No. 481.

    The parties' familiarity with the facts of the case is

assumed and the Court recounts only what is necessary.

    As a result of the jury's verdict finding Deutsch's

Redemption bottle packaging dilutes Diageo's Bulleit trade dress

this Court entered, on September 7, 2022, a Permanent Injunction

Order, Dkt. No. 468, prohibiting the sale of the Diluting

Redemption Packaging at issue in this litigation and any

colorable imitation of it. Deutsch's motion seeks to clarify

that its use of the Redemption Sur Lee Bottle Design or a

similar or comparably modified design complies with the terms of

the injunction. Dkt. No. 477 at 3.

-1-



Opposing, Diageo argues that the Sur Lee bottle design retains a similar "look and feel" to the enjoined Redemption Packaging, and the proposed use of that design fails to make the required clear and unequivocal break from both the prior diluting trade dress and Diageo's mark, violating the Permanent Injunction. Dkt. No. 493 at 1.

Diageo urges the Court to apply the Safe Distance Rule in determining whether the Sur Lee Bottle or comparably modified versions violate the Permanent Injunction. Under the Safe Distance Rule, "a party who has once infringed a trademark may be required to suffer a position less advantageous than that of an innocent party, and a court can frame an injunction which will keep a proven infringer safely away from the perimeter of future infringement." Car Freshner Corp. v. D & J Distrib. & Mfg., Inc., 14-CV-391, 2016 WL 315949, at *2 (S.D.N.Y. Jan. 8,

SPA-43

2016); see also Wella Corp. v. Wella Graphics, Inc., 37 F.3d 46, 48 (2d Cir. 1994).

The Safe Distance Rule is generally applied after a finding of liability when the Court is interpreting or enforcing an injunction. It "has generally been applied in consideration of a party's duty to abide by a previous court order upon a finding of infringement." Cartier, Inc. v. Four Star Jewelry Creations, Inc., 348 F. Supp. 2d 217, 254 (S.D.N.Y. 2004).  It is a yardstick by which the Court can measure whether a defendant, who has been found to violate the trademark rights of another, is keeping a wide berth between its proffered new mark and the plaintiff's protected mark.

Within the Second Circuit and across the country, courts have applied the Safe Distance Rule when there has been a finding of both trademark infringement and dilution. See, e.g., Car Freshner Corp., 2016 WL 315949, at *2 (applying the Safe Distance Rule following verdict of infringement and dilution); N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F. Supp. 2d 305, 345-46 (S.D.N.Y. 2010) (same). However, this Court is unaware that the safe distance rule has been applied in circumstances when a defendant—like Deutsch here—was only found liable for dilution, and non-willful.

The Safe Distance Rule is not the rule of decision in this case, although it supports the outcome, because the close

question whether the proffered Sur Lee bottle or a comparably
modified version complies with the Permanent Injunction is
disposed of by the Injunction itself.

The Sur Lee bottle is generally similar to the other
bottles in the Redemption line, but is visually altered by a
skirt of brown glass which obscures the base (which itself is
newly elaborated by a striking label) and lightens in darkness
as it rises towards the shoulders of the bottle.

These new aspects will tend to guide a purchaser away from
the initial impression that the bottle is part of the Bulleit
brand. However, it is a close question whether she is apt to be
left in doubt; and whether those aspects are so conspicuous as
to make the Sur Lee bottle instantly distinct, beyond mistake,
from the diluting bottle.

The situation is controlled by the language of the
Injunction.

The Permanent Injunction ordered Deutsch "to undertake a
change to the Redemption glass bottle and packaging that will
convey a substantially different commercial impression . . ."
Dkt. No. 468 at 36. It required that the "Redemption package
must have no superficial, at a glance, resemblance to the
Bulleit bottle." Id.

No customer can be in doubt; nor can there be a question
about the bottle's difference from that of Diageo.

Those provisions bar the Sur Lee bottle design's proposed half-step alterations to the Redemption packing just as effectively as the Safe Distance Rule would.

Deutsch's motion for clarification is denied.

So Ordered.

Dated:  New York, New York
        November 7, 2022

_Louis L. Stanton_
LOUIS L. STANTON
U.S.D.J.

In The Matter Of:

*DIAGEO NORTH AMERICA, INC., v.*

*W.J. DEUTSCH & SONS LTD., et al.,*

*December 7, 2022*

*Southern District Court Reporters*

```
                                                              1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    DIAGEO NORTH AMERICA, INC.,

4                     Plaintiff,

5           v.                         17 Cv. 4259 (LLS)

6    W.J. DEUTSCH & SONS LTD., et al.,

7                     Defendants.

8    ------------------------------x

9                                      New York, N.Y.
                                       December 7, 2022
10                                     2:30 p.m.

11   Before:

12                     HON. LOUIS L. STANTON,

13                                     District Judge

14                     APPEARANCES

15   JENNER & BLOCK LLP
          Attorneys for Plaintiff
16   BY:  GIANNI P. SERVODIDIO
          SUSAN J. KOHLMANN
17        JACOB D. ALDERDICE

18   ARENTFOX SCHIFF LLP
          Attorneys for Defendants
19   BY:  ERIC ROMAN
          MICHAEL CRYAN
20        NEIL LLOYD

21

22

23

24

25
```

1          (In open court; case called)

2          THE COURT:  Please be seated.

3          Welcome back.

4          I have signed orders for you to bring in such amount

5     of equipment and bottles that I am surprised I don't see an

6     array of bottles, but I am really interested in seeing the

7     actual bottles.  The photographs do not convey the reality.

8          Let's proceed.

9          MR. ROMAN:  Good afternoon, your Honor.  My name is

10    Eric Roman.  I am with ArentFox Schiff on behalf of the

11    defendants.

12         We do have a physical sample of a mockup of the

13    proposed redesign for you to inspect.  We also have samples of

14    the enjoined Redemption bottle and packaging, and of the

15    Bulleit bottle that incorporates the trade dress that's at

16    issue in the case, that we can bring up for you as well, with

17    your permission.

18         THE COURT:  You don't have the proposed new bottle?

19         MR. ROMAN:  We do have a mockup of the proposed new

20    bottle.  Yes, we do, your Honor.

21         THE COURT:  I am not sure what the words "a mockup"

22    means.

23         MR. ROMAN:  It's in its early stages.  So the

24    designers produced essentially a model of what the final bottle

25    would look like.  We refer to that as a mockup.

3

1       THE COURT:  Let's see that.

2       Have you showed it to your adversary?

3       MR. ROMAN:  Yes, we have, your Honor.

4       THE COURT:  Good.

5       MR. ROMAN:  So what we have handed up, your Honor --

6       THE COURT:  This is one of the four.

7       MR. ROMAN:  That's right.

8       So we handed up the mockup.  That would be option 1 of

9  the four variations that's on the physical bottle in front of

10  you.  There are three other variations.

11       So there's four all together.  There are three labels

12  that were handed up to you as well, and those labels are marked

13  on the back with the option that they correspond to.

14       The differences between the four variations in the

15  proposed redesign are essentially within the four corners of

16  the label.  So you can refer to the bottle with the label on it

17  as option 1.  But options 2, 3, and 4 are essentially the

18  labels that correspond to each of those variations.

19       We also have, if your Honor would like, samples of the

20  Bulleit bottle that incorporates the trade dress, and also a

21  sample of the enjoined Redemption packaging.

22       THE COURT:  Yes.  And I have the details of the label

23  attached to your memorandum.

24       MR. ROMAN:  Yes, your Honor.  There is an Exhibit A to

25  our memorandum of law in support of our motion that has the

1   details of the differences between each of the labels in each

2   of the four variations.

3          Essentially, I have put up on the screen, your Honor,

4   a graphic that shows the four different options.  Again, the

5   differences between the four variations lie within the four

6   corners of the label.  The main differences, option 1 and 3

7   have sort of four corners, four framing corners, instead of a

8   rectangular border for the label.  And you will see that in

9   options 1 and 3.

10          And then for options 2 and 4, the border in the label

11  is different, it is rectangular, but it is different from the

12  enjoined design, in that the enjoined Redemption bottle and

13  packaging have a more ornate and colorful rectangle.  This

14  rectangle in options 2 and 4 is a -- it's a paper embossed but

15  muted black border, and you can see that in options 2 and 4.

16          There are other variations in the labels.  The most

17  important one being, in the lower right-hand corner of the

18  label, there is a logo that you will see on options 1, 2 and 3.

19  But other than the differences in the labels, the changes that

20  we will be describing today apply across the four different

21  variations.

22          THE COURT:  Surely those variations in the label are

23  not material enough to change the trade dress.  Wouldn't you

24  agree?

25          MR. ROMAN:  In combination with the other changes that

1  we have made in the proposed redesign --

2          THE COURT:  Can you please answer my question in the

3  way I framed it.

4          MR. ROMAN:  Simply the changes in the label alone

5  would not be -- that would not be sufficient.  It's in

6  combination with other changes.

7          THE COURT:  OK.

8          MR. ROMAN:  So the injunction requires, your Honor,

9  that Deutsch undertake a change to the Redemption glass bottle

10  and packaging that will convey a substantially different

11  commercial impression, but that has no superficial at-a-glance

12  resemblance to the Bulleit bottle.  And these proceedings are

13  governed by the language of the injunction, as was set forth in

14  your Honor's order regarding the Sur Lee motion.  It's the

15  language of the injunction that controls here.

16          The injunction also permits Deutsch to retain certain

17  features of the enjoined bottle packaging, including the brand

18  name Redemption, terms such as pre-prohibition or rye revival,

19  the label other than the border that was in the enjoined

20  packaging, the embossed frond that is at the bottom of the

21  Redemption bottle, and the concave back of the bottle.  And our

22  proposed redesign incorporates those elements that were

23  permitted to retain.

24          THE COURT:  The second bottle to the right as you face

25  me, in other words, this bottle, still has the word

6

1    "Redemption," and I take it that that is the bottle that was in

2    evidence at the trial, and the one on its left, my right, is

3    the one of the four new proposals?

4            MR. ROMAN:  That is correct, your Honor.

5            THE COURT:  OK.

6            MR. ROMAN:  One thing to note about the bottle that's

7    in front of you, to your right, the right most bottle, to the

8    right of that, the proposed redesign -- to the right, it's the

9    right most bottle in front of you.  One thing to note about

10   that bottle is that there is a tax band around the top of the

11   cork and that tax band is brown.  The proposed redesign would

12   have a black tax band.

13           THE COURT:  Spread laterally across the top.

14           MR. ROMAN:  The tax band goes across the top.

15   Correct, your Honor.

16           So moving through the changes of the proposed

17   redesign, from the top of the bottle down, we have, as we were

18   just referring to, the cork closure, it is lighter in the

19   proposed redesign.  It's essentially a light brown.  It gets

20   rid of the black color in the enjoined cork closure.  And there

21   is also the tax band that we were just describing, which would

22   be black in color.

23           A second difference, and this is a prominent

24   difference, is the elimination of the raised embossed lettering

25   and text dividers in the enjoined packaging.  As you will

1  notice, the embossed lettering is completely eliminated.

2         Consonant with that, we have a slightly larger label

3  that's positioned slightly higher in the bottle to account for

4  the empty real estate that resulted from removing the

5  embossing, removing the embossed lettering, which is a slightly

6  larger label, and it's moved a little higher in the bottle.

7         And we noted earlier for you, your Honor, the

8  differences in the label, option 1 that you have in front you

9  and option 3, which is one of the labels you have in front of

10  you, they both have this new four-corner framing.  There is no

11  longer a rectangular border in the label.  And options 2 and 4

12  incorporate the new softer embossed black border into the

13  label, again, a change in the border from the enjoined

14  packaging.

15         There are also some other changes to the label, to the

16  communication structure and the logo, but we went through those

17  earlier, your Honor.

18         THE COURT:  The communication structure refers to the

19  words on the label, correct?

20         MR. ROMAN:  Correct.  It refers to the words at the

21  bottom of the label.

22         We feel strongly that these changes -- the removal of

23  the embossing, the change in the color to the cork closure, the

24  tax band across the cork closure, the change in the size and

25  positioning of the label, and the change to the border --

1  overall, combined with things, for example, like the frond, the

2  embossed frond on the bottom of the bottle that we were allowed

3  to retain, convey a substantially different look and feel to

4  the redesign, which is a substantially different commercial

5  impression from the Bulleit trade dress.

6          You will see in the graphic in front of you a

7  side-by-side comparison of them.  You have the bottles in front

8  of you.  There is a significant difference in the feel of these

9  two designs.

10          Now, just to elaborate on that, the Bulleit bourbon

11  design has the font, the prominence of the embossing, the

12  amount of real estate the embossing takes up on the front of

13  the bottle, the fact that the embossing is on the chest of the

14  bottle, all of those give this bottle a very vintage frontier

15  feel.  That's the commercial impression it conveys.  That

16  combined with the label, it's much thinner, it's a thin strip

17  that goes across the bottom portion of the bottle, and we are

18  talking about the Bulleit bottle here, that makes room for that

19  embossing.  So that embossing stands out in the Bulleit bottle.

20  That's what a consumer sees, and that's what conveys the

21  immediate at-a-glance impression to the consumer of the Bulleit

22  trade dress.

23          The Redemption bottle has a totally different look in

24  the front.  The redesigned Redemption bottle has no embossing

25  whatsoever.  That's a completely different look and feel.  That

1 combined with the lighter cork, the tax band, the larger label,

2 and the fact that the labels are very different, at a glance

3 they don't resemble each other at all, again, different look

4 and feel, substantially different commercial impression caused

5 by this redesign.

6       In terms of resemblance, it's the Bulleit trade dress

7 that's at issue here.  The Bulleit trade dress is, to use sort

8 of a tired phrase, it's a whole that's greater than the sum of

9 its parts.  It's combination of different elements.

10       As Mr. Bello, who is the executive at Diageo in charge

11 of the Bulleit brand during the relevant time period in this

12 litigation, as he testified, when asked to explain to the jury,

13 what is Diageo's brand image, what is the look and feel of

14 Bulleit, what is Diageo claiming rights to in this case, he

15 explained it's the combination of several elements.  One, the

16 border on the label; second, the shape of the glass mold of the

17 bottle; third, the embossed raised lettering on the front of

18 the bottle, but not just the embossed raised lettering, the

19 size and placement of that embossed raised lettering; and the

20 black cap.  He stated all of that together is really what

21 creates our very distinctive and unique trade dress.

22       Now, a corollary of that -- so all of that together is

23 what creates the trade dress, not any individual element.  A

24 corollary of the whole is greater than the sum of its parts is

25 that if you change the parts, certainly if you change enough of

1 the parts, you change how the whole looks, you change the look

2 and feel of the package.

3 As Mr. Bello explained during the trial, when talking

4 about the look and feel of the Bulleit trade dress, he said, we

5 are just talking about the combination, not the individual

6 elements.  He was stressing that.  And he said, it's very easy

7 to create a distinctive package without varying all of the

8 individual elements.  In other words, you don't need to change

9 every element to have a package that has a different look and

10 feel, that conveys a different commercial impression, and that

11 is non-diluting.

12 If we look at one of the more exhaustive lists of

13 elements that Diageo provided, that make up or comprise the

14 Bulleit design mark and trade dress, that can be found in the

15 complaint, paragraph 13(a) through (g) of the complaint.

16 Looking through that list of seven elements, six of

17 them are eliminated by this proposed redesign:

18 The embossed brand name above the label, gone.

19 Arched text in the top line of the embossed brand

20 name, gone.

21 Convex text divider between components of the embossed

22 brand name, also gone.

23 Arrow-shaped text divider on the label, eliminated.

24 Border of parallel lines on the label, with respect to

25 options 1 and 3, it is not a rectangular shape within the

MC78DIAC

1  label; it's four corners, four framing corners.  With respect

2  to options 2 and 4, there is a rectangular frame there, but

3  it's different, very different from the rectangular frame that

4  was in the label in the enjoined Redemption package.

5        Finally, the cork bottle cap with the black top, also

6  eliminated in the proposed redesign.

7        Now, when you have that many elements eliminated, you

8  change the whole.  And that's what we are respectfully

9  suggesting here, your Honor, is that if you examine the new

10  redesign, the proposed redesign, you will see that there are so

11  many changes that were made, that cover almost every one of the

12  elements of the Bulleit trade dress, that the new design bears

13  no resemblance, even at a glance, to the Bulleit trade dress.

14        Now, one example from the trial, that illustrates how

15  you can alter just a couple of elements and avoid confusion or

16  dilution of a trade dress, is the example of

17  Dr. McGillicuddy's.

18        Now, in the graphic in front of you on the screen,

19  your Honor, there is a photograph of Dr. McGillicuddy's whiskey

20  bottle packaging as it was before Diageo's suit.  Sazerac, who

21  owns McGillicuddy's brand, was accused by Diageo of infringing

22  and diluting the Bulleit trade dress, just as Deutsch was

23  accused in this case.  And this was the bottle packaging that

24  was accused of infringing and diluting.

25        Sazerac agreed to redesign the bottle and packaging.

MC78DIAC

12

The redesign was eliminating the embossed lettering from the front of the bottle and moving that to the back of the bottle, and increasing the size of the label.  Diageo was fine with that design.  Diageo felt that that design was sufficient, the removal of the embossed lettering and the increase in the size of the label, that that was sufficient to avoid confusion and dilution.

In the words of Mr. Bello, who testified about this at trial, when he was asked, Why was it acceptable from your perspective to allow Sazerac to make this change?, he responded, Because there wouldn't be any confusion; with that large paper label on the front of the package, there would be no confusion with the overall Bulleit look and feel.  That's changing just those two elements.  Why were you OK with the embossing on the back of the bottle?, Mr. Bello was asked. Because people aren't seeing that emboss when they are shopping the shelf.  It's the back of the bottle.

Well, your Honor, if you compare the Dr. McGillicuddy redesign with our proposed redesign, and also with the Bulleit trade dress -- and I do have a physical sample of the Dr. McGillicuddy redesign if the Court would like to see it -- you can see that the proposed redesign bears many similarities in the changes that it makes to the enjoined bottle packaging.  In fact, if Dr. McGillicuddy's redesign was fine with Diageo, the Redemption redesign should be even more fine with Diageo,

1  because Dr. McGillicuddy retained a black cap and the proposed

2  redesign changes the color of the black cap.

3          So in conclusion, it's Deutsch's position that this

4  proposed redesign meets all the requirements of the injunction.

5  It makes meaningful changes that create a substantially

6  different commercial impression, that with those changes the

7  resemblance between the proposed redesign and the Bulleit

8  bourbon trade dress disappeared.  There is no at-a-glance

9  resemblance between these two bottles.  And, therefore, the

10 Redemption proposed redesign, if approved, would assuredly not

11 dilute the Bulleit trade dress.

12         Thank you.

13         THE COURT:  Thank you, Mr. Roman.

14         Mr. Servodidio.

15         MR. SERVODIDIO:  Good afternoon, your Honor.

16         Maybe just to pick up on that last point that -- I

17 just had my colleague hand up a photograph to you so you have

18 that in front of you because I might refer to it.

19         I would like to pick up on the last point that

20 opposing counsel made about Dr. McGillicuddy, because I think

21 it really paints a stark contrast to what we are here today to

22 discuss, which is the scope of an injunction, and what we

23 litigated at trial.

24         You have to remember that Dr. McGillicuddy's packaging

25 that counsel showed you was instantly objected to by Diageo.

SPA-60

1    It wasn't on the market for six years like Redemption.  We

2    didn't have a jury trial against Dr. McGillicuddy's packaging.

3    And there wasn't a permanent injunction enjoining Dr.

4    McGillicuddy making them change their design.  What he showed

5    you was a settlement agreement, a bottle Diageo objected to and

6    quickly got them to change in a settlement.  It has nothing to

7    do with the reason that brings us here today, which is, after

8    an adverse finding, how far does Deutsch have to go to

9    eliminate the diluting association with an infringing bottle

10   that was in the market for six years, that they sold $54

11   million worth of revenue on, and they spent millions of dollars

12   of advertising?  So that's point number one.

13          Point number two, the presentation that I just heard

14   was like a fresh bite at the apple.  Here we are, Judge, here

15   is the bottle that we designed after the trial, let me show it

16   to you and let me argue all the reasons why, if I dissect it

17   up, it's not confusing or diluting of Bulleit.  But with all

18   due respect, that's not the proper analysis when you're

19   interpreting the scope of your Honor's order.  It's not whether

20   this design infringes or dilutes Diageo's rights.  It goes back

21   to the plain language of the order.  At a glance, is this,

22   beyond mistake, instantly distinguishable from the diluting

23   product line that they were selling, and therefore does it

24   break off that association with Bulleit?

25          And I think, really, we are at a point where all the

1 things he talked about, all the things that he explained were

2 different, he forgot to mention one thing that is exactly the

3 same. That distinctive canteen-shaped bottle, that we spent so

4 much of the time at trial arguing about, guess what, it hasn't

5 been modified at all. The dimensions are the same, the breadth

6 of the shoulders, the tapering, the shelf presence. And I want

7 to just walk your Honor quickly through some of the evidence we

8 heard at trial, because I think that's so important here. But

9 I think the analysis that we heard was just fundamentally

10 wrong. It's not whether or not the new bottle is in violation;

11 it's whether they have gone far enough from the diluting

12 package line and from Bulleit.

13      I would like to just start by talking about what I

14 have handed to you. On the left side is the enjoined product.

15 That's the Redemption rye that we had the trial about. And I

16 just want to remind your Honor, that was just one of four or

17 five different products that had that same look and feel that's

18 the subject of the injunction, including the Sur Lee bottle

19 that was the subject of the last hearing.

20      Right next to that is the proposed redesign with one

21 of the labels. Just looking at those two, it's pretty clear

22 that they are very close. The opposite of completely

23 different, which is what your order requires, they are very

24 close. And then right next are the four Bulleit bottles. And

25 I think it's important to note that the trial was about more

1   than just the orange label Bulleit bottle that has been placed

2   in front of you.  Your Honor will recall there was a whole

3   family of rye extensions that had different labels, including a

4   black label.

5           So I would like to start by looking at the first

6   slide.  Counsel rightfully started with the language of your

7   Honor's order.  And we agree the order controls this proceeding

8   and the order is informed by the supporting case law about

9   Lanham Act injunctions, like the safe distance rule.

10          So what does the order say?  A change to the

11  Redemption glass bottle in packaging that will convey a

12  substantially different commercial impression.  Well, they

13  didn't change the glass bottle.  It's the same mold.  It's the

14  same canteen shape, and I want to come back to that.  What they

15  did was filled in the embossing.  That is not a different mold.

16  That's just a quick fix.

17          Next slide.  And this is again in your Honor's

18  permanent injunction order, the test that you set out, it has

19  to have no superficial at-a-glance resemblance to the Bulleit

20  bottle.  That's key because consumers shop at a glance.  These

21  bottles are on a crowded shelf in the liquor store.  They see

22  the bottles.  The test is not, here are all the elements that

23  are different.  Here is a dissection of the elements.  It's the

24  overall look at a glance.

25          Next slide.

1        Your Honor will recall we were here two months ago to

2    argue about the Sur Lee bottle.  I would like my colleague to

3    hand that up to the Court, if I may.

4        In considering whether this package complied with your

5    Honor's order, the Court issued a decision November 7, a month

6    ago, which I think is very important to today's proceeding.

7    The Court held that in order for -- in rejecting the Sur Lee

8    design, the Court held, a compliant design has to be instantly

9    distinct, beyond mistake, from the diluting bottle.  And I

10   think that really answers the question.  The analysis is not

11   new design versus Bulleit in a vacuum.  The analysis is new

12   design, is it instantly distinct, beyond mistake, from the

13   enjoined package?

14       And then ultimately that ties back to Bulleit.  We are

15   not saying you don't look at Bulleit.  Of course you do.  But

16   the first analysis is, have they cut off that association with

17   the enjoined packaging?  Because that's what your injunction is

18   doing.  It's cutting off that association that they built up

19   for six years, selling a bottle that the jury found violated

20   our rights and that your Honor found was causing irreparable

21   injury.  So you don't get to take that out of the equation.  A

22   compliant design has to have a clean and unequivocal break from

23   the look and feel of the diluting product line.

24       So let's look at what they did.  You can turn to the

25   next slide.

1    Counsel walked through a list of changes very

2  meticulously, but he didn't tell you what they didn't change.

3  It's pretty obvious.  The canteen shape.  That's the elephant

4  in the room.  That's what drives commercial impression.  If you

5  look at these two things, it has to be beyond a doubt instantly

6  distinguishable.  And the canteen shape answers that question.

7  It's not.  It looks just like the old packaging.  If you're a

8  customer of Redemption for the last six years, and you're used

9  to seeing that bottle on the left in this slide, and then you

10  go to the store and you see this new design, you're going to

11  know that that's the same bottle that you have been buying and

12  associating with Bulleit.  That's the problem.  They haven't

13  done a clean break.

14    What else is similar?  Just look at the labels.  How

15  can you say with a straight face that those labels are

16  significantly different?  They are virtually the same size.

17  They are virtually in the same place on the bottle.  They have

18  made some tweaks to the label and communication, which counsel

19  admitted don't really make a material change.  So the placement

20  of the label is still a huge problem here because it's

21  conveying that old commercial impression.

22    Then they went to the tax band.  They went to the

23  cork.  They took off a black cork.  They lightened the cork.

24  So that's good.  But then they put a black tax band over it.

25  He clarified the one in front of you is brown.  The one they

1  would like to use is black, just like the old black cork.

2         So there is an element on the top that, again, is

3  picking up that black element that was on the enjoined

4  packaging.  And the other thing you will note, the Bulleit

5  bottle also has that tax band at the bottom of its enclosure.

6  If you look at the bottom of the Bulleit enclosure, you will

7  see there is a little rectangular sticking out from the bottom.

8  So they have changed some elements, but they picked up others.

9         They took off the embossing.  I will tell you that is

10  not a trivial change from Diageo's perspective.  But that alone

11  in isolation isn't enough.  You have to look -- and counsel

12  said this clearly, and we agree -- you have to look at the

13  overall commercial impression.  And the removal of the

14  embossing, while a step in the right direction, doesn't alter

15  the overall commercial impression in a way that complies with

16  your Honor's order.

17         And we would submit that if Sur Lee didn't comply,

18  this is even a step backwards.  Because at the last hearing,

19  you will recall, they were trying to make much of the

20  coloration on Sur Lee.  And we heard a whole presentation about

21  how that coloration and that intricate silkscreen label design

22  on Sur Lee, that was going to be what was going to distinguish

23  these bottles in the minds of the consumer.  Well, when they

24  lost that, inextricably, now the coloration is gone.  What they

25  said was a big distinguisher, now that's gone, back to the same

1 clear glass; and the intricate silkscreen on Sur Lee, that's

2 not on their proposed design here either. They have gone back

3 to that square label.

4       I want to make another point, because your Honor's

5 injunction order does give a safe harbor for them to use a

6 label without a border, to use a rye frond, to use a concave

7 back, to use the name Redemption. We don't disagree with any

8 of those things. But the key preamble to that is there has to

9 be a substantial change to the overall commercial impression.

10 Once you have done that, then you can retain some of the other

11 elements. And we have a really good example of that, if I

12 could ask my co-counsel to hand up the upper tier bottle.

13       So, your Honor, what we are showing you here is the

14 Deutsch upper tier, it's like a barrel strength, more expensive

15 version of Redemption. That bottle is currently in the market.

16       THE COURT: Did you say there is a Sur Lee bottle with

17 the coloration gone?

18       MR. SERVODIDIO: The point I was making is that the

19 Sur Lee bottle, which your Honor enjoined and said did not

20 comply with the order, that has very distinct coloration. They

21 had argued that that was a distinguishing factor. Your Honor

22 said that wasn't enough. That's gone from their new proposed

23 design. You see, the glass that they want you to order is

24 acceptable now --

25       THE COURT: You say the coloration is not in their new

21

1    bottle.

2              MR. SERVODIDIO:  Exactly.  It's worse in some ways

3    than Sur Lee because it's closer to the enjoined packaging than

4    even Sur Lee was.

5              So the point I wanted to make about the bottle that I

6    just put in front of you is the upper tier packaging.  Your

7    Honor's injunction gives them the right to use that bottle

8    shape.  That is a clear and unequivocal different commercial

9    impression.  Notice that that bottle has the same embossing on

10   it as the enjoined packaging.  We didn't object to that because

11   the shape was such a significant differentiator.

12             I just want to say a few words about the shape.

13   Because we heard a lot, counsel made a lot about taking off the

14   embossing.  But what he really didn't talk about was the shape.

15             You can turn to the next slide.

16             This was an important exhibit at the trial.  This was

17   the defendants' own focus group report, and we spent a lot of

18   time talking about it with a lot of witnesses.  What their own

19   market research, when they were redesigning the diluting

20   bottle, what it told them was, bottle shape is a primary driver

21   for brand perception.  Not the embossing, not the label, not

22   these other elements, but the shape is a really important thing

23   for a consumer when they are forming impressions about the

24   brand.

25             Go to the next slide.

1          And there was a lot of evidence in a three-week trial

2     about how Diageo believed, and we believe we proved to the

3     jury, that the shape was unique.  It was a canteen shape that

4     the designer found on the floor of an antique store and the

5     dimensions of it were unique.  And we presented a lot of

6     evidence that separate and apart from the other elements, that

7     canteen shape of Bulleit was unique.  And they tried really

8     hard to persuade the jury otherwise, and they were

9     unsuccessful.

10          Next slide.

11          When Deutsch was designing the diluting bottle that

12    the jury found violated Diageo's rights, they were driven by

13    the shape.  We all remember, this was their design brief

14    referencing your Honor's order, make it similar to Bulleit.  So

15    the commercial impression, as designed by the defendant, of the

16    enjoined packaging was driven by that shape similar to Bulleit.

17          Next slide.

18          You remember some of these design documents.  These

19    were Deutsch documents showing how important it was to get that

20    shape as close as possible to Bulleit.

21          Next slide.

22          So just a word or two about the labels.  I don't think

23    what they have done here is significant or material.  I think

24    the shape drives it.  But using that similar square label with

25    the border, it's hard to distinguish between the enjoined label

1    and the new label, to be honest, far away at a glance.  And we

2    already mentioned that the cork in some ways brings it closer

3    to Bulleit.

4          So I would like to just conclude.  This was a long

5    hard-fought case, your Honor, and the jury reached a well

6    supported verdict that Deutsch was diluting Diageo's famous

7    trade dress.  They were able to build up Redemption by trading

8    on that association with Bulleit for six years.  They sold a

9    lot of product.  And the purpose of the injunction order, to

10   give Diageo a real remedy, really the only remedy it has in

11   this case, is to make them make a meaningful change from the

12   diluting package that will break off that association in the

13   marketplace with Bulleit.  Because otherwise what they are

14   doing is, all of that goodwill that they had by drafting off of

15   Bulleit, they are just transitioning that right into that new

16   design.  That's rewarding them for six years of dilutive

17   conduct.

18         What the injunction requires and the law requires is

19   for them to cut it off and start from scratch.  And they have

20   got plenty of options to do it.  We are not telling them don't

21   launch a new bottle.  We don't want to be here every month

22   arguing about this.  But they have to do more.  This is another

23   close call, if your Honor would have it that way.  We don't

24   think it's a close call, but if your Honor thinks this is

25   close, it's not enough.  The injunction requires clarity, it

1  requires something that you see it and it's instantly distinct,
2  and we would submit this isn't a close call.

3          I am happy to answer any questions, your Honor.

4          THE COURT:  Thank you, Mr. Servodidio.

5          MR. ROMAN:  Your Honor, may I have some rebuttal?

6          THE COURT:  Mr. Roman, you have half risen.

7          MR. ROMAN:  I was asking permission to offer some
8  rebuttal, your Honor.

9          THE COURT:  It's not as though I didn't have a memory
10  of the case or the evidence.  And I have heard a lot of it
11  repeated here, and it has some use to do that, but I think any
12  rebuttal can be pretty short and carefully directed.

13          MR. ROMAN:  Thank you, your Honor.

14          Very briefly, the proposed redesign does make a change
15  to the bottle.  It removes the embossing.  That's a change to
16  the mold of the bottle.  It's not a change to the shape of the
17  mold, but the shape of the mold alone is not the Bulleit trade
18  dress.

19          What your injunction requires, your Honor, in addition
20  to the specific elements that we have all argued about and
21  described ad nauseam at this proceeding and at prior ones, it
22  requires that the defendants create a meaningfully changed
23  Redemption packaging such that it cannot dilute the Bulleit
24  trademark and trade dress.

25          THE COURT:  Are you talking about the embossing?

1        MR. ROMAN:  I am talking about the Bulleit trademark

2   and trade dress as being the proper focus of this inquiry.

3   It's not the shape of the glass mold alone.  It's the entire

4   trade dress.  It's all the elements that Diageo defined as

5   being the trade dress.

6        THE COURT:  It sounds to me as if I am hearing my

7   instructions to the jury being played back.

8        MR. ROMAN:  I understand, your Honor, and I don't mean

9   to repeat the obvious.  But the main rebuttal here is, we

10  changed six out of the seven identified elements of the Bulleit

11  trade dress to create a --

12       THE COURT:  Mr. Roman, I was here this afternoon when

13  you were talking.

14       MR. ROMAN:  I understand, your Honor.

15       THE COURT:  Didn't you cover this point there?  I

16  think I remember those exact words.

17       MR. ROMAN:  I will move on to just my second point,

18  which is that when it comes to the safe distance rule, and the

19  constant referral to that type of standard, that is not what

20  governs here.  What governs here is your injunction.  What the

21  breakaway has to be, the complete break -- in addition to my

22  microphone breaking -- the complete break has to be from the

23  association that consumers might have between the enjoined

24  trade dress and the Bulleit trade dress.  That's the break,

25  between the enjoined Redemption bottle packaging and the

1  Bulleit trade dress.  This proposed redesign accomplished that.

2         THE COURT:  I think that's too narrow.  I think the

3  logic doesn't bear the conclusion.  Because the purpose of the

4  dilution remedy is to stop the Redemption bottle from bleeding

5  sales away from the Bulleit bottle.  So it is a continuing bar

6  on a Redemption bottle that is not different enough so that it

7  will not dilute the sales of the Bulleit bottle.  And that is

8  the standard which we apply to each of the bottles tendered by

9  Redemption.

10         MR. ROMAN:  If I may respond to that, your Honor.

11         THE COURT:  Yes.

12         MR. ROMAN:  The likelihood of confusion that is the

13  central tenet of trademark infringement, that is where you get

14  sales being bled off through confusion.  The jury didn't find

15  any likelihood of confusion here.  The jury didn't find that

16  the Redemption packaging and that the Bulleit trade dress were

17  so similar that consumers would confuse the two, that they

18  would buy one thinking that the other one was Redemption or

19  Bulleit or vice versa.  That wasn't what the jury found.  They

20  found a likelihood of dilution.  And dilution is really about

21  the association that consumers have with a particular

22  well-known trade dress or a particularly well-known mark.

23         We can think of dilution as kind of like what happened

24  to Kleenex, a victim of its own success.  They had a mark for

25  facial tissue that eventually over time became diluted by its

27

1  own popularity.  That might happen anyway to the mark, but what

2  the dilution logic tended to prevent is to prevent that type of

3  thing from happening as a result of either a competitor or a

4  noncompetitor's actions.

5       So the dilution, it's a very slow harm.  It's about

6  the loss of association in the mind of the public between the

7  Bulleit trade dress and the Bulleit brand.

8       THE COURT:  What is your point?

9       MR. ROMAN:  The point here is that if you take

10  away -- and again, forgive me for repeating, but if you take

11  away most of the elements of the Bulleit trade dress to create

12  a redesign that has just a different look, that does not look

13  at all like the Bulleit trade dress, then you're not creating

14  any association in the consumer's mind that would dilute the

15  Bulleit trade dress.

16       THE COURT:  I think we are talking about a question of

17  degree, whether the proposed product is different enough not to

18  pose a risk of dilution.  And I want to hear you out in full,

19  but without repetition.

20       MR. ROMAN:  It is different enough, because the

21  proposed redesign, particularly without the embossing, has a

22  completely different look and feel to it.  It is not the

23  vintage, harder, sort of gritty feel that the Bulleit design

24  was intended to convey.  The Bulleit bottle, the shape of the

25  mold of the bottle, without the embossing, would not be the

1  Bulleit trade dress.  It would be something else.

2          THE COURT:  Mr. Roman, can you see the embossing from

3  where you are?

4          MR. ROMAN:  No, your Honor.  But, respectfully, I

5  would be closer to the bottles if I were shopping for them.

6          THE COURT:  Before you bought it.

7          MR. ROMAN:  Right.

8          THE COURT:  I think we have pretty well covered the

9  field.

10          MR. ROMAN:  Thank you, your Honor.

11          THE COURT:  And I think the answer is really simple

12  and clear.  The successive changes made in the Redemption

13  bottle are in the right direction.  The closest that the new

14  Redemption bottle came to being satisfactory was in the Sur Lee

15  one, which is the one on your extreme right, as you all know.

16  And the more experience I have with this case and these

17  bottles, the more convinced I am that the dominant factor in

18  the trade dress is the shape of the bottle.  That is the thing

19  that the consumer immediately picks up long before the presence

20  or absence of embossing is discernible by the eye.  And these

21  alterations that have been made, leaving that always to one

22  side, are not big enough to go far enough, and in their nature

23  I am afraid they can't be because of the overwhelming dominant

24  position in the trade dress of the shape of the bottle.  And I

25  think the moral probably is that, if you painted the bottle

1  green or red or black, despite its shape, it would be quite

2  satisfactory because it would be so different.  But it's got to

3  be that kind of a major change.  And the present candidates are

4  not sufficient in their change or fresh enough in their

5  approach to qualify.

6          So the application is denied.  The parties are left to

7  keep experimenting.  But my own conclusion tentatively is, each

8  suggestion is considered on its own merits, but I think the

9  shape of the bottle is very hard to overcome, and the decision

10  should be made to blanket out, substitute something striking,

11  or go to a bottle with a completely different shape, like that

12  candidate.  So that's the way it goes.

13          Thank you, all.  The application is denied.

14          MR. ROMAN:  Thank you, your Honor.

15          MR. SERVODIDIO:  Thank you, your Honor.

16          (Adjourned)

17

18

19

20

21

22

23

24

25

## $

**$54 (1)**
14:10

## A

**able (1)**
23:7
**above (1)**
10:18
**absence (1)**
28:20
**acceptable (2)**
12:9;20:24
**accomplished (1)**
26:1
**account (1)**
7:3
**accused (3)**
11:21,23,24
**across (5)**
4:20;6:13,14;7:24;
8:17
**Act (1)**
16:9
**actions (1)**
27:4
**actual (1)**
2:7
**ad (1)**
24:21
**addition (2)**
24:19;25:21
**Adjourned (1)**
29:16
**admitted (1)**
18:19
**adversary (1)**
3:2
**adverse (1)**
14:8
**advertising (1)**
14:12
**afraid (1)**
28:23
**afternoon (3)**
2:9;13:15;25:12
**Again (6)**
4:4;7:13;9:3;16:17;
19:2;27:10
**against (1)**
14:2
**ago (1)**
17:1,6
**agree (3)**
4:24;16:7;19:12
**agreed (1)**
11:25
**agreement (1)**
14:5
**allow (1)**

## 12:10

**allowed (1)**
8:2
**almost (1)**
11:11
**alone (4)**
5:4;19:10;24:17;
25:3
**alter (2)**
11:15;19:14
**alterations (1)**
28:21
**always (1)**
28:21
**amount (2)**
2:4;8:12
**analysis (5)**
14:18;15:9;17:10,
11,16
**antique (1)**
22:4
**apart (1)**
22:6
**apple (1)**
14:14
**application (2)**
29:6,13
**apply (2)**
4:20;26:8
**approach (1)**
29:5
**approved (1)**
13:10
**Arched (1)**
10:19
**ArentFox (1)**
2:10
**argue (2)**
14:16;17:2
**argued (2)**
20:21;24:20
**arguing (2)**
15:4;23:22
**around (1)**
6:10
**array (1)**
2:6
**Arrow-shaped (1)**
10:23
**associating (1)**
18:12
**association (10)**
14:9,24;17:16,18;
23:8,12;25:23;26:21;
27:6,14
**assuredly (1)**
13:10
**at-a-glance (4)**
5:11;8:21;13:8;
16:19
**attached (1)**
3:23
**avoid (2)**

## 11:15;12:6

**away (4)**
23:1;26:5;27:10,11

## B

**back (13)**
2:3;3:13;5:21;12:2,
15,17;14:20;16:14;
17:14;19:25;20:2,7;
25:7
**backwards (1)**
19:18
**band (10)**
6:10,11,12,14,21;
7:24;9:1;18:22,24;
19:5
**bar (1)**
26:5
**barrel (1)**
20:14
**bear (1)**
26:3
**bears (2)**
11:12;12:22
**became (1)**
26:25
**behalf (1)**
2:10
**Bello (4)**
9:10;10:3;12:8,15
**beyond (4)**
14:22;17:9,12;18:5
**big (2)**
19:25;28:22
**bite (1)**
14:14
**black (16)**
4:15;6:12,20,22;
7:12;9:20;11:5;13:1,
2;16:4;18:23,24;19:1,
1,3;29:1
**blanket (1)**
29:10
**bled (1)**
26:14
**bleeding (1)**
26:4
**border (12)**
4:8,10,15;5:19;
7:11,12,13,25;9:16;
10:24;20:6;22:25
**both (1)**
7:10
**bottle (89)**
2:14,15,18,20,24;
3:9,16,20,4:12;5:9,12,
17,21,21,24,25;6:1,6,
7,9,10,17;7:3,6;8:2,
13,14,14,17,18,19,23,
24;9:17,18;11:5,20,
23,25;12:2,2,15,17,
23;14:5,9,15;15:3,10,

## 18;16:1,11,13,20;
## 17:2,9,19;18:9,11,17;
## 19:5;20:12,15,16,19;
## 21:1,5,7,9,20,20;
## 22:11;23:21;24:15,
## 16;25:25;26:4,5,6,7;
## 27:24,25;28:13,14,18,
## 24,25;29:9,11

**bottles (12)**
2:5,6,7;8:7;13:9;
15:24;16:21,22;
19:23;26:8;28:5,17
**bottom (7)**
5:20;7:21;8:2,17;
19:5,6,7
**bought (1)**
28:6
**bourbon (2)**
8:10;13:8
**brand (10)**
5:17;9:11,13;10:18,
19,22;11:21;21:21,
24;27:7
**breadth (1)**
15:5
**break (7)**
14:24;17:22;18:13;
23:12;25:21,22,24
**breakaway (1)**
25:21
**breaking (1)**
25:22
**brief (1)**
22:13
**briefly (1)**
24:14
**bring (2)**
2:4,16
**brings (2)**
14:7;23:2
**brown (3)**
6:11,19;18:25
**build (1)**
23:7
**built (1)**
17:18
**Bulleit (59)**
2:15;3:20;5:12;8:5,
10,18,19,21;9:6,7,11,
14;10:4,14;11:12,13,
22;12:13,19;13:7,11;
14:17,24;15:12,24;
16:1,19;17:11,14,15;
18:12;19:4,6;22:7,14,
16,20;23:3,8,13,15;
24:17,23;25:1,10,24;
26:1,5,7,16,19;27:7,7,
11,13,15,23,24;28:1
**buy (1)**
26:18
**buying (1)**
18:11

## C

**call (3)**
23:23,24;24:2
**called (1)**
2:1
**came (1)**
28:14
**can (14)**
2:16;3:16;4:15;5:2;
10:14;11:15;12:22;
17:24;18:15;20:10;
21:15;24:12;26:23;
28:2
**candidate (1)**
29:12
**candidates (1)**
29:3
**canteen (5)**
16:14;18:3,6;22:3,7
**canteen-shaped (1)**
15:3
**cap (4)**
9:20;11:5;13:1,2
**carefully (1)**
24:12
**case (9)**
2:1,16;9:14;11:23;
16:8;23:5,11;24:10;
28:16
**caused (1)**
9:4
**causing (1)**
17:20
**central (1)**
26:13
**certain (1)**
5:16
**certainly (1)**
9:25
**change (27)**
4:23;5:9;7:13,23,
24,25;9:25;9:25;10:1,1,
8;11:8;12:10;14:4,6;
16:10,13;18:2,19;
19:10;20:9;23:11;
24:14,15,16;29:3,4
**changed (3)**
19:8;24:22;25:10
**changes (14)**
4:19,25;5:4,6;6:16;
7:15,22;11:11;12:23;
13:2,5,6;18:1;28:12
**changing (1)**
12:14
**charge (1)**
9:10
**chest (1)**
8:13
**claiming (1)**
9:14
**clarified (1)**

18:25
**clarity (1)**
  23:25
**clean (2)**
  17:22;18:13
**clear (4)**
  15:21;20:1;21:8;
  28:12
**clearly (1)**
  19:12
**close (7)**
  15:22,24;22:20;
  23:23,24,25;24:2
**closer (3)**
  21:3;23:2;28:5
**closest (1)**
  28:13
**closure (4)**
  6:18,20;7:23,24
**co-counsel (1)**
  20:12
**colleague (2)**
  13:17;17:2
**color (4)**
  6:20,22;7:23;13:2
**coloration (6)**
  19:20,21,24;20:17,
  20,25
**colorful (1)**
  4:13
**combination (5)**
  4:25;5:6;9:9,15;
  10:5
**combined (3)**
  8:1,16;9:1
**commercial (14)**
  5:11;8:4,15;9:4;
  10:10;13:6;16:12;
  18:4,21;19:13,15;
  20:9;21:8;22:15
**communication (3)**
  7:16,18;18:18
**compare (1)**
  12:18
**comparison (1)**
  8:7
**competitor (1)**
  27:3
**complaint (2)**
  10:15,15
**complete (2)**
  25:21,22
**completely (5)**
  7:1;8:25;15:22;
  27:22;29:11
**compliant (2)**
  17:8,22
**complied (1)**
  17:4
**complies (1)**
  19:15
**comply (2)**
  19:17;20:20

**components (1)**
  10:21
**comprise (1)**
  10:13
**concave (2)**
  5:21;20:6
**conclude (1)**
  23:4
**conclusion (3)**
  13:3;26:3;29:7
**conduct (1)**
  23:17
**confuse (1)**
  26:17
**confusing (1)**
  14:17
**confusion (7)**
  11:15;12:6,11,13;
  26:12,14,15
**considered (1)**
  29:8
**considering (1)**
  17:4
**Consonant (1)**
  7:2
**constant (1)**
  25:19
**consumer (5)**
  8:20,21;19:23;
  21:23;28:19
**consumers (4)**
  16:20;25:23;26:17,
  21
**consumer's (1)**
  27:14
**continuing (1)**
  26:5
**contrast (1)**
  13:21
**controls (2)**
  5:15;16:7
**Convex (1)**
  10:21
**convey (5)**
  2:7;5:10;8:3;16:11;
  27:24
**conveying (1)**
  18:21
**conveys (3)**
  8:15,20;10:10
**convinced (1)**
  28:17
**cork (12)**
  6:11,18,20;7:23,24;
  9:1;11:5;18:23,23,23;
  19:1;23:2
**corner (1)**
  4:17
**corners (6)**
  3:15;4:6,7,7;11:1,1
**corollary (2)**
  9:22,24
**correspond (2)**

3:13,18
**counsel (7)**
  13:20,25;16:6;18:1,
  18;19:11;21:13
**couple (1)**
  11:15
**course (1)**
  17:15
**court (38)**
  2:1,2,18,21;3:1,4,6,
  22;4:22;5:2,7,24;6:5,
  13;7:18;12:21;13:13;
  17:3,5,7,8;20:16,25;
  24:4,6,9,25;25:6,12,
  15;26:2,11;27:8,16;
  28:2,6,8,11
**cover (2)**
  11:11;25:15
**covered (1)**
  28:8
**create (5)**
  10:7;13:5;24:22;
  25:11;27:11
**creates (2)**
  9:21,23
**creating (1)**
  27:13
**crowded (1)**
  16:21
**currently (1)**
  20:15
**customer (1)**
  18:8
**cut (2)**
  17:16;23:19
**cutting (1)**
  17:18

**D**

**decision (2)**
  17:5;29:9
**defendant (1)**
  22:15
**defendants (2)**
  2:11;24:22
**defendants' (1)**
  21:17
**defined (1)**
  25:4
**degree (1)**
  27:17
**denied (2)**
  29:6,13
**described (1)**
  24:21
**describing (2)**
  4:20;6:21
**design (21)**
  4:12;8:11;10:14;
  11:12;12:4,4;14:4,20;
  17:8,8,11,12,22;
  18:10;19:21;20:2,23;

22:13,18;23:16;27:23
**designed (2)**
  14:15;22:15
**designer (1)**
  22:4
**designers (1)**
  2:24
**designing (1)**
  22:11
**designs (1)**
  8:9
**despite (1)**
  29:1
**details (2)**
  3:22;4:1
**Deutsch (8)**
  5:9,16;11:22;14:8;
  20:14;22:11,19;23:6
**Deutsch's (1)**
  13:3
**Diageo (13)**
  9:10,14;10:13;
  11:21;12:3,4,24,25;
  13:25;14:5;22:2;
  23:10;25:4
**Diageo's (6)**
  9:13;11:20;14:20;
  19:10;22:12;23:6
**difference (3)**
  6:23,24;8:8
**differences (6)**
  3:14;4:1,5,6,19;7:8
**different (34)**
  4:4,11,11,20;5:10;
  8:3,4,23,25;9:2,3,4,9;
  10:9,10;11:3,3;13:6;
  15:2,17,23;16:3,12,
  15,23;18:16;21:8;
  26:6;27:12,17,20,22;
  29:2,11
**differentiator (1)**
  21:11
**dilute (4)**
  13:11;24:23;26:7;
  27:14
**diluted (1)**
  26:25
**dilutes (1)**
  14:20
**diluting (12)**
  11:22,24;14:9,17,
  22;15:11;17:9,23;
  21:19;22:11;23:6,12
**dilution (9)**
  11:16;12:7;26:4,20,
  20,23;27:2,5,18
**dilutive (1)**
  23:16
**dimensions (2)**
  15:5;22:5
**directed (1)**
  24:12
**direction (2)**

19:14;28:13
**disagree (1)**
  20:7
**disappeared (1)**
  13:8
**discernible (1)**
  28:20
**discuss (1)**
  13:22
**dissect (1)**
  14:16
**dissection (1)**
  16:23
**distance (2)**
  16:9;25:18
**distinct (4)**
  17:9,12;20:20;24:1
**distinctive (3)**
  9:21;10:7;15:3
**distinguish (2)**
  19:22;22:25
**distinguishable (2)**
  14:22;18:6
**distinguisher (1)**
  19:25
**distinguishing (1)**
  20:21
**divider (2)**
  10:21,23
**dividers (1)**
  6:25
**documents (2)**
  22:18,19
**dollars (1)**
  14:11
**dominant (2)**
  28:17,23
**done (3)**
  18:13;20:10;22:23
**doubt (1)**
  18:5
**down (1)**
  6:17
**Dr (10)**
  11:17,19;12:18,20,
  24;13:1,20,24;14:2,3
**drafting (1)**
  23:14
**dress (37)**
  2:15;3:20;4:23;8:5,
  22;9:6,7,21,23;10:4,
  14;11:12,13,16,22;
  12:20;13:8,11;23:7;
  24:18,24;25:2,4,5,11,
  24,24;26:1,16,22;
  27:7,11,13,15;28:1,
  18,24
**driven (2)**
  22:12,16
**driver (1)**
  21:20
**drives (2)**
  18:4;22:24

**due (1)**
14:18
**during (2)**
9:11;10:3

**E**

**earlier (2)**
7:7,17
**early (1)**
2:23
**easy (1)**
10:6
**either (2)**
20:2;27:3
**elaborate (1)**
8:10
**element (4)**
9:23;10:9;19:2,3
**elements (21)**
5:22;9:9,15;10:6,8,
13,16;11:7,12,15;
12:14;16:22,23;19:8;
20:11;21:22;22:6;
24:20;25:4,10;27:11
**elephant (1)**
18:3
**eliminate (1)**
14:9
**eliminated (5)**
7:1;10:17,23;11:6,7
**eliminating (1)**
12:1
**elimination (1)**
6:24
**else (2)**
18:14;28:1
**emboss (1)**
12:16
**embossed (15)**
4:14;5:20;6:24;7:1,
5,12;8:2;9:17,18,19;
10:18,19,21;12:1,5
**embossing (21)**
7:5,23;8:11,12,13,
19,19,24;12:15;
16:15;19:9,14;21:9,
14,21;24:15,25;27:21,
25;28:2,20
**empty (1)**
7:4
**enclosure (2)**
19:5,6
**enjoined (22)**
2:14;3:21;4:12,12;
5:17,19;6:20,25;7:13;
11:4;12:23;15:14;
17:13,17;19:3;20:19;
21:3,10;22:16,25;
25:23,25
**enjoining (1)**
14:3
**enough (12)**

4:23;9:25;15:11;
19:11;20:22;23:25;
26:6;27:17,20;28:22,
22;29:4
**entire (1)**
25:3
**equation (1)**
17:21
**equipment (1)**
2:5
**Eric (1)**
2:10
**essentially (5)**
2:24;3:15,17;4:3;
6:19
**estate (2)**
7:4;8:12
**even (4)**
11:13;12:25;19:18;
21:4
**eventually (1)**
26:25
**evidence (5)**
6:2;15:7;22:1,6;
24:10
**exact (1)**
25:16
**exactly (2)**
15:2;21:2
**examine (1)**
11:9
**example (4)**
8:1;11:14,16;20:11
**executive (1)**
9:10
**exhaustive (1)**
10:12
**Exhibit (1)**
3:24;21:16
**expensive (1)**
20:14
**experience (1)**
28:16
**experimenting (1)**
29:7
**explain (1)**
9:12
**explained (3)**
9:15;10:3;15:1
**extensions (1)**
16:3
**extreme (1)**
28:15
**eye (1)**
28:20

**F**

**face (2)**
5:24;18:15
**facial (1)**
26:25
**fact (3)**

8:13;9:2;12:24
**factor (2)**
20:21;28:17
**family (1)**
16:3
**famous (1)**
23:6
**far (4)**
14:8;15:11;23:1;
28:22
**features (1)**
5:17
**feel (15)**
7:22;8:3,8,15,25;
9:4,13;10:2,4,10;
12:13;15:17;17:23;
27:22,23
**felt (1)**
12:4
**few (1)**
21:12
**field (1)**
28:9
**filled (1)**
16:15
**final (1)**
2:24
**Finally (1)**
11:5
**find (2)**
26:14,15
**finding (1)**
14:8
**fine (3)**
12:3,24,25
**first (2)**
16:5;17:16
**five (1)**
15:17
**fix (1)**
16:16
**floor (1)**
22:4
**focus (2)**
21:17;25:2
**font (1)**
8:11
**forgive (1)**
27:10
**forgot (1)**
15:2
**forming (1)**
21:23
**forth (1)**
5:13
**found (7)**
10:14;17:19,20;
22:4,12;26:19,20
**four (17)**
3:6,9,11,14,15;4:2,
4,5,5,7,7,20;6:3;11:1,
1;15:16,24
**four-corner (1)**

7:10
**frame (2)**
11:2,3
**framed (1)**
5:3
**framing (3)**
4:7;7:10;11:1
**fresh (2)**
14:14;29:4
**frond (4)**
5:20;8:1,2;20:6
**front (17)**
3:9;6:7,9;7:8,9;8:6,
7,12,24;9:17;11:18;
12:2,12;13:18;16:2;
18:25;21:6
**frontier (1)**
8:14
**full (1)**
27:18
**fundamentally (1)**
15:9

**G**

**gets (1)**
6:19
**gives (1)**
21:7
**glance (6)**
9:2;11:13;14:21;
16:20,24;23:1
**glass (7)**
5:9;9:16;16:11,13;
20:1,23;25:3
**goes (4)**
6:14;8:17;14:20;
29:12
**Good (5)**
2:9;3:4;13:15;
18:24;20:11
**goodwill (1)**
23:14
**governed (1)**
5:13
**governs (2)**
25:20,20
**graphic (3)**
4:4;8:6;11:18
**greater (2)**
9:8,24
**green (1)**
29:1
**gritty (1)**
27:23
**group (1)**
21:17
**guess (1)**
15:4

**H**

**half (1)**

24:6
**hand (3)**
13:17;17:3;20:12
**handed (2)**
3:5,8,12;15:14
**happen (1)**
27:1
**happened (1)**
26:23
**happening (1)**
27:3
**happy (1)**
24:3
**harbor (1)**
20:5
**hard (3)**
22:8,25;29:9
**harder (1)**
27:23
**hard-fought (1)**
23:5
**harm (1)**
27:5
**hear (1)**
27:18
**heard (6)**
14:13;15:8,9;19:20;
21:13;24:10
**hearing (3)**
15:19;19:18;25:6
**held (2)**
17:7,8
**higher (2)**
7:3,6
**honest (1)**
23:1
**Honor (39)**
2:9,20;3:3,5,19,24;
4:3;5:8;6:4,15;7:7,17;
11:9,19;12:18;13:15;
15:7,16;16:2;17:1,20;
20:13,19,21;23:5,23,
24;24:3,5,8,13,19;
25:8,14;26:10;28:4,
10;29:14,15
**Honor's (9)**
5:14;14:19;16:7,17;
17:5;19:16;20:4;21:7;
22:14
**huge (1)**
18:20

**I**

**identified (1)**
25:10
**illustrates (1)**
11:14
**image (1)**
9:13
**immediate (1)**
8:21
**immediately (1)**

28:19
**important (7)**
4:17;15:8,25;17:6;
21:16,22;22:19
**impression (15)**
5:11;8:5,15,21;9:4;
10:10;13:6;16:12;
18:4,21;19:13,15;
20:9;21:9;22:15
**impressions (1)**
21:23
**including (3)**
5:17;15:18;16:3
**incorporate (1)**
7:12
**incorporates (3)**
2:15;3:20;5:22
**increase (1)**
12:5
**increasing (1)**
12:3
**individual (3)**
9:23;10:5,8
**inextricably (1)**
19:24
**informed (1)**
16:8
**infringement (1)**
26:13
**infringes (1)**
14:20
**infringing (3)**
11:21,24;14:9
**injunction (17)**
5:8,13,15,16;13:4,
22;14:3;15:18;16:18;
17:17;20:5;21:7;23:9,
18,25;24:19;25:20
**injunctions (1)**
16:9
**injury (1)**
17:21
**inquiry (1)**
25:2
**inspect (1)**
2:13
**instantly (6)**
13:25;14:22;17:8,
12;18:5;24:1
**instead (1)**
4:7
**instructions (1)**
25:7
**intended (1)**
27:24
**interested (1)**
2:6
**interpreting (1)**
14:19
**into (2)**
7:12;23:15
**intricate (2)**
19:21;20:1

**irreparable (1)**
17:20
**isolation (1)**
19:11
**issue (2)**
2:16;9:7
**issued (1)**
17:5

**J**

**Judge (1)**
14:14
**jury (11)**
9:12;14:2;17:19;
22:3,8,12;23:5;25:7;
26:14,15,19

**K**

**keep (1)**
29:7
**key (2)**
16:20;20:8
**kind (2)**
26:23;29:3
**Kleenex (1)**
26:24

**L**

**label (41)**
3:16,16,22;4:6,8,10,
18,22;5:4,19;7:2,6,8,
11,13,15,19,21,25;
8:16;9:1,16;10:18,23,
24;11:1,4;12:3,6,12;
16:1,4;18:18,20;
19:21;20:3,6;21:21;
22:24,25;23:1
**labels (13)**
3:11,12,18;4:1,16,
19;7:9;9:2;15:21;
16:3;18:14,15;22:22
**language (4)**
5:13,15;14:21;16:6
**Lanham (1)**
16:9
**large (1)**
12:12
**larger (3)**
7:2,6;9:1
**last (5)**
13:16,19;15:19;
18:8;19:18
**laterally (1)**
6:13
**launch (1)**
23:21
**law (3)**
3:25;16:8;23:18
**leaving (1)**
28:21

**Lee (13)**
5:14;15:18;17:2,7;
19:17,20,22;20:1,16,
19;21:3,4;28:14
**left (4)**
6:2;15:14;18:9;
29:6
**lettering (8)**
6:24;7:1,5;9:17,18,
19;12:1,5
**lie (1)**
4:5
**light (1)**
6:19
**lightened (1)**
18:23
**lighter (2)**
6:18;9:1
**likelihood (3)**
26:12,15,20
**line (4)**
10:19;14:23;15:12;
17:23
**lines (1)**
10:24
**liquor (1)**
16:21
**list (2)**
10:16;18:1
**lists (1)**
10:12
**litigated (1)**
13:23
**litigation (1)**
9:12
**little (2)**
7:6;19:7
**logic (2)**
26:3;27:2
**logo (2)**
4:18;7:16
**long (2)**
23:4;28:19
**longer (1)**
7:11
**look (24)**
2:25;8:3,23,25;9:3,
13;10:1,4,9,12;12:13;
15:17;16:24;17:15,
23,24;18:5,14;19:6,
11,12;27:12,12,22
**Looking (3)**
10:16;15:21;16:5
**looks (2)**
10:1;18:7
**loss (1)**
27:6
**lost (1)**
19:24
**lot (8)**
21:13,13,17,18;
22:1,5;23:9;24:10
**lower (1)**

4:17

**M**

**main (2)**
4:6;25:9
**major (1)**
29:3
**makes (3)**
8:18;12:23;13:5
**making (2)**
14:4;20:18
**many (3)**
11:7,11;12:22
**mark (4)**
10:14;26:22,24;
27:1
**marked (1)**
3:12
**market (4)**
14:1,10;20:15;
21:19
**marketplace (1)**
23:13
**material (3)**
4:23;18:19;22:23
**may (3)**
17:3;24:5;26:10
**Maybe (1)**
13:16
**McGillicuddy (5)**
12:18,21;13:1,20;
14:4
**McGillicuddy's (6)**
11:17,19,21;12:24;
13:24;14:2
**mean (1)**
25:8
**meaningful (2)**
13:5;23:11
**meaningfully (1)**
24:22
**means (1)**
2:22
**meets (1)**
13:4
**memorandum (2)**
3:23,25
**memory (1)**
24:9
**mention (1)**
15:2
**mentioned (1)**
23:2
**merits (1)**
29:8
**meticulously (1)**
18:2
**microphone (1)**
25:22
**might (3)**
13:18;25:23;27:1
**million (1)**

14:11
**millions (1)**
14:11
**mind (2)**
27:6,14
**minds (1)**
19:23
**mistake (3)**
14:22;17:9,12
**mockup (5)**
2:12,19,21,25;3:8
**model (1)**
2:24
**modified (1)**
15:5
**mold (8)**
9:16;16:13,15;
24:16,17,17;25:3;
27:25
**month (2)**
17:5;23:21
**months (1)**
17:1
**moral (1)**
28:25
**more (8)**
4:13;10:12;12:25;
15:25;20:14;23:22;
28:16,17
**most (4)**
4:16;6:7,9;27:11
**motion (2)**
3:25;5:14
**move (1)**
25:17
**moved (1)**
7:6
**moving (2)**
6:16;12:2
**much (3)**
8:16;15:4;19:19
**muted (1)**
4:15

**N**

**name (6)**
2:9;5:18;10:18,20,
22;20:7
**narrow (1)**
26:2
**nature (1)**
28:22
**nauseam (1)**
24:21
**need (1)**
10:8
**new (17)**
2:18,19;6:3;7:10,
12;11:9,12;15:10;
17:11,11;18:10;
20:22,25;23:1,15,21;
28:13

**next (10)**
15:20,24;16:17,25;
17:25;21:15,25;
22:10,17,21
**noncompetitor's (1)**
27:4
**non-diluting (1)**
10:11
**note (4)**
6:6,9;15:25;19:4
**noted (1)**
7:7
**notice (2)**
7:1;21:9
**November (1)**
17:5
**number (2)**
14:12,13

**O**

**object (1)**
21:10
**objected (2)**
13:25;14:5
**obvious (2)**
18:3;25:9
**off (10)**
14:24;17:16,18;
18:23;19:9;21:13;
23:12,14,19;26:14
**offer (1)**
24:7
**OK (3)**
5:7;6:5;12:14
**old (3)**
18:7;21;19:1
**Once (1)**
20:10
**one (22)**
3:6;4:17;6:2,3,6,9;
7:9;9:15;10:12;11:11,
14;14:12;15:2,16,20;
18:25,25;26:18,18;
28:15,15,21
**ones (1)**
24:21
**only (1)**
23:10
**open (1)**
2:1
**opposing (1)**
13:20
**opposite (1)**
15:22
**option (6)**
3:8,13,17;4:6;7:8,9
**options (11)**
3:17;4:4,9,10,14,15,
18;7:11;10:25;11:2;
23:20
**orange (1)**
16:1

**order (17)**
5:14;14:19,21;
15:23;16:7,7,8,10,18;
17:5,7;19:16;20:5,20,
23;22:14;23:9
**orders (1)**
2:4
**ornate (1)**
4:13
**others (1)**
19:8
**otherwise (2)**
22:8;23:13
**out (7)**
8:19;16:18;17:21;
19:7;25:10;27:18;
29:10
**over (2)**
18:24;26:25
**overall (6)**
8:1;12:13;16:24;
19:13,15;20:9
**overcome (1)**
29:9
**overwhelming (1)**
28:23
**own (6)**
21:17,18;26:24;
27:1;29:7,8
**owns (1)**
11:21

**P**

**package (9)**
10:2,7,9;11:4;
12:12;15:12;17:4,13;
23:12
**packaging (25)**
2:14;3:21;4:13;
5:10,17,20;6:25;7:14;
11:20,23,25;12:23;
13:24;14:2;16:11;
17:17;18:7;19:4;21:3,
6,10;22:16;24:23;
25:25;26:16
**painted (1)**
28:25
**paints (1)**
13:21
**paper (2)**
4:14;12:12
**paragraph (1)**
10:15
**parallel (1)**
10:24
**particular (1)**
26:21
**particularly (2)**
26:22;27:21
**parties (1)**
29:6
**parts (4)**

**9:9,24,25;10:1**
**people (1)**
12:16
**perception (1)**
21:21
**period (1)**
9:11
**permanent (2)**
14:3;16:18
**permission (2)**
2:17;24:7
**permits (1)**
5:16
**permitted (1)**
5:23
**perspective (2)**
12:10;19:10
**persuade (1)**
22:8
**photograph (2)**
11:19;13:17
**photographs (1)**
2:7
**phrase (1)**
9:8
**physical (3)**
2:12;3:9;12:20
**pick (2)**
13:16,19
**picked (1)**
19:8
**picking (1)**
19:3
**picks (1)**
28:19
**place (1)**
18:17
**placed (1)**
16:1
**placement (2)**
9:19;18:19
**plain (1)**
14:21
**played (1)**
25:7
**Please (2)**
2:2;5:2
**plenty (1)**
23:20
**point (12)**
13:16,19;14:12,13,
25;20:4,18;21:5;
25:15,17;27:8,9
**popularity (1)**
27:1
**portion (1)**
8:17
**pose (1)**
27:18
**position (2)**
13:3;28:24
**positioned (1)**
7:3

**positioning (1)**
7:25
**possible (1)**
22:20
**preamble (1)**
20:8
**pre-prohibition (1)**
5:18
**presence (2)**
15:6;28:19
**present (1)**
29:3
**presentation (2)**
14:13;19:20
**presented (1)**
22:5
**pretty (4)**
15:21;18:3;24:12;
28:8
**prevent (2)**
27:2,2
**primary (1)**
21:20
**prior (1)**
24:21
**probably (1)**
28:25
**problem (2)**
18:12,20
**proceed (1)**
2:8
**proceeding (3)**
16:7;17:6;24:21
**proceedings (1)**
5:12
**produced (1)**
2:24
**product (5)**
14:23;15:14;17:23;
23:9;27:17
**products (1)**
15:17
**prominence (1)**
8:11
**prominent (1)**
6:23
**proper (2)**
14:18;25:2
**proposals (1)**
6:3
**proposed (26)**
2:13,18,19;3:15;
5:1,22;6:8,11,16,19;
10:17;11:6,10;12:19,
22;13:1,4,7,10;15:20;
20:2,22;24:14;26:1;
27:17,21
**proved (1)**
22:2
**provided (1)**
10:13
**public (1)**
27:6

**purpose (2)**
23:9;26:3
**put (3)**
4:3;18:24;21:6

**Q**

**qualify (1)**
29:5
**quick (1)**
16:16
**quickly (2)**
14:6;15:7
**quite (1)**
29:1

**R**

**raised (4)**
6:24;9:17,18,19
**reached (1)**
23:5
**real (3)**
7:4;8:12;23:10
**reality (1)**
2:7
**really (13)**
2:6;9:20;13:21;
14:25;17:10;18:19;
20:11;21:14,22;22:7;
23:10;26:20;28:11
**reason (1)**
14:7
**reasons (1)**
14:16
**rebuttal (4)**
24:5,8,12;25:9
**recall (3)**
16:2;17:1;19:19
**rectangle (2)**
4:13,14
**rectangular (7)**
4:8,11;7:11;10:25;
11:2,3;19:7
**red (1)**
29:1
**Redemption (28)**
2:14;3:21;4:12;5:9,
18,21;6:1;8:23,24;
11:4;12:25;13:10;
14:1;15:15;16:11;
18:8;20:7,15;23:7;
24:23;25:25;26:4,6,9,
16,18;28:12,14
**redesign (31)**
2:13;3:15;5:1,22;
6:8,11,17,19;8:4;9:5;
10:17;11:6,10,10,25;
12:1,19,19,21,22,24,
25;13:2,4,7,10;15:20;
24:14;26:1;27:12,21
**redesigned (1)**
8:24

**redesigning (1)**
21:19
**refer (3)**
2:25;3:16;13:18
**referencing (1)**
22:14
**referral (1)**
25:19
**referring (1)**
6:18
**refers (2)**
7:18,20
**regarding (1)**
5:14
**rejecting (1)**
17:7
**relevant (1)**
9:11
**remedy (3)**
23:10,10;26:4
**remember (4)**
13:24;22:13,18;
25:16
**remind (1)**
15:16
**removal (3)**
7:22;12:5;19:13
**removes (1)**
24:15
**removing (2)**
7:4,5
**repeat (1)**
25:9
**repeated (1)**
24:11
**repeating (1)**
27:10
**repetition (1)**
27:19
**report (1)**
21:17
**requirements (1)**
13:4
**requires (8)**
5:8;15:23;23:18,18;
25;24:1,19,22
**research (1)**
21:19
**resemblance (6)**
5:12;9:6;11:13;
13:7,9;16:19
**resemble (1)**
9:3
**respect (3)**
10:24;11:1;14:18
**respectfully (2)**
11:8;28:4
**respond (1)**
26:10
**responded (1)**
12:11
**result (1)**
27:3

**resulted (1)**
7:4
**retain (4)**
5:16,23;8:3;20:10
**retained (1)**
13:1
**revenue (1)**
14:11
**revival (1)**
5:18
**rewarding (1)**
23:16
**rid (1)**
6:20
**right (16)**
3:7;5:24;6:2,7,7,8,
8,9;15:20,24;19:14;
21:7;23:15;28:7,13,
15
**rightfully (1)**
16:6
**right-hand (1)**
4:17
**rights (4)**
9:14;14:20;17:20;
22:12
**risen (1)**
24:6
**risk (1)**
27:18
**ROMAN (34)**
2:9,10,19,23;3:3,5,
7,24;4:25;5:4,8;6:4,6,
14;7:20;13:13;24:5,6,
7,13;25:1,8,12,14,17;
26:10,12;27:9,20;
28:2,4,7,10;29:14
**room (2)**
8:18;18:4
**rule (2)**
16:9;25:18
**rye (4)**
5:18;15:15;16:3;
20:6

**S**

**safe (3)**
16:9;20:5;25:18
**sales (3)**
26:5,7,14
**same (10)**
15:3,5,17;16:13,14;
18:11,16,17;19:25;
21:9
**sample (3)**
2:12;3:21;12:20
**samples (2)**
2:13;3:19
**satisfactory (2)**
28:14;29:2
**saying (1)**
17:15

**Sazerac (3)**
11:20,25;12:10
**Schiff (1)**
2:10
**scope (2)**
13:22;14:19
**scratch (1)**
23:19
**screen (2)**
4:3;11:18
**seated (1)**
2:2
**second (4)**
5:24;6:23;9:16;
25:17
**seeing (3)**
2:6;12:16;18:9
**sees (1)**
8:20
**selling (2)**
14:23;17:19
**separate (1)**
22:6
**Servodidio (6)**
13:14,15;20:18;
21:2;24:4;29:15
**set (2)**
5:13;16:18
**settlement (2)**
14:5,6
**seven (2)**
10:16;25:10
**several (1)**
9:15
**shape (27)**
9:16;10:25;16:14;
18:3,6;21:8,11,12,14,
20,22;22:3,3,7,13,16,
20,24;24:16,17;25:3;
27:24;28:18,24;29:1,
9,11
**shelf (3)**
12:17;15:6;16:21
**shop (1)**
16:20
**shopping (2)**
12:16;28:5
**short (1)**
24:12
**shoulders (1)**
15:6
**show (1)**
14:15
**showed (3)**
3:2;13:25;14:4
**showing (2)**
20:13;22:19
**shows (1)**
4:4
**side (2)**
15:14;28:22
**side-by-side (1)**
8:7

**signed (1)**
2:4
**significant (3)**
8:8;21:11;22:23
**significantly (1)**
18:16
**silkscreen (2)**
19:21;20:1
**similar (5)**
18:14;22:14,16,24;
26:17
**similarities (1)**
12:22
**simple (1)**
28:11
**Simply (1)**
5:4
**six (8)**
10:16;14:1,10;
17:19;18:8;23:8,16;
25:10
**size (5)**
7:24;9:19;12:3,5;
18:16
**slide (10)**
16:6,17,25;17:25;
18:9;21:15,25;22:10,
17,21
**slightly (3)**
7:2,3,5
**slow (1)**
27:5
**softer (1)**
7:12
**sold (2)**
14:10;23:8
**sort (3)**
4:7,9:7;27:23
**sounds (1)**
25:6
**specific (1)**
24:20
**spent (3)**
14:11;15:3;21:17
**Spread (1)**
6:13
**square (2)**
20:3;22:24
**stages (1)**
2:23
**standard (2)**
25:19;26:8
**stands (1)**
8:19
**stark (1)**
13:21
**start (3)**
15:13;16:5;23:19
**started (1)**
16:6
**stated (1)**
9:20
**step (1)**

**19:14,18**
**sticking (1)**
19:7
**still (2)**
5:25;18:20
**stop (1)**
26:4
**store (3)**
16:21;18:10;22:4
**straight (1)**
18:15
**strength (1)**
20:14
**stressing (1)**
10:6
**striking (1)**
29:10
**strip (1)**
8:16
**strongly (1)**
7:22
**structure (2)**
7:16,18
**subject (2)**
15:18,19
**submit (2)**
19:17;24:2
**substantial (1)**
20:9
**substantially (6)**
5:10;8:3,4;9:4;
13:5;16:12
**substitute (1)**
29:10
**success (1)**
26:24
**successive (1)**
28:12
**sufficient (4)**
5:5;12:4,6;29:4
**suggesting (1)**
11:9
**suggestion (1)**
29:8
**suit (1)**
11:20
**sum (2)**
9:8,24
**superficial (2)**
5:11;16:19
**support (1)**
3:25
**supported (1)**
23:6
**supporting (1)**
16:8
**Sur (13)**
5:14;15:18;17:2,7;
19:17,20,22;20:1,16,
19;21:3,4;28:14
**sure (1)**
2:21
**Surely**

4:22
**surprised (1)**
2:5

**T**

**talk (1)**
21:14
**talked (1)**
15:1
**talking (9)**
8:18;10:3,5;15:13;
21:18;24:25;25:1,13;
27:16
**tapering (1)**
15:6
**tax (10)**
6:10,11,12,14,21;
7:24;9:1;18:22,24;
19:5
**telling (1)**
23:20
**tended (1)**
27:2
**tendered (1)**
26:8
**tenet (1)**
26:13
**tentatively (1)**
29:7
**terms (2)**
5:18;9:6
**test (2)**
16:18,22
**testified (2)**
9:12;12:8
**therefore (2)**
13:9;14:23
**thin (1)**
8:16
**thinking (1)**
26:18
**thinner (1)**
8:16
**third (1)**
9:17
**though (1)**
24:9
**three (2)**
3:10,11
**three-week (1)**
22:1
**tier (3)**
20:12,14;21:6
**ties (1)**
17:14
**tired (1)**
9:8
**tissue (1)**
26:25
**today (3)**
4:20;13:21;14:7
**today's (1)**

17:6
**together (3)**
3:11;9:20,22
**told (1)**
21:20
**took (2)**
18:23;19:9
**top (7)**
6:10,13,14,17;
10:19;11:5;19:2
**totally (1)**
8:23
**trade (37)**
2:15;3:20;4:23;8:5,
22;9:6,7,21,23;10:4,
14;11:12,13,16,22;
12:20;13:8,11;23:7;
24:17,24;25:2,4,5,11,
24,24;26:1,16,22;
27:7,11,13,15;28:1,
18,24
**trademark (3)**
24:24;25:1;26:13
**trading (1)**
23:7
**transitioning (1)**
23:15
**trial (13)**
6:2;10:3;11:14;
12:9;13:23;14:2,15;
15:4,8,15,25;21:16;
22:1
**tried (1)**
22:7
**trivial (1)**
19:10
**trying (1)**
19:19
**turn (2)**
17:24;21:15
**tweaks (1)**
18:18
**two (9)**
8:9;12:14;13:9;
14:13;15:21;17:1;
18:5;22:22;26:17
**type (2)**
25:19;27:2

**U**

**ultimately (1)**
17:14
**undertake (1)**
5:9
**unequivocal (2)**
17:22;21:8
**unique (4)**
9:21;22:3,5,7
**unsuccessful (1)**
22:9
**up (18)**
2:16;3:5,8,12;4:3;

8:12;10:13;13:16,17,
19;14:17;17:3,18;
19:3,8;20:12;23:7;
28:19
**upper (3)**
20:12,14;21:6
**use (8)**
9:7;19:1;20:5,6,6,7;
21:7;24:11
**used (1)**
18:8
**using (1)**
22:24

**V**

**vacuum (1)**
17:11
**variations (9)**
3:9,10,14,18;4:2,5,
16,21,22
**varying (1)**
10:7
**verdict (1)**
23:6
**versa (1)**
26:19
**version (1)**
20:15
**versus (1)**
17:11
**vice (1)**
26:19
**victim (1)**
26:24
**vintage (2)**
8:14;27:23
**violated (2)**
17:19;22:12
**violation (1)**
15:10
**virtually (2)**
18:16,17

**W**

**walk (1)**
15:7
**walked (1)**
18:1
**way (4)**
5:3;19:15;23:23;
29:12
**ways (2)**
21:2;23:2
**Welcome (1)**
2:3
**well-known (2)**
26:22,22
**whatsoever (1)**
8:25
**whiskey (1)**
11:19

**whole (6)**
9:8,24;10:1;11:8;
16:2;19:20
**within (3)**
3:15;4:5;10:25
**without (5)**
10:7;20:6;27:19,21,
25
**witnesses (1)**
21:18
**word (2)**
5:25;22:22
**words (8)**
2:21;5:25;7:19,20;
10:8;12:8;21:12;
25:16
**worse (1)**
21:2
**worth (1)**
14:11
**wrong (1)**
15:10

**Y**

**years (6)**
14:1,10;17:19;18:8;
23:8,16

**1**

**1 (7)**
3:8,17;4:6,9,18;7:8;
10:25
**13a (1)**
10:15

**2**

**2 (7)**
3:17;4:10,14,15,18;
7:11;11:2

**3**

**3 (6)**
3:17;4:6,9,18;7:9;
10:25

**4**

**4 (6)**
3:17;4:10,14,15;
7:11;11:2

**7**

**7 (1)**
17:5

SPA-83

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -X

DIAGEO NORTH AMERICA, INC.,

                    Plaintiff,              17 Civ. 4259 (LLS)

            - against -                          ORDER

W.J. DEUTSCH & SONS LTD. ET AL.,

                    Defendants.
- - - - - - - - - - - - - - - - - - - -X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/8/22

     Deutsch's Motion for a Pre-Release Compliance Determination

Under the Permanent Injunction (Dkt. No. 504) is denied for the

reasons stated on the record at the December 7, 2022 hearing.

     So ordered.

Dated: New York, New York
       December 8, 2022

                              _____
                              Louis L. Stanton
                              LOUIS L. STANTON
                              U.S.D.J.